**STANDARD MANUFACTURING
COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 641–85C.

United States Claims Court.

Dec. 20, 1991.

James F. Hibey, Washington, D.C., for plaintiff, Michael O'Neil, Dallas, Tex., and Herbert J. Hammond, Dallas, Tex., of counsel.

Richard J. McGrath, John Fargo and Vito J. DiPietro, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, D.C., with whom was the Asst. Atty. Gen., for defendant.

## OPINION

HORN, Judge.

The plaintiff, Standard Manufacturing Company, Inc. (Standard), is the owner of United States Patent No. 4,522,548 (the '548 patent), issued June 11, 1985, for an "Aerial Weapons Handling Trailer." The plaintiff filed this case under 28 U.S.C. § 1498 (1988), seeking reasonable and entire compensation for the defendant's use of its patented invention in two aerial weapons handling trailers, designated as the MHU–196/M and MHU–204/M trailers. These trailers are used in loading weapons into the B–52, B–1B and Advanced Technology Bombers (B–2).

The court previously granted the plaintiff's Motion for Leave to File its Second Amended Complaint, in which the plaintiff withdrew its claim of infringement as to Claims 1, 2, 4, 10 and 16–19 of the plaintiff's patented invention, leaving only Claim 9 in the suit. The validity of Claim 9 of the patent in suit and the enforceability of the patent were tried before this court for nine days. The issues of liability and damages were bifurcated, with the issue of damages deferred until after the court's determination of liability. The defendant in this lawsuit has conceded that if the patent in suit is found valid and enforceable, then the defendant has made unau-

thorized use of the patent and is, therefore, liable to the plaintiff for reasonable compensation for such improper use.

The defendant raises two challenges to the validity and enforceability of Claim 9 of the patent in suit. First, the defendant contends that Claim 9 is invalid under 35 U.S.C. § 103 (1988), alleging that the subject matter would have been obvious to one of ordinary skill in the art at the time the invention was made. A subsidiary issue, which is part of the defendant's obviousness defense, is whether certain work performed in 1976–1977 by the plaintiff's competitor, Aircraft Armaments Incorporated (AAI), on the development of a proposed trailer known as the MHU–145/M, constitutes prior art upon which the obviousness of the patented invention in suit should be judged. Moreover, the defendant asserts that even if Claim 9 is valid, the patent in suit is unenforceable due to the inequitable conduct of the inventors and their counsel during the prosecution of the patent before the United States Patent and Trademark Office.

The court has carefully reviewed the testimony of each witness who appeared at the trial. On behalf of the defendant, Dr. James Kirk, qualified as a technical expert; Professor Martin Adelman, qualified as a "legal expert" in the field of patent law; Theodore Alfriend, the lead engineer for AAI Corporation during the period at issue in this case; Thomas DeSalvo, the AAI designer of the accused device; Robert A. LeBlanc, a munitions handling engineer for the Air Force; and inventors, Robert R. Dean and Harry S. Mankey, (the last two as adverse witnesses) were called by the defendant. For the plaintiff, Judge Joseph V. Colaianni, qualified as a "legal expert;" Norman D. Oswald, President of Standard Manufacturing Company; Harry Mankey, former engineer at Standard; John F. Bryan, Jr., plaintiff's technical expert; Colonel Richard Grammer, former Director of Munitions for the Strategic Air Command; William C. Blackwell, former Munitions Superintendent for the Strategic Air Command and employee of Standard; Conrad G. Armstrong, former Deputy for Strategic and Space Systems; Charles H. An-

thony, Manager of the MHU–145 Project at Eglin AFB; Stuart J. Millman, Patent Examiner; Gregory W. Carr, attorney with Gardere & Wynne; and Theodore Alfriend, called as an adverse witness. The court also has examined all the pleadings and documents filed with this court by both parties, including correspondence; contract documents for the plaintiff and their competitors; design notes; the patent documents, consisting of the file wrapper, photographs, drawings and models; and, where specifically designated, the deposition testimony, admitted by the court, attached to the Plaintiff's Motion to Admit Deposition Testimony. For the reasons discussed below, the court finds in favor of the plaintiff on the issue of liability and holds that the plaintiff has a properly prosecuted and valid patent, which was prosecuted in good faith and, therefore, has been infringed upon by the government.

## BACKGROUND

The plaintiff, Standard, filed this action under 28 U.S.C. § 1498 (1988), to recover reasonable compensation for the government's use of the subject matter claimed in the '548 patent, entitled "Aerial Weapons Handling Trailer." The '548 patent was filed on September 28, 1982, by the inventors: Norman D. Oswald, Robert R. Dean and Harry S. Mankey, and assigned to the plaintiff.

In its First Amended Complaint, Standard asserts that Claims 1, 2, 4, 9, 10, 16, 18 and 19 of the '548 patent cover the MHU–196/M trailer, which is a large capacity munitions handling trailer used for loading the B–1B and the B–52 bombers. This court scheduled the trial in the instant lawsuit, following discovery and the filing of, and subsequent dismissal of, a related case in which the plaintiff alleged that the government had breached an agreement with the plaintiff by improperly disclosing certain proprietary information, namely the patented invention, contained in an unsolicited proposal submitted by the plaintiff to the government. Narrowing the issues for trial, the court granted the plaintiff's Motion for Leave to File its Second Amended

Complaint, withdrawing its claim of infringement as to Claims 1, 2, 4, 10 and 16–19 of the plaintiff's patented invention, leaving only Claim 9 in the suit. Presently, the devices accused of infringing the asserted Claim of the '548 patent are the MHU–196/M and the MHU–204/M munitions handling trailers (MHT's). The MHU–196/M is a weapons loading trailer used by the defendant to load the B–52 and B–1B bombers. The MHU–204/M is an adaptation of the MHU–196/M trailer, modified for the purposes of loading the Advanced Technology Bomber (B–2).

Based upon the record and the testimony and evidence submitted at trial, the court determines the following to be the relevant facts of the case presented for its review.[1]

### The Prior Art MHU–7/M, MHU–33/M and MHU–123/M Trailers.

The plaintiff, Standard, is a privately held corporation organized under the laws of the State of Texas. Standard has its principal place of business at 4012 West Illinois, Dallas, Texas. For over thirty years, Standard has been in the business of designing, developing, testing, manufacturing and supporting vehicles and special equipment for military and industrial use. A major part of Standard's business is the design, development, manufacture and support of munitions handling equipment (variously known as munitions handling trailers (MHT), munitions handling units (MHU), or munitions lifting trailers (MLT)), also known as weapons loaders, for the United States Armed Forces, for use in loading bombs, missiles and other aerial weaponry into or onto military aircraft. Thousands of weapons loaders designed, developed and manufactured by Standard are in use by the Armed Forces of the United States and those of more than forty other countries throughout the world.

Standard began its participation in the weapons loading industry in 1953 with its design of the MJ–1. The MJ–1 was a powered vehicle capable of transporting a bomb or missile weighing several thousand pounds to an aircraft and precisely positioning the load to mate with an attachment fixture on the aircraft. Standard's activity in the industry continued with the MJ–4, a vehicle designed and adapted to load heavier weapons packages onto the F–4 Phantom fighter aircraft.

In the late 1950's, when the mainstay of the strategic bomber force of the United States Air Force (USAF) was the B–52 bomber, Standard submitted an unsolicited proposal to the USAF and later was awarded a contract to design and develop a trailer known as the MHU–7/M. This trailer replaced fourteen pieces of equipment previously used to load the B–52. The MHU–7/M was subsequently upgraded to increase its load capacity and Standard apparently was awarded a contract for the drawings and prototype loader which was designated as the MHU–33/M. Later, when the MHU–33/M was modified to increase further its loading capacity, it was re-designated by the USAF as the MHU–123/M. In 1982, Standard submitted an "Unsolicited Proposal" to the United States Air Force for the manufacture of upgrading kits which were to be incorporated in the MHU–7/M and MHU–123/M trailers previously procured. The kits included a "power inching mechanism" designed by Standard.

By stipulation of the parties, the designs of the MHU–7/M, MHU–33/M and MHU–123/M (MHU–7–33–123/M) trailers are to be considered by this court as identical in all respects material to this case. Also by stipulation of the parties, the MHU–7–33–123/M trailers may be considered a part of the relevant prior art, within the meaning of 35 U.S.C. §§ 102 and 103 (1988).

1. Although the defendant contends that the court should not make findings of fact with respect to the procurement history of the weapons loading trailers at issue in this case, the court has concluded that such findings are, to a limited extent, necessary to properly address the factual issues concerning a legal determination of the unobviousness of the patent in suit.

8

Figure 1.

LH FRONT FLOODLIGHT
TOOL BOX
FRONT END HYDRAULIC ASSEMBLY
BRAKE WINCH
ARC COMPENSATOR
LIFT ARM
MAIN CONTROL AREA
CIRCUIT BREAKER BOX AND EXTERNAL POWER RECEPTACLE
TILT MECHANISM
LIFT BEAM

Type MHU-33/M Bomb Trailer

The MHU–33/M and MHU–123/M trailers, depicted in Figures 1 and 2, have a U-shaped frame formed by two longitudinal beams, interconnected by a cross beam located at the forward end of the frame. Each longitudinal beam has an inside (or inner) and outside (or outer) surface. The distance between the outer surfaces of the longitudinal beams is greater than the distance between the inner surfaces of the longitudinal beams.

Figure 2.

# MHU-123M

The frames of the MHU–7–33–123/M trailers are supported by four wheels, two located at the front and two located at the back of the frame. Two hydraulically actuated lift arms are pivotally mounted at their proximal ends to the inner surfaces of each of the longitudinal beams of the frame for lifting the weapons load from the ground to an intermediate position for transport, and then upwardly for attachment of the load to the aircraft. Secured to the distal ends of the lift arms on each side of the MHU–7–33–123/M frames is a lift beam, used to support one side of a weapons load carried by the trailer. The narrower portion is that portion of the lift beam associated with the front of the trailer and is also that portion of the lift beam to which the forward lift arm is connected for pivotal and sliding motion with respect to the lift beam. The wider portion of the lift beam is that portion of each beam associated with the rear of the trailer and is also that portion of the lift beam to which the rear lift arm is connected for pivotal and sliding motion with respect to the lift beam. The lift beam has a narrower, forward portion and a wider, rearward portion. Significantly, the distance between the outer surfaces of the lift beams at the rear of the MHU–7–33–123/M trailers is greater than the distance between the outer surfaces of the lift beams at front of the trailer. In the MHU–7–33–123/M, however, there are no differences in the distance between the inner surfaces of the lift beam at the forward or narrower portion of the lift beam and the distance between the inner surfaces of the lift beam at the rearward or wider portion of the trailer. The distance between the outer surfaces of the narrower portion of the lift beams at the front of the MHU–7–33–123/M trailers is greater than the distance between the outer surfaces of the respective lift arms, both at their proximal and distal ends at the front of the trailers. Likewise, the distance between the outer surfaces of the

wider portion of the lift beams at the rear of the MHU–7–33–123/M trailers appears to be greater than the distance between the outside surfaces of the respective lift arms, both at their proximal and distal ends, at the rear of the trailers. However, the distance between the inside surfaces of the proximal ends of the rear lift arms is greater than the distance between the outside surfaces of the front and narrower portion of the lift beams.

The load to be carried by the MHU–7–33–123/M trailers includes the weapon(s) and its bolster mechanism, which elevates the weapon(s) above ground level. The distance between the outside surfaces of the bolster, at its point of connection to the lift beams, is less than the distance between the inner surfaces of the lift beams. From either side of the bolster, there are two protruding pins which connect to the lift beams of the MHU–7–33–123/M trailers.

In a typical loading operation, an MHU–7–33–123/M trailer is backed into position around the weapons load with the lift arms lowered, thereby locating the lift beams just above the underlying surface, beneath the protruding pins of the weapons bolster and next to the weapons load. Simultaneous pivoting of the lift arms varies the vertical position of the lift beams and lifts the weapons load. The distal ends of the lift arms move through an arc. The lift beams, however, move only in a vertical direction. As the lift arms pivot and the lift beams are raised, an "arc compensator" translates or slides the position of the distal ends of the lift arms with respect to the lift beams, maintaining the horizontal position of the left beams.[2] In the MHU–7–33–123/M trailers, the lift arms and arc compensator operate within the shadow of the lift beams, i.e., they are positioned directly beneath the lift beams.[3] According to the

---

2. As described by Dr. Kirk, although there is no disagreement in the record on this point, the lift beams of the MHU–7–33–123/M trailer are arranged "so as to be able to go vertically up and down with no translation in the fore and aft direction."

3. Although the parties disagree as to its significance, in the words of the defendant's technical expert, Dr. Kirk, "within the shadow of the lift

testimony of Dean Oswald, the President of Standard, and one of the co-inventors of the patent in suit, to avoid interference with the rear lift arms, when the lift beams are moved to their lowered position, the weapons package can be no wider than the inside surfaces of the lift beams.

The two rear lift arms pivotally connected to each of the longitudinal extending beams of the frame of the MHU–7–33–123/M trailers have a slight bend in their configuration. The presence of this slight bend make it possible for the arc compensator to clear the lift arms as the lift beams are raised and lowered, and results in the distance between the inner surfaces of the distal ends of the two rear lift arms (the point of their connection to the lift beams) being less than the distance between the inside surfaces of the proximal ends of the same rear lift arms (the point of their pivotal connection to the each of the respective longitudinal beams of the frame of the trailer). This slight bend in the rear lift arms is characterized by the plaintiff as a "clearance bend" and is characterized by the defendant as an "offset" within the meaning of the patent in suit.

### The Development of the MHU–145/M Trailer.

In the early 1970's, the United States Air Force began development of the B–1 bomber, a long range aircraft intended to improve the capabilities of the Strategic Air Command (SAC), the first-alert strategic defense division of the USAF. The B–1 bomber program,[4] as it existed in February of 1973, called for the design, development and fabrication of a "high capacity loader," referred to as the Munitions Transport Loading System (MT/LS).

Although the prior art MHU–7–33–123/M trailers are capable of loading the internal bomb bays of the B–52 bomber with weapons loads (loads weighing up to 13,250 lbs for the MHU–7, and perhaps more for the MHU–33 and MHU–123 trailers, as each was improved), the prior art MHU–7–33–123/M trailers lack sufficient lift height to load the internal bomb bays of the B–1 bomber. The fuselage of the B–1 bomber is higher off the ground than the B–52 bomber and the introduction of newer and heavier weapons in the 1970's necessitated the development of a larger loader. The larger capacity loader required for the B–1 bomber, therefore, necessitated a loader having an approximate lift height of ten feet and a weight capacity of 35,000 lbs.

In the fall of 1973, the Air Force published a synopsis of the requirements for the new loader in the Commerce Business Daily, Issue No. PSA–5735, and issued a request for proposals for the B–1 bomber loading system. The plaintiff, Standard, and a competitor, AAI, were among the five companies which submitted loading system proposals to the Armament Division located at Eglin Air Force Base, Florida. The Air Force selected AAI as the winning bidder and awarded AAI contract No. F0835–74–C–0038, which had a contract price of $1,471,626.00. Theodore Alfriend was the program manager and project engineer for AAI and Charles Anthony was the program manager for the Air Force.

The MT/LS contract required the development of a "drive under, load and drive away" loading system which was to be comprised of three vehicles, i.e., a tow vehicle, a transport trailer, and a loader. The contract also required that the vehicles be developed in three phases. The first phase called for the development of a prototype tow vehicle, the second phase called for the

---

beam," means that if you were to take a light and shine it directly downward from above one of the lift beams, "you would find that the rear lift arm, [of the MHU–7–33–123/M trailers] and in particular the far end of the lift arm, operates within the shadow of the lift beam. So the distal end of the lift arm operates within the shadow of the lift beam." In other words, the lift arms attached at their distal ends to the lift

beam would be completely underneath the lift beam.

**4.** Since the B–1 bomber program was terminated by the government in 1977 and, subsequently, reinstated by the government in 1981, the first B–1 development project is referred to as the B–1 project and the second is referred to as the B–1B project.

development of a prototype transport vehicle and the third phase called for the development of a prototype loader. The tow vehicle was designated as the AS/32K–6 tow vehicle, the transport trailer was designated as the MHU–144/M transport trailer, and the loader was designated as the MHU–145/M loader. The MHU–145/M was to be coupled to the AS/32K–6 tow vehicle and driven underneath the B–1 bomber fuselage and between the landing gear of the B–1 bomber.

In accordance with the schedule set forth in the MT/LS contract, AAI designed and built a prototype of the AS/32K–6 tow vehicle during phase I of the project.[5] AAI also designed the MHU–144/M transport trailer during phase II of the project. During phase III of the contract, AAI began constructing two mock-ups of the MHU–145/M loader.

The technical specification which accompanied the solicitation for proposal for the MT/LS specified that the loader design shall be "U-shaped, similar to the MHU–33/M." The MHU–33/M trailer is a member of the MHU–7–33–123/M family of trailers, which the plaintiff, Standard, had designed for the Air Force beginning in the early 1960's. The technical specification also required that the MHU–145/M loader "be designed to transport and load preloaded AGM/69 rotary launchers and high density conventional munitions racks into the bomb bays of the B–1 aircraft and SRAM and SLAD missiles onto the wing stations of the B–52 aircraft." Additionally, the MT/LS contract called for the design of a "loader [with] a maximum load capacity of 35,000 pounds." Finally, important to the instant action, the technical specification required that the MHU–145/M loader design include "[a]utomatic positioning and sensing devices ... to automatically load weapons into the bomb bay of the B–1 aircraft under field conditions."

The bomb bay doors of the B–1 present a problem because in their open position they hang downward in a vertical position and allow relatively little horizontal clearance between the load and the bomb bay doors. In order to solve this clearance problem, according to the defendant, AAI designed the MHU–145/M trailer to have four lift arms; the two rear lift arms incorporated "offsets" and the two front lift arms were offset in their entirety. Theodore Alfriend, AAI's program manager and project engineer on the MT/LS contract, stated that the purpose of offsetting the rear lift arms was to allow the upper portion of the lift arms and the weapons load to fit within the width of the open B–1 bomb bay doors. Mr. Alfriend stated that "[i]deally, the span between those lift arms, the ends of the lift arms that go up should be such that it goes between the vertical bomb bay doors with sufficient clearance so that you can do this with safety." AAI submitted a preliminary design for the MHU–145/M loader to the Air Force in May 1974.

During Phase III of the MT/LS contract, AAI commenced construction of two mock-ups relating to the MHU–145/M loader. The first mock-up, called the "trailerable" mock-up, was a semi-trailer designed to test positioning of the MHU–145/M trailer relative to the B–1 bomber. The trailerable mock-up had no lift mechanism. The prototype tow vehicle and trailerable mock-up were driven beneath an actual B–1 bomber to verify the dimensions of the MHU–145/M trailer design and to ensure that it could be accurately positioned beneath the aircraft.

The second mock-up was referred to as the "optical" mock-up. The optical mock-up of the proposed MHU–145/M trailer, depicted in Figure 3, was a full scale version of the lift system and had a lift mechanism with a lift capacity of approximately 1,000 pounds. Instead of full size wheels, the optical mock-up employed casters which allowed the optical mock-up to move laterally.

---

5. The parties agree that the AS/32K–6 tow vehicle was 84 inches high, which prevented it from being driven underneath the B–52 fuselage, which was only 77 inches high when the bomb bay doors were open.

Figure 3.

The optical mock-up received its name from its inclusion of the electronics and hydraulic jack pads necessary to demonstrate the optical alignment system which was to be included in the MHU–145/M trailer. Although the optical mock-up was not a real weapons loading trailer and could not have been used to lift or load real weapons packages, the optical mock-up was tested with a simulated weapons package and a wooden mock-up of the B–1 bomber bomb bays. The tests were conducted at AAI's facility in Cockeysville, Maryland in the presence of employees from the Air Force, Rockwell International and AAI. The optical mock-up successfully lifted and aligned the simulated weapons package within the wooden mock-up of the B–1 bomb bays. Mr. Alfriend, AAI's program manager and project engineer on the MT/LS contract, was questioned at trial as to whether he believed that, based upon the design of the MHU–145/M and tests conducted on the optical mock-up, the MHU–145/M design (depicted in Figure 3) would have worked as intended. Mr. Alfriend testified that there was no doubt in his mind that if the design for the MHU–145/M were carried into hardware, it would have worked.

In June 1977, during Phase III of the MT/LS contract, when the MHU–145/M loader was still undergoing development, and prior to the critical design review,[6] the prime contract with Rockwell International for the B–1 bomber program was cancelled by the government. AAI's contract with the defendant for the design of a loading system was also formally terminated for the convenience of the government. According to the testimony of Mr. Alfriend, at the time the MT/LS contract was cancelled,

6. Mr. Alfriend, AAI's program manager and project engineer for the MT/LS project, described the critical design review as the last meeting between the contractor and government representatives, prior to the production or manufacturing of a device under contract with the government, wherein representatives of the government have an opportunity to review the contractor's designs and make the necessary changes required by the contract prior to manufacturing.

preliminary design drawings of AAI's proposed MHU–145/M were completed, however, no "top assembly manufacturing drawings" were completed. According to the uncontested documents admitted into evidence, at the point at which the MT/LS contract was terminated, AAI had only completed 40 percent of the detail design of the proposed MHU–145/M loader. Additionally, the parties have stipulated to the fact that no full scale loader, i.e., a loader capable of performing the tasks for which it was designed, was ever actually built.

After cancellation of the B–1 bomber program calling for the MHU–145/M trailer, AAI tried to interest the Air Force in a new trailer design for the B–52 bomber based upon the MHU–145/M design. Specifically, in December of 1979, AAI conceived of a trailer having the lift system of the MHU–145/M trailer mounted on the chassis of the new MHU–173/E trailer for use with a wide body jet transporting cruise missiles. However, there was no evidence introduced into the record in the instant case that more than drawings of such a trailer were ever developed or produced for the government, although some conceptual discussions were held with representatives of Boeing Military Airplane Company (Boeing), Lockheed, and perhaps the Air Force.

### Air Launched Cruise Missile Program/Development of the MHU–173/E Trailer

In the 1970's, a program which developed under the Air Launched Cruise Missile Program, known as the Cruise Missile Integration Program, evolved to provide B–52 bombers with the capability of delivering air launched cruise missiles from rotary launchers contained in the bomb bay or pylon adapter packages on the wings of B–52 bombers.[7] Boeing, as the prime contractor for the program, was responsible for the support equipment and modifications to the B–52. Boeing issued a request for proposals soliciting bids for the design, development, and manufacture of a trailer capable of loading both rotary launchers and pylon adapters into the bomb bay and onto the wing stations of a B–52 bomber. Both Standard and its competitor, AAI, submitted bids in response to the request. The two proposals were substantially similar in that they both described a U-shaped trailer having four lift masts, and four hydraulically operated jacks for precise positioning of the weapons load. AAI prevailed in the competition and was awarded the contract by Boeing. Under the contract, No. F33657–79–C–0416, AAI designed, developed, and manufactured a trailer known as the MHU–173/E for loading rotary launchers and pylon adapters into and onto the B–52 bomber.[8]

The MHU–173/E was developed under a crash program and immediately fielded in order to meet the Air Force's urgent requirement to load the air launched cruise missile into the B–52 bomber. When delivered to the USAF in 1981, the MHU–173/E was the largest capacity loader (40,000 pounds) and the most complex piece of munitions handling equipment in the Air Force inventory.

7. Rotary launchers and pylon adapters are made to carry cruise missiles on the B–52 in multiple packages.

8. The prototype MHU–173/E included an automatic optical positioning system which was developed for the MHU–145/M trailer and tested on the optical mock-up.

Figure 4.

The MHU–173/E, depicted in Figure 4, includes a U-shaped frame supported by two sets of wheels mounted on opposite sides of the open end of the trailer and a single pair of wheels mounted to a cross-member forming the closed end. All three sets of wheels are driven by hydraulic motors and can be turned ninety degrees as needed for lateral movement of the trailer to a position beneath the wing of the B–52 bomber (for pylon adapter loading) or beneath the aircraft weapons bay (for rotary launcher loading). In operation, the MHU–173/E trailer is towed into position parallel to the B–52 bomber. The wheels are then rotated 90 degrees and the trailer is moved laterally or sideways approximately 15 to 20 feet to a position directly beneath the B–52. Once the trailer is underneath the B–52, four hydraulic jacks, one positioned at each corner of the trailer frame, are extended to lift the trailer frame until the trailer wheels are suspended above the underlying surface. These jacks include "X–Y pads" which fine tune the positioning of the frame in two directions to more precisely position the frame and the weapons load with respect to the B–52. The lift mechanism of the MHU–173/E loader includes four lift masts, each mounted near a corner of the trailer frame, and lift beams, supported by the four lift masts, which engage the weapons load. The lift action appears to be caused by the lift masts located at each corner of the respective lift beams on both sides of the trailer. The lift masts, propelled by a chain drive, raise the weapons load which is resting on the lift beams through the bomb bay doors and into the aircraft.

When the MHU–173/E trailers were first delivered to the USAF at Griffiths Air Force Base, the enlisted personnel at the Base were given on-the-job training on how to maintain the newly arrived trailers. Additionally, when the trailers were first delivered, there were few spare parts available for the personnel to properly perform regular maintenance and repair on the new loader.

Pursuant to the contract, No. F33657–79–C–0416, Boeing purchased the MHU–173/E trailers from AAI, and resold the trailers to the USAF. Nineteen MHU–173/E loaders were purchased and resold to the Air Force by Boeing in separate quantities (designated Lots I and II). These lots were delivered between March, 1981 and May, 1982. Apparently, in an

effort to save money, the Air Force "broke out" the contract to AAI for the MHU–173/E loaders from the contract with Boeing for the Air Launched Cruise Missile Program in 1982. Lots III and up of the MHU–173/E trailers were procured directly from AAI, by the Air Force, under the "breakout contract," No. F33657–82–C–2025, that was initiated under the authority of the original contract, No. F33657–79–C–0416.

The MHU–173/E loader had problems from the very beginning. It was extremely expensive, overly complex and considerably more difficult to operate and maintain than existing trailers. Although the MHU–173/E loader was properly certified for use with the transport and loading of nuclear weapons, the Air Force Weapons Laboratory identified a number of nuclear safety design deficiencies in the trailer.[9] These problems are listed in a document which notes the nuclear safety community's concern over the failure of the Aeronautical Systems Division at Wright–Patterson Air Force Base to correct these design deficiencies.[10] The towing speed of the trailer, when carrying nuclear weapons, was restricted to ten miles per hour (five mile per hour around curves), due to the failure of the trailer to meet stringent nuclear safety requirements. In the first months of operation, the trailers experienced almost daily failures which impaired their operational and nuclear safety.[11]

The in-commission rate of the MHU–173/E loaders for the first six months of their field operation was only slightly better than 50%, sometimes falling below what was required to meet the Strategic Air Command's Emergency War Orders. Subsequently, the in-commission rate improved, but it never got much better than 70% to 80%.[12] The Strategic Air Command

9. The Air Force Weapons Laboratory listed the following deficiencies:
 (A) overloading of the lift system resulting in 'weak pin' failures;
 (B) lack of 'failsafe' capability when 'weak pins' fail, allowing uncontrolled load movement;
 (C) lack of a system to accurately indicate to the operator the amount of upward force being applied against the aircraft or maintenance frame, etc.;
 (D) lack of sufficient brake force to meet [applicable requirements];
 (E) incompatibility of MB–4/MLT brake combination [the tow vehicle trailer brake] resulting in a jackknife hazard;
 (F) lack of capability to properly align the load bars with the holes in the side rails for insertion/extraction without applying excessive forces on the lift system.

10. The Aeronautical Systems Division of the Air Force Systems Command had responsibility for managing the MHU–173/E loader program.

11. The following quote from plaintiff's Trial Exhibit 365, which is a communication from SAC Headquarters to the Headquarters of the USAF concluded that, regardless of any training related problems that the USAF was having with the MHU–173/E trailer, the trailer was "very complicated" to operate.
 Subj: Documentation of MHU–173 Deficiencies
 Ref: HQ USAF/LEYW Msg 291710Z bef 84
 1. Analysis of recent data gathered on the MHU–173/E indicates that there were 105 major component failures on 58 trailers which required interim contractor support during the four month period ending 21 Feb 84. This is an average of nearly one major failure per calendar day or 1.2 Failures per working day. Most of these failures required extensive unit manpower to remove and replace the defective component (e.g. 9 Wheel motors at 25 to 45 manhours each, 11 x-y pads at 16 to 90 manhours each). Average in commission rates have varied from 71 percent to 84 percent over the past 5 months, with an average of 79.4 percent. The 84 percent in commission rate of Mar 84 does not represent a significant improvement over the 82.5 Percent of Sep 83. Additionally, the Oct 83 rate was 71 percent.
 2. Maintenance data from four units shows wide variations in maintenance manhours expended per maintenance action. All units, however, show a mean time to repair in excess of specification requirements. * * *
 3. The MHU–173/E continues to be very expensive to maintain. * * *
 4. We recognize that some MHU–173/E problems are caused by personnel error, but we disagree with the implication that most problems are attributable to operator error due to lack of training. * * * In summary: operator training for the MHU–173/E is adequate. The fact that the trailer is very complicated to operate should not reflect upon the quality of training provided to the Air Force technicians.

12. The MHU–173/E performed so poorly that Col. Foster, Deputy for Strategic Systems, Aeronautical Systems Division at Wright–Patterson Air Force Base, instructed Lieutenant Colonel Kissner, Deputy Director of Logistics, to form a

concluded that the MHU–173/E loader was not a good engineering design and that action needed to be taken to remedy the situation. Problems with the MHU–173/E loader, as well as the reinstatement of the

Tiger Team of experts from various disciplines to make recommendations concerning problems with the MHU–173/E. In November, 1983, the Tiger Team identified forty-one problems with the MHU–173/E and recommended appropriate corrective action, which included a number of engineering changes to be implemented via engineering change proposals or via AAI's, then pending, Value Engineering Change Proposal.

13. Personnel from the Aeronautical Systems Division of the Air Force Systems Command were critical of early drafts of the SAC–SON and attempted to lessen its requirements. A very early draft of SAC–SON 26–82, distributed on December 3, 1982 throughout the USAF by Brigadier General Harold J.M. Williams, Deputy Chief of Staff Logistics, states, in pertinent part:

DRAFT
SAC STATEMENT OF OPERATIONAL NEED (SON) (FORMAT A) (SAC SON 26–82) FOR 60K LOADER TO LOAD/UNLOAD COMMON STRATEGIC ROTARY LAUNCHER AND B–1B/ADVANCED TECHNOLOGY BOMBER (ATB)
A. *MISSION.*
 1. *MISSION AREA:* Strategic warfare support USDR & E area 1.140.
 2. *MISSION ELEMENT NEED:* To support rapid and sustained munitions loading operations involving Common Strategic Rotary Launcher (CSRL) and B–1/ATB aircraft, the Strategic Air Command (SAC) will have critical needs for:
 a. Munitions Lift Trailer: A lift trailer capable of handling, loading and unloading future munitions delivery packages weighing up to 60,000 lbs into existing and future strategic bomber aircraft.
B. *BASIS OF NEED:* The Strategic Air Command must develop capability to rapidly deliver from storage and upload projected weapons delivery packages, specifically the Common Strategic Rotary Launcher (CSRL), into existing and future programmed aircraft, specifically OAS/CMI modified B–52 and B–1B/ATB aircraft. Existing Munitions Lift Trailers (MLTs) will not, without additional lift height adapters and without major structural modification, load/unload CSRLs into existing or programmed bomber aircraft. Additionally, due to B–1B bomb bay height, current MLTs will not be capable of loading/unloading stores into the aircraft bomb bays: Reference CSRL Statement of Capability (SOC) and B–1B SOC.
 * * * * * *
D. *ASSESSMENT:*
 1. *Munitions Loading Trailer (MLT) 60K:* Employment of the CSRL and B–1B/ATB aircraft into SAC EWO mission will dictate absolute requirements for an MLT capable of rapid-

B–1B program in 1981 and 1982, prompted SAC, to prepare a Statement of Need (SAC–SON) 26–82 for a new weapons loader. The final version of the SAC–SON, validated on July 13, 1983, stated that: [13]

ly transporting from storage and loading launchers weighing from 48 to 60K, maximum size estimated to be 145 inches wide and 265 inches long. The trailer must be capable of being positioned under B–52 and B–1B/ATB bays and lifting to loaded position in one continuous motion, existing and planned munitions packages. The trailers also must be capable of reversing these procedures.
 2. Existing MLTs will not be adequate to accomplish programmed mission taskings.
E. *CONSTRAINTS:*
 1. *Munitions Lift Trailer:* The system must be:
 * * * * * *
 b. Designed to incorporate simple mechanical systems that complement field/unit repair capabilities and provide durability required for sustained combat operations.
 * * * * * *
The final version of SAC–SON 26–82 which incorporates the comments of the major commands including the Aeronautical Systems Division at Wright–Patterson Air Force Base was issued on July 13, 1983. It reads, in relevant part:
SAC STATEMENT OF OPERATIONAL NEED (SON) (FORMAT A) (SAC SON 26–82) FOR SIMPLIFIED MUNITIONS LIFT TRAILER TO SUPPORT STRATEGIC BOMBER AIRCRAFT
A. *MISSION*
 * * * * * *
 2. *Mission element Need.* SAC has an urgent need for a Munitions Lift Trailer (MLT) to support it primary mission of inflicting damage on enemy forces. * * *
B. *BASIS OF NEED*
 1. The existing Munitions Lift Trailer (MLT) MHU–173/E being used to load B–52 Air Launched Cruise Missile (ALCM) pylons is considerably more complex and costly to maintain than other existing MLTs (MHU–7/M, MHU–123/M).
 2. Existing Munitions Lift Trailers (MLTs) will not, without developing a lift height adapter and making structural modifications, load or unload existing or programmed weapons or weapons packages on the B–1B aircraft.
C. *EXISTING AND PLANNED CAPABILITIES*
 1. Currently the MHU–7/M Munitions Lift Trailer (MLT) is used to load/unload gravity weapon clip-in assemblies; the MHU–123/M MLT is used to load/unload AGM–69 (SRAM) launchers; and the MHU–173/E MLT is used to load/unload AGM–86 (ALCM) pylons onto/into B–52 aircraft. No capability currently exists for B–1B aircraft munitions loading without modifications to existing systems (MHU–173/E).

B. BASIS OF NEED

1. The existing Munitions Lift Trailer (MLT) MHU–173/E being used to load B–52 Air Launched Cruise Missile (ALCM) pylons is considerably more complex and costly to maintain than other existing MLTs (MHU–7/M, MHU–123/M).

2. Existing Munitions Lift Trailers (MLTs) will not, without developing a lift height adapter and making structural modifications, load or unload existing or programmed weapons or weapons packages on the B–1B aircraft.

### The B–1B Program

The B–1 bomber project, which had been cancelled by the President in 1977, was reactivated by the President in 1981. The newer version of the aircraft is referred to as the B–1B bomber. After resumption of the B–1B bomber program in 1981, SAC had a new requirement for loading the B–1B bomber. This requirement was expressed in the SAC–SON 26–82. It was readily apparent to everyone in the industry that the requirement could not be met with the existing munitions handling equipment, such as the MHU–7–33–123/M or MHU–173/E trailers.

The lift height and weight capacity of the MHU–7–33–123/M trailers was inadequate to meet the requirements of SAC–SON 26–

82 as the lift height of the MHU–173/E was 75 or 76 inches and the B–1B bomber required a loader with ten feet of lift. In the summer of 1982, AAI proposed to Rockwell International, the prime contractor for the B–1B bomber, that the MHU–173/E trailer and a powered lift adapter, be used to load the B–1B. The proposal was technically feasible and the amount of research and development funds projected for a powered lift adapter was substantially less than that required for the development of a new trailer to load the B–1B. According to the testimony of Mr. Alfriend, AAI did not propose developing a new trailer because they felt it would have been more cost effective to develop a powered lift adapter.

With the reinstatement of the B–1B program in 1981, Standard recognized that there might be a need for an improved, simplified, less expensive weapons loader that could load both the B–52 and B–1B bombers without auxiliary equipment. In October, 1981, three Standard employees, Dean Oswald, Ray Dean and Harry Mankey, decided to attempt to design a munitions loader which could load both the B–52 and B–1B bombers. Development of a system to load a rotary launcher weapons package into the weapons bays of both the B–52 and B–1 bomber with the same trailer

2. Planned capabilities are to continue with existing B–52 MLTs and pursue modifications of the MHU–173/E as an interim measure of support for the B–1B until a simplified munitions lift trailer is developed and provided.

D. *ASSESSMENT*

1. The existing trailer (MHU–173/E) currently being used to load B–52 ALCM pylons and programmed for use with the B–1B is a complex and extremely costly system to maintain. * * *

 \* \* \* \* \* \*

3. SAC has a firm requirement for the most cost-effective Munitions Lift Trailer (MLT) that incorporates a simplistic design which complements field/unit repair capabilities.

E. *CONSTRAINTS*

1. *Simplified Munitions Lift Trailer.* The system must:

 \* \* \* \* \* \*

i. Provide the required 36,000 lb lift weight capability (CSRL/8 AGM 86/Launcher Loading Adapter) and be designed to lift a desired weight of 45,000 lbs (to facilitate future heavy weight

weapons packages) without requiring major modification to the basic trailer.

 \* \* \* \* \* \*

It is evident from these excerpts from the draft and final version of SAC–SON 26–82 that the early references to a 60K loader and any future weight capacity requirement of 60,000 lbs included in the draft was deleted in the final version. Additionally, both versions refer to the inadequacies of MHU–173/E system and the Strategic Air Command's intent to develop a new simpler loading system. The plaintiff contends, and would have this court find, that this "watering down" of the draft version of SAC–SON 26–82 was instigated by USAF personnel now employed by AAI. In any event, these two documents and other documents admitted during the trial result in a determination by this court that the USAF was not pleased with the present MHU–173/E system and was attempting to develop and to procure a new system better capable of supporting SAC's mission with respect to existing (B–52) and future aircraft (B–1B).

in a single stage was a challenging problem. As depicted in Figure 5, loading a rotary launcher weapons package into the weapons bay of a B–52 bomber requires transporting a 75 inch diameter weapons load under the open weapons bay doors of the aircraft, which allows only 77 inches of vertical clearance. This leaves no more than one inch clearance above and below the weapons package.

Figure 5.

While loading the B–1B bomber, as depicted in Figure 6, does not present the same problem with vertical clearance as the B–52, loading the same 75 inch diameter weapons package into the B–1B bomber requires that the load pass between the downwardly extending weapons bay doors of the aircraft which provides an opening only 80 inches wide. As the weapons package is lifted into the weapons bay, the position of the bay doors leaves only 2½ inches of clearance on each side of the weapons package. Moreover, to fully insert the weapons package into the weapons bay of the B–1 bomber requires that the weapons package be lifted by the trailer more than ten feet above the ground, a lift height which the MHU–173/E trailer could not provide. Moreover, the loader must be capable of loading the 75 inch diameter weapons load which weighs up to 45,000 pounds into an aircraft in blowing snow, sleet, rain, hail and sand.[14] The load capacity of the MHU–173/E trailer was only 40,000 pounds.

**14.** This weight requirement is found in SAC– SON 26–82.

Figure 6.

Standard began conceptual work on the B–52/B–1B loader in late 1981. After devoting more than a month to the problem, the inventors at Standard conceived of the solution to the problem that is embodied in the patented invention. Work on the loader design commenced in January, 1982 with five or six employees of Standard working on the project full time until July, 1982, at which point the basic design was complete. At the same time, Standard began work on an unsolicited proposal for submitting the design to the Air Force. Standard referred to its design as the "60K Loader" because the loader was designed to have a lift capacity of 60,000 pounds to meet what Standard believed was the future needs of Air Force weapons packages under development.

In brief, the 60K Loader Unsolicited Proposal described Standard's newly designed loader as follows:

The Trailer will be a towable six-wheeled, wishbone-type vehicle designed to transport and load weapons and weapons packages on the B–52, B–1 and 'Advanced Technology Bomber.' The basic concept is the same as that of the reliable, simplified and time tested concept utilized by the MHU–7/M and MHU–123/M Trailers. The Trailer has four lift arms, two on each side frame of the Trailer. Each pair of lift arms support a lift beam which, in turn, supports the weapons package to be transported and loaded. * * *

In terms of reliability, Standard's unsolicited proposal makes several references to the prior art MHU–7–33–123/M:

The Contractor is well aware of the reliability requirements and has always kept these as a very important 'must' during design and development. SMCO [Standard] considers the most important factor in reliability to be 'concept simplicity'; simple structures, simple systems, minimize the number of components and utilizing 'time proven' systems and components. These factors have been proven time after time in all types of equipment. As previously discussed, some very noteworthy facts are: the simplicity of the MHU–7/M and MHU–123/M Weapons Loading Trailers, the fact that these Trailers have been performing most reliably for twenty years, and the fact that the USAF thinks so highly of these Trailers that another fifteen to twenty years of usage has been planned for these Trailers. The proposed 60K Weapons Loading Trailer is the same basic time-proven simple design and nothing less than what has been

experienced in the MHU–7/M MHU–123/M Trailers in longevity and reliable performance is anticipated by the Proposed Trailer.

On July 9, 1982,[15] Standard formally submitted Unsolicited Proposal No. PR82–07–002, "for Weapons Loading Trailers With 60,000 Pound Capacity, for Loading Weapon Packages Onto Advanced Strategic Aircraft" (the 60K Loader Unsolicited Proposal) to Colonel Peter K. Marchiando, Deputy Director for Munitions at the Air Force Systems Command's Armament Division at Eglin Air Force Base in Florida. Pursuant to the Federal Acquisition Regulations, 48 C.F.R. § 15.09 (1988), copies of Standard's unsolicited proposals were marked with the appropriate proprietary rights "USE AND DISCLOSURE OF DATA" legend to ensure confidentiality.

After an initial review of Standard's unsolicited proposal, in August, 1982, Earl T. Smith, the Assistant Deputy for Munitions assigned to Eglin Air Force Base, wrote to the plaintiff as follows:

1. Your unsolicited proposal has been reviewed and evaluated by the Deputy for Munitions, Armament Division, Eglin AFB FL.

2. The proposed effort appears to offer significant improvement over existing development programs and equipment in this field. It is anticipated that funds sufficient to acquire this effort will be available in the near future. When this occurs, you will be contacted through contracting channels.

3. You can be assured that your unsolicited proposal will not be copied or reproduced without your explicit permission.

4. Your interest in the United States Air Force development program is appreciated.

5. The above should not be interpreted as obligating the United States Air Force in any manner. Any resulting obligation will occur only through the execution of a formal contract.

Shortly after the submission of the 60K Loader Unsolicited Proposal, Standard was invited to brief the 60K Loader at a B–1B/B–52 loading concept meeting held on July 29, 1982, at Andrews Air Force Base. Roughly twenty-five representatives from various Air Force Commands were present at the July briefing. Representatives of AAI were also invited to attend a separate session of the meeting, to brief the auxiliary powered lift adapter it proposed be used in conjunction with the MHU–173/E trailer to provide the extended lift height necessary to load the B–1B bomber.

At the Andrews Air Force Base meeting, Standard employees, including Dean Oswald, Harry Mankey, Ray Dean and Charles Garner, were invited to brief Air Force personnel on the 60K Loader concept. The Standard employees used viewgraphs containing information and drawings from the 60K Loader Unsolicited Proposal, but Standard personnel did not take along copies of the unsolicited proposal to the meeting, and left the meeting with the original viewgraphs which they used for their presentation. Moreover, Standard personnel testified that they handed no documents out at the meeting. At the conclusion of their briefing, Standard employees left the conference room and AAI personnel entered the room and began their own briefing of the Air Force personnel.

The AAI staff attending the briefing at Andrews Air Force Base included Al Wood, Don Tuttle, Theodore Alfriend and Jerry Stuth. AAI briefed the members of the Air Force on its proposed method of loading the B–1B bomber. AAI proposed building a powered lift adapter which would sit on top of the MHU–173/E trailer and provide it with additional lift height capability necessary to load the B–1B bomber. Somehow, during AAI's briefing, but following Standard's briefing (at which the AAI personnel had not been present), Don Tuttle obtained and removed copies of drawings from Standard's 60K Loader Unsolicited Proposal from the briefing room. Mr.

---

**15.** It is interesting to note that this date is approximately one year, to the day, prior to the issuance of SAC–SON 26–82.

Tuttle testified that he showed the papers to a few people and took them back to AAI and placed them in his files, where they were found during the discovery in this case.[16] In a similar vein, Theodore Alfriend testified at trial: "And, it was during our presentation that we found this group of drawings in a manila folder under a chair in the briefing room." He further testified that when he left the briefing room, they took the Standard materials with them and that when they got back to AAI they looked at the materials and placed them in a file at AAI Corporation which was accessible to AAI staff engineers.[17] In addition to these drawings, the materials AAI took from the July meeting held at Andrews Air Force Base included Standard's letter to Colonel Marchiando, by which Standard conveyed its unsolicited proposal to the Air Force and which contained Standard's confidential contract proposal.[18]

Following the Andrews Air Force Base meeting, Standard employees briefed personnel throughout the United States Air Force on the proposed 60K loader. The personnel included: the Air Force Systems Command Staff, the Aeronautical Systems Division at Wright–Patterson Air Force Base, the Strategic Air Command, and the Armament Division at Eglin Air Force Base. Additional copies of the 60K Loader Unsolicited Proposal and revisions thereof were sent to a number of USAF personnel, at various Air Force Commands. At least twenty meetings occurred among Standard and Air Force personnel between August, 1982, and December, 1983, concerning

Standard's 60K Loader Unsolicited Proposal. In total, Standard presented more than thirty briefings to more than 100 Air Force personnel on the 60K Loader. During some of these briefings, Standard distributed copies of briefing charts and copies of its 60K Loader Unsolicited Proposal, which all bore proprietary markings. The briefings generated considerable interest and encouragement on the part of the Air Force.

During this same period of time, three air frame manufacturers were bidding on the Common Strategic Rotary Launcher (CSRL) program. The air frame manufacturers included Rockwell International, Grumman Aerospace and the Boeing Military Airplane Company. One of the requirements of the CSRL program was to provide ground support equipment. Standard hoped that its 60K Loader would be chosen as the ground support equipment to load the CSRL. Standard, therefore, began briefing the air frame manufacturers on the 60K Loader.

Standard concluded that if it were forced to wait another year or two before its unsolicited proposal were approved, it would be too late to meet the B–1B bomber's fielding and support requirements. Accordingly, in an attempt to demonstrate the feasibility of the 60K Loader design to the Air Force, Standard committed eighteen members of its twenty-five person engineering department for a period of six or seven months to design an actual prototype. Designing and building the 60K Loader prototype cost Standard in excess of $1.2 million. Design of the prototype

---

16. Donald T. Tuttle's testimony is taken from his deposition, parts of which were designated in lieu of testimony, as evidence in the case. Mr. Tuttle was not called as a witness during the trial. Mr. Tuttle testified during a deposition that, following Standard's briefing session and during AAI's separate meeting with USAF representatives on the same day and in the same room, he picked up a manila envelop which contained Mr. Oswald's airline schedule and "two or three sheets of paper with sketches on it." Mr. Tuttle also testified that the sketches he picked up were similar to the sketches found in AAI's files during discovery in this case, which are Standard's sketches from the unsolicited proposal. The drawings which AAI obtained

during the briefing contained Standard's proprietary legend.

17. Additionally, Mr. Alfriend testified that AAI received another series of drawings, very similar to what was contained in materials Mr. Tuttle obtained following the briefing at Andrews Air Force Base, when an AAI associate received a series of pictures from an acquaintance at Boeing.

18. AAI, therefore, appears to have had Standard's initial bid from its unsolicited proposal, which quoted a unit price of $385,000.00, provided the Air Force would contract for a production lot of at least fifty units.

began in the fall of 1982 and was completed by March of 1983. Key officials from various Air Force organizations came to Standard's facility to view work on, and demonstrations of the prototype. Standard encountered problems in building the prototype of the 60K Loader. There were significant differences between the 60K Loader prototype and the conceptual drawings which were part of the unsolicited proposal. In addition, the 60K Loader prototype differs from the figures which appear in the patent in suit and which depict the first and second embodiments of the invention. Specifically, the conceptual drawings in the unsolicited proposal and in the patent in suit disclose a trailer having a mechanical arc compensator while the prototype trailer uses a hydraulic arc compensator. Harry Mankey, one of the inventors of the '548 patent admitted that it would have been virtually impossible to make the lifting mechanism disclosed in the unsolicited proposal and the '548 patent work properly because the depicted mechanical arc compensator would not fit within the allowed space envelope. Accordingly, when Standard built the prototype of the 60K Loader it abandoned the mechanical arc compensator and substituted a hydraulic arc compensator.

In 1982, while Standard was promoting its 60K Loader concept throughout the USAF, AAI was proposing that a powered lift adapter designed to be mounted on top of the MHU–173/E be used to add the additional lift height required to load the B–1B bomber. In January, 1982, AAI submitted a study of alternative means for loading the B–1B bomber to International Rockwell, the prime contractor for the B–1B aircraft.[19] Subsequent to AAI's submission, Rockwell issued a request for proposal which included the powered lift adapter. Both AAI and Standard submitted bids. While Standard was about to build a prototype of its 60K Loader design, AAI continued to promote the powered lift

adapter for loading the B–1B bomber until late in 1983.

### The Strategic Weapons Loader Competition—MHU–196/M

As late as August 2, 1983, AAI was briefing the USAF on the use of the powered lift adapter for the MHU–173/E and its advantages over Standard's proposed 60K Loader. Significantly, during an August 2, 1983 briefing on the advantages of the powered lift adapter over Standard's 60K Loader Unsolicited Proposal, AAI used briefing papers which included one of Standard's conceptual drawings, similar to Figure 1 of the patent in suit and identical to one of the figures included in Standard's unsolicited proposal. Of particular note is that previously, it had been AAI's contention that the best approach to loading the B–1B bomber was the MHU–173/E powered lift adapter combination. Nevertheless, within approximately three months of August 2, 1983, AAI abandoned the powered lift adapter concept completely. AAI redesigned the MHU–173/E trailer, eliminating or changing more than two-thirds of its parts, significantly reducing the complexity of the design and most significantly, providing the MHU–173/E with a new lift system which enabled it to load the new B–1B bomber without auxiliary equipment.

In August of 1983, AAI began the project to redesign the MHU–173/E. That project resulted in a Value Engineering Change Proposal (VECP) to the MHU–173/E contract, making design changes to the MHU–173/E trailer and enabling it to load the B–1B bomber. Essentially, AAI proposed to replace the lift mast system presently employed by the MHU–173/E loader with a lift system substantially similar to Standard's patented invention.

AAI's project to redesign the MHU–173/E trailer began with a meeting held on August 8, 1983.[20] As described by the

---

**19.** AAI employee, Tom DeSalvo, who claims to have independently derived the invention disclosed in the patent in suit, testified that he worked on and drafted portions of the study.

**20.** The court once again points out that, prior to this meeting, it appears that Mr. Brickman and Mr. Alfriend obtained copies of designs which were included as part of Standard's 60K Loader Unsolicited Proposal. Mr. Donald T. Tuttle, a former employee of AAI, appears to have ob-

would-be inventor of AAI's new loader design, Mr. Thomas DeSalvo, the purpose of the August 8, 1983 meeting was to begin a new project "[t]o take a fresh look at modifying the MLT [Munitions Lift Trailer] to attain the loading capabilities of airplanes other than the B–52." On direct examination, Mr. DeSalvo was questioned as to when he had first seen the '548 patent or the drawings from Standard's unsolicited proposal. He claimed that he had seen neither before designing 173 VECP.

At the trial, the notes taken by Mr. DeSalvo of the August 8, 1983 meeting were introduced and give a clear indication of what transpired at that meeting. Mr. DeSalvo's notes include the front side of three separate pages, clipped together, as well as a copy of the back side of the first page of those notes. Mr. DeSalvo's notes contain references to Standard's 60K loader design, most notably the phrase "don't look at MLT or Standard's design," and the state-ment "STANDARD BEETS [sic] US NOW ... STANDARD HAS HDWR THIS MONTH." It is curious that, notwithstanding these references in his notes, Mr. DeSalvo testified that he independently derived the conceptual design of the accused trailer, the MHU–196/M, and that his new design concept for a loader capable of loading the B–52 and B–1B bombers was based on the Scott Russell Straight-line Motion mechanism as depicted below in Figure 7. Mr. DeSalvo described his new design concept for the MHU–173/E as having the same lift arms disclosed in Standard's patent in suit, as well as Standard's 60K Unsolicited Proposal. Mr. DeSalvo also stated that the lift arm configuration, with offset portions, was a required design in order for the new design concept to load the B–1B bomber. AAI's modified trailer design, originally referred to as the MHU–173/E VECP, is presently designated as the MHU–196/M loader.

Figure 7.

The Scott Russell Straight-line Motion mechanism includes two links. The first link contains points ABC. The second link contains DB. The short link DB is half the length of the longer link ABC and is pivot-ally connected to the mid-point B of the longer link. Point D is pinned and only allowed to rotate. Point C is constrained so that it may only move horizontally. The Scott Russell mechanism was designed to

tained a copy of documents disclosing Standard's 60K Loader design during the July 29, 1982 briefing held at Andrews Air Force Base. Mr. Tuttle testified in his deposition that he showed these documents to several people, including Mr. Alfriend, and placed it in a file in his office at AAI. When Mr. Tuttle retired from

AAI, Mr. Brickman took over Mr. Tuttle's office. Mr. Alfriend testified that AAI received a second copy of the drawings, very similar to those materials obtained by Mr. Tuttle, when an AAI associate received these similar designs from an acquaintance at Boeing.

provide vertical motion of Point A if Point C is moved horizontally or Point D is rotated.

AAI submitted its fully documented new design in draft form to the Aeronautical Systems Division at Wright–Patterson Air Force Base on October 27, 1983 as a proposed Value Engineering Change Proposal (VECP).[21] The modifications proposed by AAI were primarily associated with the lifting mechanism of the MHU–173/E trailer.[22] About the time AAI informally submitted its VECP under the MHU–173/E contract, Standard learned from Rockwell that it had been the successful bidder for the powered lift adapter. Upon receipt of AAI's VECP, the powered lift adapter requirement was cancelled by the B–1 System Program Office at Wright–Patterson Air Force Base. AAI's VECP was formally received by the Aeronautical Systems Division at Wright–Patterson Air Force Base on December 23, 1983, and it was approved seven days later on December 30. Before the VECP was formally submitted, much less approved, the Aeronautical Systems Division at Wright–Patterson Air Force Base had already given AAI permission to use two MHU–173/E chassis, al-

ready property of the USAF, to build a prototype VECP trailer. Less than a month after AAI formally submitted its VECP, and only three weeks after the VECP was approved, a preliminary design review for AAI's VECP was held on January 18, 1984.

On January 25, 1984, Standard protested AAI's submission and the Air Force's approval of the VECP, principally on the grounds that the procurement action authorized not a minor modification of the MHU–173/E, but rather a major new design resulting in a new vehicle, and that such action would amount to unfair sole source procurement with AAI and, therefore, would be in conflict with the competitive procurement process for the Simplified Strategic Weapons Loader. The Office of the Assistant Secretary of the Air Force prepared a response to Standard's claims regarding whether the VECP with AAI was a major new design resulting in a new vehicle and whether it, therefore, should be ineligible for submission as a VECP and also whether the AAI VECP was, perhaps, not responsive to the strategic weapons loader (SWL) requirement.[23]

21. As described by the Mr. Theodore Alfriend of AAI, a Value Engineering Change Proposal (VECP) is a proposal which is supposed to reduce the USAF's overall cost for the subject of the proposal. Under the VECP, the savings are then shared between the contractor and the government, in this case the USAF, usually on a fifty-fifty basis. A VECP is intended to give the USAF the option of contracting for engineering changes designed to improve the overall design of a presently procured device. It is not intended to circumvent competition or to award contracts for entirely new equipment, nor is it intended to serve as a means of fixing problems in a basic design.

22. The VECP also incorporated a number of engineering changes necessary to correct problems with the MHU–173/E trailer.

23. In response to Standard's protest and the inquiry of Office of the Assistant Secretary, Lieutenant Colonel Kissner made several interesting statements in an internal memorandum:

* * * * * *

2.b. Increasing interest in a SWL has been stirred at all levels due to briefings by Standard on a bigger, simpler design trailer starting in the Spring of 1982 and significant support and oper-

ations problems in SAC with the MLT [Munitions Lift Trailer]. * * *

* * * * * *

4.c. I'm sure it is frustrating to Standard, a good company which builds good products, to brief their design so broadly, develop and prototype this loader on their own, and not have a contract for the item. Technically, they could probably satisfy the B–1B loading requirements and program schedule. However, for that to happen, an agency would have to give them a sole source contract to complete their development, qualifications, and certifications. Standard has no more right to a sole source effort than anyone else. The VECP for the MLT is part of a continuing procurement to better meet B–52 and interim B–1B requirements.

* * * * * *

4.g. * * * We don't see how the VECP design approach would violate SMCO's [Standard's] patent rights. The VECP design approach does appear similar to that briefed by SMCO. AAI used this approach in the early to mid 1970's on a program at Eglin AFB for a loader for the B–1A. It's basically a Scott–Russell mechanism which is an old idea for vertical lifting. We were not aware that any

AAI's VECP was submitted following approval of the Strategic Weapons Loader or Simplified Munitions Lift Trailer program at Eglin Air Force Base. A primary source selection team was chosen to select the winner of the Strategic Weapons Loader competition. Standard, PACCAR and Wilson Manufacturing submitted proposals, and PACCAR was selected as the new contractor for the Strategic Weapons Loader. A comparative evaluation team was then assembled to recommend a winner of the Strategic Weapons Loader program in competition with the AAI's VECP. The final decision was made in favor of PACCAR; and in August of 1985, PACCAR was awarded the Strategic Weapons Loader contract. However, for reasons apparently beyond PACCAR's control, PACCAR began development of the Strategic Weapons Loader later than required under the contract schedule. PACCAR never delivered under the contract and, in early 1985, PACCAR's contract for the Strategic Weapons Loader was terminated for default due to an inadequate design and for failure to meet the delivery schedule.[24]

patents were involved by either SMCO [Standard] or AAI.

 \* \* \* \* \* \*

4.1. \* \* \* We believe authorization of the AAI VECP to simplify units on contract (sic) and needed for B–52 requirements is not unfair competition. Since there was not qualified design available other than AAI's and our program has no funds or authority for a development program, there is not reason for competition to continue to meet B–52 requirements. Therefore, there is no violation of Government procurement policy. Such action, since no VECP funding is being provided to AAI and the VECP MLT cannot meet the SWL requirements, has no effect on the competitive SWL program. \* \* \*

 \* \* \* \* \* \*

5.b. *AAI did not need access to SMCO's* [Standard Manufacturing Company] *unsolicited* proposal. SMCO briefed their design all through the Air Force. AAI could have picked up a copy from any briefed agency.

 \* \* \* \* \* \*

**24.** Conrad Armstrong, the former Deputy for Strategic Systems, Office of the Assistant Secretary of the Air Force, testified that PACCAR's inability to meet the schedule was due in part to its inability to get B–1B data necessary to design the trailer, because the flow of information from the USAF to PACCAR was delayed considerably by the Aeronautical Systems Division at Wright–Patterson Air Force Base.

**MODIFIED MHU–173/E**
B-52/B-1B APPLICATIONS

Figure 8.

AAI was, subsequently, awarded a sole source contract pursuant to the VECP (now designated the MHU–196/M), depicted in Figure 8, and it has manufactured and delivered all of the accused MHU–196/M trailers to date.[25] Following the approval of the VECP, three employees of the Aeronautical Systems Division at Wright–Patterson Air Force Base, Mr. Joe Gordy, Lieutenant Colonel G. Gordon Kissner and Colonel James E. Foster, all involved in the approval of the VECP, retired from the USAF and were, subsequently, employed by AAI.[26]

Minor modifications were subsequently made to the MHU–196/M loader design to adapt it to load the Advanced Technology Bomber. The modified version of the trailer is identified as the MHU–204/M. The defendant has stipulated that at least one MHU–204/M trailer has been manufac-

25. The SAC–SON 26–82, validated in late 1983, called for a trailer having a lift capacity of at least 50,000 pounds. The MHU–196/M trailer's capacity was only 40,000 pounds. Nevertheless, in justifying the decision to award the sole source contract to AAI, the Aeronautical Systems Division at Wright–Patterson Air Force Base seems, for some odd reason, to have represented to Congress that the MHU–196/M satisfied the SAC Statement of Need 26–82.

26. Mr. Gordy was the individual who suggested that AAI submit the modified MHU–173/E design as a Value Engineering Change Proposal. Colonel Foster was involved in the Configuration Control Board Approval and the SAC–SON 26–82. Lieutenant Colonel Kissner arranged for the highest level of priority for nuclear certification of the VECP.

tured for the USAF. Like the MHU–196/M, procurement of the MHU–204/M, to date, has also been from AAI, by sole source contract.

### The Patent in Suit

On February 18, 1982, after working on the new loader design for approximately two to three months, preliminary drawings of the first two embodiments of the invention, depicted in Figures 9 and 10 respectively,[27] were sent to Standard's outside patent counsel, Michael A. O'Neil, by Mr. Charles Garner, Vice President and in-house General Counsel at Standard. Later in 1982, the third embodiment of the invention, depicted in Figure 11,[28] was conceived. The third embodiment of the '548 patent was a variation on the first and second embodiments in which the lift mechanism was flipped upside down. On September 28, 1982, Standard filed a patent application covering the 60K Loader, disclosing all three embodiments of the invention.

## Figure 9.

FIG. 1

---

27. Figure 9 is a reproduction of Figure 1 of the '548 patent and Figure 10 is a reproduction of Figure 27 of the '548 patent.

28. Figure 11 is a reproduction of Figure 37 of the '548 patent.

Figure 10.

FIG. 27

In the first embodiment of the invention, illustrated in Figure 9, the front and rear lift arms extend in opposite directions. In the second embodiment, illustrated in Figure 10, the lift arms extend in the same direction, and point towards the rear of the trailer. The second embodiment is disclosed in Standard's 60K Loader Unsolicited Proposal and it is this embodiment of the '548 patent which Standard built as a prototype.

In the first and second embodiments, the lift arms are pinned to the trailer frame and slide in the lift beams. In the third embodiment, illustrated in Figure 11, the lift arms are pinned to the lift beams and roll or slide in the trailer frame. The third embodiment is virtually identical to the accused MHU–196/M and MHU–204/M trailers.

Figure 11.

FIG. 37

Standard filed its original patent application on September 28, 1982. The application contained 26 claims, including, in pertinent part the following: [29]

1. An aerial weapons handling trailer for receiving, transporting and lifting weapons packages characterized by a predetermined width comprising:

a frame including first and second longitudinally extending beams spaced apart more than the predetermined width and a cross beam interconnecting the front ends of the longitudinally extending beams;

at least two front wheels and at least two rear wheels for supporting the front and rear ends of the frame, respectively;

means supporting the front and rear wheels for pivotal movement between first orientations wherein the wheels support the frame for movement in a direction extending substantially parallel to the longitudinally extending beams of the frame and second orientations wherein the wheels support the frame for movement in a direction extending substantially perpendicular to the longitudinally extending beams of the frame;

drive means for selectively rotating at least one of the front wheels and at least one of the rear wheels to propel the trailer;

at least four lift arms;

means supporting at least two of the lift arms on the first longitudinally extending beam of the frame for pivotal movement with respect thereto;

means supporting at least two of the lift arms on the second longitudinally extending beam of the frame for pivotal movement with respect thereto;

· hydraulic cylinder means connected between the frame and lift arms for selec-

tive actuation to pivot the lift arms relative to the frame;

first and second lift beams;

means supporting the first lift beam on the distal ends of the lift arms that are pivotally supported on the first longitudinally extending beam of the frame;

means supporting the first lift beam on the distal ends of the lift arms that are pivotally supported on the second longitudinally extending beam of the frame;

the distal ends of the lift arms being inwardly offset to support the lift beams in a spaced apart relationship which is not greater than the predetermined width of the weapons package; and

the lift arms being pivotable under the action of the hydraulic cylinder means to position the lift beams beneath a weapons package that is received between the longitudinally extending beams of the frame and thereafter to move the lift beams of the weapons package carried thereby upwardly between the longitudinally extending beams of the frame and further upwardly into the weapons bay of an aircraft.

\* \* \* \* \* \*

13.[30] The aerial weapons handling trailer *according to Claim 1 wherein each lift arm is connected to one of the longitudinally extending beams of the frame for pivotal and sliding motion with respect thereto, wherein the distal end of each lift arm is pivotally connected to one of the lift beams, and further including a bell crank pivotally supported on the frame and connected between the hydraulic cylinder means and the lift arms, said bell crank being responsive to actuation of the hydraulic cylinder means*

---

**29.** Any underlining, bracketing or other emphasis or punctuation appearing in any of the claim language of the original application or any of the amendments thereto is from the file history or file wrapper of the patent in suit. The term file history or file wrapper is the term of art used to describe the Patent and Trademark Office's administrative record with respect to a particular application for the issuance of a patent.

**30.** Claim 13 later was renumbered as Claim 9, as is more fully discussed below.

to pivot the lift arm and thereby raise and lower the lift beam.

On March 8, 1983, before the First Office Action in the case, Standard filed with the United States Patent and Trademark Office, a Prior Art Statement, pursuant to Rule 1.56 of the Patent and Trademark Office Rules,[31] bringing to the attention of the Patent and Trademark Office prior art which the inventors believed to be material to the application. In the Prior Art Statement, Standard identified the MHU–7/M and MHU–33/M trailers as the closest prior art of which it was aware. Original drawings of the MHU–7/M and MHU–33/M trailers taken from one of Standard's catalogs were included with Standard's Prior Art Statement as submitted. These drawings also were included in the '548 patent issued on June 11, 1985, as prior art references which the Patent Examiner considered before the issuance of the patent in suit. Standard also pointed out in the Prior Art Statement that the MHU–7/M and MHU–33/M, "apparatus manufactured by Standard Manufacturing Company, Inc., have been in public use and on sale more than one year prior to the filing date of the above-identified application. Although other apparatus similar to that of Standard Manufacturing are manufactured by others, they are no more pertinent than the references of this group."

Standard then distinguished the claims submitted in the original application from the prior art MHU–7/M and MHU–33/M trailers. In doing so, Standard pointed out that:

[T]he references herein comprise weapons loading trailers which are relevant to the present invention in certain respects. Each reference utilizes a frame having a pair of longitudinally extending beams interconnected by a cross beam at the front ends thereof. The front and rear ends of the frame are each supported by at least two wheels. Each of the longitudinal beams of the frame has a pair of

lift arms pivoted thereto. Each pair of lift arms has a lift beam pivotally mounted to the distal ends thereof. Hydraulic cylinder means are included for pivoting both pairs of lift arms to raise and lower the lift beams.

Attempting to distinguish what it considered the most relevant prior art trailers from the invention disclosed in the application, Standard represented:

Notwithstanding these and other similarities, Applicants respectfully submit that the present invention is patentably distinct from the references of this group [prior art MHU–7/M and MHU–33/M trailers]. For example, the present invention is capable of lifting a weapons package into the weapons bay of an aircraft without the use of auxiliary lifting apparatus. This feature is accomplished by providing lift beams having outside surfaces which are spaced apart no further than the predetermined width of the weapons package. Therefore, the additional expense and operational complications associated with the references of this group [including the MHU–7/M and MHU–33/M trailers], including the need for an auxiliary device to lift and load weapons packages in particular instances, are obviated by the present invention.

On December 29, 1983, Standard submitted a Preliminary Amendment to its application, prior to the first Office Action of the Patent Examiner, Stuart Millman. In the Preliminary Amendment, Standard advanced an additional 9 claims, Claims 27–38, to be appended to its original application. The additional claims read as follows:

27. In a load handling trailer for receiving, transporting and lifting a load having a predetermined width, said trailer including a frame having at least two lift arms connected thereto, wherein said lift arms are supported on said frame for lifting, lowering and supporting said load, a plurality of load engaging means

**31.** As is discussed more fully below, Rule 56 of the Patent and Trademark Office Rules, 37 C.F.R. § 1.56 (1988), sets forth the applicant's duty of candor in the United States Patent and Trademark Office. It requires disclosures to the Patent and Trademark Office of any information which is material, i.e., which a reasonable examiner would consider important in deciding whether to allow the application to issue as a patent.

which are each connected to the distal ends of said lift arms, and further including means for selectively actuating said lift arms relative to said frame to lift, lower and support said load, the improvement comprising:

the ends of said lift arms adjacent and connected to said frame being positioned in a spaced apart relationship greater than said predetermined width of said load to provide additional stability for said load handling trailer when a load is supported thereby; and

the distal ends of said lift arms being inwardly offset from their respective points of connection to said frame toward the center of said frame to position said load engaging means, in a spaced apart relationship which is no greater than said predetermined width of said load.

28. The improvement according to Claim 27 wherein each of said lift arms includes a first portion adjacent and connected to said frame, an offset portion positioned at the end of said first portion remote from the point of connection of said lift arm to said frame, extending inwardly therefrom and toward the center of said frame, and a third portion, including the distal end of said lift arm, extending from said offset portion and positioned substantially inwardly from said first portion of said lift arm; and

said third portion of said lift arm being disposed directly beneath the bottom of said load.

29. The improvement according to Claim 27 wherein each of said lift arms pivots with respect to said frame in response to said actuation means to lift, lower and support said load.

30. The improvement according to Claim 29 wherein each of said lift arms pivots with respect to said frame along a substantially vertical plane to lift, lower and support said load.

31. The improvement according to Claim 30 wherein said first and third portions of each lift arm are aligned with the vertical plane along which said lift arm pivots to lift, lower and support said load.

32. A method of vertically transporting a load, having a predetermined diameter through an opening of minimal clearance comprising:

providing load supporting means for engaging and supporting said load along the bottom surface thereof at points within the outer-most lateral perimeter of said load;

providing lifting means, operatively connected to said supporting means for lifting, lowering and supporting said supporting means, wherein each of said lifting means includes a first portion positioned within the outer-most lateral perimeter of said load adjacent to and extending from said load supporting means and a remaining second portion of said lifting means positioned outside of the outer most lateral perimeter of said load;

providing a frame operatively connected to and supporting said lifting means at points positioned outside of the outer most lateral perimeter of said load, thereby providing additional stability in the handling of said load; and

actuating said lifting means to selectively pass said load, said load supporting means and some length of said first portion of said lifting means vertically through said opening.

33. The method according to Claim 32 wherein the step of providing lifting means includes providing at least two lifting arms connected to said frame at points which are positioned in a spaced apart relationship greater than said predetermined diameter of said load to provide stability in the handling of said load.

34. The method according to Claim 33 wherein the step of providing lifting means includes providing at least two lifting arms having ends distal from the ends thereof connected to said frame, which are inwardly offset toward the center of said frame to position said load supporting means within the outer most lateral perimeter of said load.

35. The method according to Claim 34 wherein said step of providing lifting means includes providing at least two lifting arms each having a first portion adjacent said frame, an offset portion

positioned at the end of said first portion remote from the point of connection of said lifting arm to said frame and extending inwardly therefrom, and a third portion extending from said offset portion and positioned substantially inwardly from said first portion of said lifting arm.

36. The method according to Claim 35 wherein said step of actuating said lifting means includes pivoting each of said lifting arms with respect to said frame.

37. The method according to Claim 36 wherein said step of actuating said lifting means includes pivoting each of said lifting arms with respect to said frame along a substantially vertical plane.

38. The method according to Claim 37 wherein said step of providing lifting means includes aligning said first and third portions of each lifting arm with the vertical plane along which said lifting arm is pivoted.

The first Office Action for the '548 patent was issued by the Patent Examiner on January 11, 1984. This Office Action documented a telephone conversation held on December 13, 1983, between Michael O'Neill, attorney for the plaintiff, and the Patent Examiner, in which, "a provisional election was made without traverse to prosecute the invention of figures 27–36 claims 1–3, 6–13 and 20–25." Claims 4, 5, 14–19 and 26 were "withdrawn from consideration by the Examiner as being drawn to a non-elected invention." Claims 6 and 7 were withdrawn because they are dependent on Claim 5, which is a claim that was not elected.[32] In addition, in the first Office Action, the Patent Examiner rejected remaining Claims 1–3, 8–13, and 20–25. Claim 1 was rejected "under 35 U.S.C. 103 as being unpatentable over Taylor in view of Norris." The Taylor reference, is an Elevating Dolly disclosed in United States Patent No. 2,929,519. The following diagrams are Figures 1 and 4 of the Taylor reference:

Taylor reference Figure 1.

_____

32. Subsequent to the withdrawal of Claims 4, 5, 14–19 and 26, the remaining claims were renumbered. This resulted in Claim 13 of the original patent application being referred to in the future as Claim 9 in the '548 patent.

Taylor reference Figure 4.

*Fig. 4.*

The Norris reference is United States Patent No. 3,972,379. The Examiner's discussion of the Norris and Taylor references reads as follows:

Taylor demonstrates a trailer 11 comprising two longitudinally extending beams 19 and 21, cross-member 22, removable cross-member 26, wheel assemblies 18, fores and aft lifting assemblies 14 and 15 and lifting beams 16. The lifting assemblies are pivotally mounted onto the base frame 12 and their distal ends are both pivotally and slidably mounted on the lifting beams 16. Each of the four lifting assemblies is controlled by a hydraulic cylinder. Norris demonstrates a vehicle drive system that comprises four wheels 16, powered by motors M1–M4, that can be pivoted about a vertical axis to allow a vehicle to move in any desired direction.

It would be obvious to modify the wheel assemblies of Taylor to include the type of driving system taught by Norris.

The Examiner also rejected Claims 2, 8, 9, and 20 "under 35 U.S.C. 103 as being unpatentable over Taylor in view of Norris as applied to claim 1" and "further in view of Ryan." The Ryan reference is United States Patent No. 2,454,840. The Examiner stated:

Ryan demonstrates a lifting trailer comprised of longitudinally extending beams 2 and 3, cross-member 4, lifting beams 29 and 54 and hydraulic cylinders 36 and 37. The lifting beams 29 and 54 are constrained to remain parallel during the lifting cycle and are pivotally attached to the inside of the longitudinally extending beams 2 and 3.

It would be obvious to modify the lifting arms of Taylor to be pivotally mounted on the longitudinal beams and to have them oriented so that they remain parallel, as taught by Ryan, in a system combining the teachings of Taylor and Norris. The shape of the lifting arms is considered to be only a design choice that adds no new, unexpected or unobvious teaching over the prior art.

Finally, the Examiner rejected Claims 3, 10–13 and 21–25 "under 35 U.S.C. 103 as being unpatentable over Taylor in view of Norris and Ryan as applied to claim 1 above, and further in view of the MHU33M or MHU7M bomb trailers." The Examiner

then continued with the following description of his analysis of the prior art trailers, apparently based upon the two diagrams presented by the applicant, Standard, to the Examiner as part of the Prior Art Statement, filed on March 8, 1983:

The dimensional layouts of the MHU33M and MHU7M bomb trailers show a system including a longitudinal adjustment mechanism for moving the lift beams relative to the lift arms, a bell crank used between the lift arm and the hydraulic cylinder powering it and a connection link between the fore and aft bell cranks that also includes a tilt adjustment mechanism.

It would be obvious to include a selective longitudinal position control mechanism, as shown by the MHU33M or the MHU7M, between the lifting arms and lifting beams of Taylor's system and it would also be obvious to add the bell crank and connecting link, also shown by the MHU33M or the MHU7M, in combination of the teachings of Taylor, Norris, and Ryan. Also, it would be obvious to modify the connecting link in this modified system to include a tilt adjustment mechanism, like the one taught by the MHU33M or the MHU7M. The powering system for operating the tilt mechanism, and the shape of the lift arms are considered to be only design choices over the systems in the prior art.

Following the first Office Action, the Patent Examiner, Mr. Millman, held a telephonic conference with one of Standard's patent counsel, Gregory Carr, on January 17, 1984. The Examiner Interview Summary Record documenting the conference states that: (1) no exhibit was shown or demonstration was conducted; (2) the claims discussed were 27 through 38; (3) that an agreement "was reached with respect to some or all of the claims in question;" and (4) in Mr. Millman's handwriting: "Mr. Carr confirmed that claims 27–38, which were amended on 12/28/83, read on the previously elected species as described in Figures 27–36."

In a second Office Action, dated February 3, 1984, the Patent Examiner stated that the remaining Claims 1–3, 8–13, 20–25 and 27–38 are rejected. Most notably, in the statement of the Examiner which is part of this Office Action, the Examiner rejected the claims added in the first Amendment, Claims 27–38, "under 35 U.S.C. 102(b) as being anticipated by Taylor." The Examiner wrote: "Note that Taylor shows lift arms having offset elements."

In response to these two Office Actions, on April 16, 1984, Standard filed a second Amendment to its application for a patent on its Aerial Weapons Handling Trailer. The Amendment reads as follows: [33]

Kindly cancel Claims 27 through 38, inclusive, and amend Claims 1, 2 and 20 as follows:

1. (Amended) An aerial weapons handling trailer for receiving, transporting and lifting weapons packages characterized by a predetermined width comprising:

a frame including first and second longitudinally extending beams spaced apart more than the predetermined width and a cross beam interconnecting the front ends of the longitudinally extending beams;

at least two front wheels and at least two rear wheels for supporting the front and rear ends of the frame, respectively;

means supporting the front and rear wheels for pivotal movement between first orientations wherein the wheels support the frame for movement in a direction extending substantially parallel to the longitudinally extending beams of the frame and second orientations wherein the wheels support the frame for movement in a direction extending substantially perpendicular to the longitudinally extending beams of the frame;

[drive means for selectively rotating at least one of the front wheels and at least

---

**33.** The underlined sections of the amended claims represent those sections which were added in the second Amendment. The brackets are also included in the claims language as presented.

one of the rear wheels to propel the trailer;]

at least four lift arms;

means supporting *the proximal ends of* at least two of the lift arms on the first longitudinally extending beam of the frame for pivotal movement with respect thereto;

means supporting *the proximal ends of* at least two of the lift arms on the second longitudinally extending beam of the frame for pivotal movement with respect thereto;

hydraulic cylinder means connected between the frame and the lift arms for selective actuation to pivot the lift arms relative to the frame;

first and second lift beams;

means supporting the first lift beam on the distal ends of the lift arms that are pivotally supported on the first longitudinally extending beam of the frame;

means supporting the second lift beam on the distal ends of the lift arms that are pivotally supported on the second longitudinally extending beam of the frame;

[the distal ends of the lift arms being inwardly offset to support the lift beams in a spaced apart relationship which is not greater than the predetermined width of the weapons package; and]

*the lift arms being pivotable between a first position, wherein the distal ends thereof are disposed adjacent a plane defined by the bottom surfaces of the trailer wheels, and a second position, wherein the distal ends of said lift arms are disposed above the proximal ends thereof, the lift arms including:*

*a) first portions, including the proximal ends thereof;*

*b) third portions, including the distal ends thereof; and*

*c) offset portions rigidly interconnecting the first and third positions thereof;*

*the first portions of the lift arms supported on the first longitudinally extending beam being spaced from the first portions of the corresponding lift arms supported on the second longitu-*

*dinally extending beam a distance greater than the predetermined width of the weapons package, such that clearance is maintained between the first portions of the lift arms and the weapons package as the lift arms pivot between the first and second positions;*

*the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the outwardly facing surfaces of the third portions of the corresponding lift arms supported on the second longitudinally extending beam a distance no greater than predetermined width of the weapons package, such that the third portions of the lift arms do not extend from within the outermost lateral periphery of the weapons package as the lift arms pivot between the first and second portions;*

*the first and third portions of each lift arm extending from the offset portion thereof to form an obtuse angle, such that when lift arms are in the first position, the first portions thereof extend downwardly from the frame and the third portions thereof extend substantially parallel to the plane defined by the bottom surfaces of the trailer wheels; and*

the lift arms being pivotable under the action of the hydraulic cylinder means to position the lift beams beneath a weapons package that is received between the longitudinally extending beams of the frame and thereafter to move the lift beams and the weapons package carried thereby upwardly between the longitudinally extending beams of the frame and further upwardly into the weapons bay of an aircraft.

2. (Amended) The aerial weapons handling trailer according to Claim 1 wherein each of the longitudinally extending beams of the frame is characterized by an inwardly facing surface, [and wherein each of the lift arms includes a] *the* first portion of each lift arm is pivotally connected to one of the longitudinally extending beams of the frame and

[extending] *extends* adjacent and substantially parallel to the inwardly facing surface of the longitudinally extending beam of the frame, [a second portion positioned at the end of the first portion remote from the point of pivotal connection thereof to the longitudinally extending beam of the frame and extending inwardly therefrom,] and [a] *the* third portion [extending] *of each lift arm extends* from the [inwardly] offset portion parallel to the [first portion] *inwardly facing surface of the longitudinally extending beam of the frame* and *is* positioned substantially inwardly therefrom.

20. (Amended) An aerial weapons handling trailer for receiving, transporting and lifting weapons packages characterized by a predetermined width comprising:

a frame including first and second longitudinally extending beams and a cross beam interconnecting the front ends of the longitudinally extending beams;

the longitudinally extending beams having inwardly facing surfaces spaced apart further than the predetermined width of the weapons package;

at least two front wheels and at least two rear wheels for supporting the front and rear ends of the frame, respectively;

means supporting the front and rear wheels for pivotal movement between first orientations wherein the wheels support the frame for movement in a direction extending substantially parallel to the longitudinally extending beam of the frames and second orientations wherein the wheels support the frame for movement in a direction extending substantially perpendicular to the longitudinally extending beams of the frame;

[drive means for selectively rotating at least one of the front wheels and at least one of the rear wheels to propel the trailer;]

a plurality of lift arms;

means pivotally supporting *the proximal ends of* at least two of the lift arms on the first longitudinally extending beams of the frame with the lift arms

extending substantially parallel to each other;

means supporting *the proximal ends of* at least two of the lift arms on the second longitudinally extending beam of the frame with the lift arms extending substantially parallel to each other;

[each of the lift arms including a first portion pivotally connected to one of the longitudinally extending beams of the frame and extending adjacent and parallel to the inside surface of the longitudinally extending beam, a second portion extending inwardly from the first portion, in a third portion extending from the second portion substantially parallel to the first portion and positioned substantially inwardly therefrom relative to the longitudinally extending beam of the frame;]

*the lift arms being pivotable between a first position, wherein the distal ends thereof are disposed adjacent a plane defined by the bottom surfaces of the trailer wheels, and a second position, wherein the distal ends of said lift arms are disposed above the proximal ends thereof, the lift arms including:*

*a) first portions, including the proximal ends thereof;*

*b) third portions, including the distal ends thereof; and*

*c) offset portions rigidly interconnecting the first and third portions thereof,*

*the first portions of the lift arms supported on the first longitudinally extending beams being spaced from the first portions of the corresponding lift arms supported on the second longitudinally extending beam a distance greater than the predetermined width of the weapons package, such that clearance is maintained between the first portions of the lift arms and the weapons package as the lift arms pivot between the first and second positions;*

*the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the outwardly facing surfaces of the third*

*portions of the corresponding lift arms supported on the second longitudinally extending beam a distance no greater than predetermined width of the weapons package, such that the third portions of the lift arms do not extend from within the outermost lateral periphery of the weapons package as the lift arms pivot between the first and second positions,*

*the first and third portions of each lift arm extending from the offset portion thereof to form an obtuse angle, such that when the lift arms are in the first position, the first portions thereof extend downwardly from the frame and the third portions thereof extend substantially parallel to the plane defined by the bottom surfaces of the trailer wheels;*

a pair of lift beams including [the] *a* first lift beam supported on the distal ends of the lift arms which are in turn pivotally supported on the first longitudinally extending beam of the frame and a second lift beam supported on the distal ends of the lift arms which are pivotally supported on the second longitudinally extending beam of the frame;

the lift beams having outside surfaces which are spaced apart no further than the predetermined width of the weapons package;

means connecting the distal ends of the [left] *lift* arms to the lift beams for pivotal movement with respect thereto; and

hydraulic cylinder means connected between the frame and lift arms for selective actuation to pivot the lift arms and thereby raise and lower the lift beams.

Kindly add the following new claims:

39. In a load handling trailer for receiving, transporting and lifting a load having a predetermined width, said trailer including a frame having at least two lift arms pivotally connected to said frame at the proximal ends thereof within said frame, wherein said lift arms are supported on said frame for lifting, lowering and supporting said load, a plurality of loading engaging means which are each connected to the distal ends of said lift arms, and further including means for selectively pivoting said lift arms relative to said frame to lift, lower and support said load, the improvement comprising:

means for supporting said frame at a predetermined distance above an underlying support surface;

said lift arms being pivotable between a first position, wherein the distal ends of said lift arms are disposed adjacent the underlying support surface, and a second position, wherein the distal ends of said lift arms are disposed above the proximal ends thereof;

said lift arms including:

first portions, including the proximal ends thereof, positioned in a spaced apart relationship greater than the predetermined width of said load, such that clearance is maintained between the first portions of said lift arms and said load as said lift arms pivot between said first and second positions;

third portions, including the distal ends thereof, positioned in a spaced apart relationship that is no greater than the predetermined width of said load, such that the outer surfaces of the third portions of said lift arms are spaced apart no more than the predetermined width of said load as said lift arms pivot between said first and second positions; and

offset portions interconnecting the first and third portions thereof;

the first and third portions of said lift arms extending from said offset portions to form an obtuse angle, such that when said lift arms are disposed in said first positions, the first portions thereof extend downwardly from said frame and said third portions thereof extend substantially parallel to the underlying support surface.

40. The improvement according to Claim 39 wherein said lift arms pivot at the proximal ends thereof only about an axis which is substantially horizontal relative to said frame, to lift, lower and support said load.

41. The improvement according to Claim 40 wherein said frame includes first and second longitudinally extending beams spaced apart more than the predetermined width of said load, and wherein each of said lift arms is pivotally connected to one of the longitudinally extending beams.

42. The improvement according to Claim 41 wherein each of the longitudinally extending beams of said frame is characterized by an inwardly facing surface, and wherein the first and third portions of each of said lift arms extend substantially parallel to the inwardly facing surface of the longitudinally extending beam of said frame to which said lift arm is pivotally connected.

43. The improvement according to Claim 40 wherein the first and third portions of each of said lift arms remain substantially parallel to a plane which is perpendicular to the relatively horizontal axis about which each said lift arm pivots as said lift arm pivots between said first and second positions.

44. The improvement according to Claim 39 wherein the predetermined distance above the underlying surface at which said frame is supported is at least as great as one-half the height of said load, such that said load is cradled between the longitudinal beams of said frame when said lift arms are in said first position, and such that when said lift arms are in said second position, said load will be raised above the underlying surface to a height that is substantially greater than the height of said load.

After the inclusion of the amendments to the pending patent application, Standard included several pages of Remarks to the Amendment filed April 16, 1984 with the Patent and Trademark Office. In these Remarks, Standard attempted to describe the invention's uniqueness to the Patent Examiner:

As a result of the previously identified Office Actions, Claims 1 through 3, 8–13, 20–15 and 27–38 stand rejected. Responsive to the grounds of rejection cited in such Office Actions, Claims 1, 2 and 20 are hereby amended, Claims 27–38 are hereby cancelled and new Claims 39–44 are hereby added. Accordingly, Applicants respectfully request reconsideration of and favorable action with respect to all claims presently pending and under consideration in [this] application.

The present invention embodies a number of unique and innovative structural features specifically relating to the lift arms of a load handling trailer. Such features provide a desirable combination of functional characteristics unavailable in prior art devices. Specifically, the load handling trailer of the present invention is capable of lifting and lowering a load having a predetermined width through an opening which allows only *minimal side clearance*. In addition, the present invention is capable of lifting a load directly from the surface on which both the trailer and the load rest and then transporting the load beneath obstructions providing *only minimal overhead clearance*. Further, the present invention is more *stable* than conventional devices when a load is lifted to its fully raised position. These functional characteristics combine to yield a load handling trailer that is far more versatile and reliable than those previously available. As is discussed in greater detail hereinafter, the unique structural configuration of the lift arms of the present invention, as now defined by the claims, provide the aforementioned desirable functional characteristics.

The references cited by the Examiner do not disclose or suggest the structural features providing the highly desirable characteristics of the present invention. A careful review of the structure disclosed by the cited references is necessary for an understanding of the distinctions between the devices disclosed thereby and the present invention. Further, an understanding of the devices disclosed by the cited references will also underscore their respective limitations and conversely, highlight the desirable features of the present invention.

In addition, Standard attempted to distinguish its invention from those inventions

cited as prior art by the Patent Examiner in the previous Office Actions:

The patent to Taylor discloses a trailer having lifting assemblies 14 and 15, each supporting a beam 16 connected therebetween. The lifting assemblies 14 and 15 are each centrally hinged, such that the assemblies extend and retract in accordion-like fashion. Due to the manner in which the assemblies 14 and 15 extend and retract, the beam 16 cannot be retracted or lowered below the trailer frame 12. In other words, the structural features of the lifting assemblies 14 and 15 limit the range of downward movement of the lift beam 16 to the height of the trailer frame 12. Thus, it is *impossible* for the device of Taylor to lift a load from the underlying surface or to transport the load below an obstacle allowing only minimal overhead clearance. Furthermore, any attempts to reduce the minimum overhead clearance characteristics of Taylor by lowering the trailer frame 12 would require a corresponding lengthening of lifting assemblies 14 and 15, if the device is to retain the same upper limits of its range movement. Such a correction would reduce the stability of the trailer in Taylor since longer lifting assemblies 14 and 15 are significantly more susceptible to load sway when the lift assemblies are fully extended.

The patent to Ryan discloses a trailer having lift beams 29 and 54 pivotally mounted to the trailer frame 2. The lifting beams 29 and 54 pivot between lower and upper positions to raise or lower a load supported thereby. Although the construction of the Ryan trailer allows for a minimum overhead clearance, the trailer is *incapable* of lifting a load through an opening allowing only minimum side clearance for the load. Specifically, the entire length of the lifting beams 29 and 54 are spaced apart greater than the width of the load which they support. This is illustrated particularly well in Figure 2 of Ryan, which shows the lifting beams 29 and 54 extending along the sides of the load when they are positioned in the lowered position. However, as if further shown in Figure 2 of Ryan, when the load is lifted into the fully raised position, a portion of the lifting beans 29 and 54 will continuously straddle the sides of the load. Thus, the lifting beams 29 and 54 must extend into any opening through which the load is to be lifted or lowered. Since the lifting beams 29 and 54 are spaced apart a greater distance than the width of the load, the Ryan trailer cannot be utilized to lift or lower a load through an opening allowing only minimal side clearance for the load.

The MHU33M and MHU7M trailers cited by the Examiner are structurally and functionally similar to the Taylor reference. As in Taylor, these trailers are *incapable* of lifting or lowering a load through an opening which provides minimal side clearance for the load. As is shown by the drawings depicting the MHU33M and MHU7M trailers, the lifting arms extend along the sides of a load supported thereby when the arms are in their lowered position. Therefore, any opening through which the load is lifted or lowered must provide additional clearance for the lifting arms supporting the load. Without such clearance, the MHU33M and MHU7M trailers are incapable of lifting or lowering a load completely through an opening.

Subsequent to Standard's filing of the Amendment to its pending application, on May 30, 1984, the Examiner issued his third and final Office Action which rejected the plaintiff's application. The Examiner rejected Claims 1–3, 8–13, 20–25 and 39–44 over the MHU–7/M and MHU–33/M trailers in view of the newly identified Hillberg reference, United States Patent No. 2,934,228. The relevant elements of the Hillberg reference, specifically, the lift arms which are gradually offset and connected to the outside later surface of the lift beams, can be seen in Figures 2 and 3 of Hillberg patent reproduced below:

Figure 2 of the Hillberg reference.

Figure 3 of the Hillberg reference.

Specifically, the Examiner's statement concerning the rejection of the pending claims, attached to the next Office Action stated, in relevant part, as follows:

2. Claims 1–3, 8–13, 20–25 and 39–44 are rejected under 35 U.S.C. 103 as being unpatentable over the MHU33M or the MHU7M trailer in view of Hillberg.

Hillberg demonstrates an article handling trailer comprising a U-shaped frame 12, lift arms 38 and 40, lifting means 36 and lift beams 64. Said lift arms 38 and 40 are shown to be comprised of an offset portion situated between a portion of said at the frame/arm connection 50 and 52 and a portion with pivots at the lift beam/arm connection 66 and 68. This offset portion can be seen best in Figure 3.

It would be obvious to utilize lifting arms with offset portions in the MHU33M or the MHU7M trailers in view of Hillberg's teaching.

Subsequent to the Patent and Trademark Office's May 30, 1984 rejection of Standard's application, one of Standard's patent counsel, Gregory Carr, appeared, in person, for two interviews with the Examiner assigned to Standard's application, as well as the Primary Examiner, Mr. Valenza, in the case. According to the required documentation in the file history of the patent in suit, the first personal interview was conducted on July 19, 1984 between Mr. Carr and Mr. Valenza. The Examiner Interview Summary Record describes the interview by indicating that: (1) no exhibit or demonstration was shown to the examiner; (2) no agreement between the parties was reached; and (3) the parties "discussed importance of third portions 48'–54' in applicants structure over the teachings in prior art." The summary record bears the signature of the primary Examiner, Mr. Valenza.

The file history also contains an Examiner Interview Summary Record documenting the second interview, held on September 10, 1984, with Mr. Carr and Examiners

Millman and Valenza present. As described by the Summary Record signed by Stuart Millman, the Examiner during the interview: (1) an exhibit, "photo of prior art, weapons handling trailer" was shown to the Examiners; (2) Standard's patent counsel and the Examiners discussed Claim 1 of the pending application as well as the "prior art trailers and Hillberg;" and (3) "Examiner suggested deleting in the claims 'width of weapons package' and inserting 'width between outermost lateral edges of the lift beams' and functional language concerning lift beams and third portion of lift arms and ~~operation thereof~~ [34] there widths."

Subsequent to the two interviews during which the Examiners suggested language to clarify the function of the offset in terms of the lift beams, the proximal and distal ends of the lift arms, and the separation between the lift beams and the lift arms, and in response to the Office Action dated May 30, 1984, Standard submitted, on October 1, 1984, its third and final Amendment to its application. The October 1, 1984 Amendment reads, in pertinent part, as follows:

Kindly cancel Claims 27–39 and 41 and amend Claims 1, 20, 40 and 42–44 as follows: [35]

1. (Twice Amended) An aerial weapons handling trailer for receiving, transporting and lifting weapons packages characterized by a predetermined width comprising:

a frame including first and second longitudinally extending beams spaced apart more than the predetermined width and a cross beam interconnecting the front ends of the longitudinally extending beams;

at least two front wheels and at least two rear wheels for supporting the front and rear ends of the frame, respectively;

means supporting the front and rear wheels for pivotal movement between

---

**34.** Crossed out on Millman's Examiner Interview Summary Record.

**35.** As with the second Amendment, the underlined sections of the amended claims represent

those sections which Standard added in the third Amendment. The brackets are also included in the claims language, as presented.

first orientations wherein the wheels support the frame for movement in a direction extending substantially parallel to the longitudinally extending beams of the frame and second orientations wherein the wheels support the frame for movement in a direction extending substantially perpendicular to the longitudinally extending beams of the frame;

at least four lift arms;

means supporting the proximal ends of at least two of the lift arms on the first longitudinally extending beam of the frame for pivotal movement with respect thereto;

means supporting the proximal ends of at least two of the lift arms on the second longitudinally extending beam of the frame for pivotal movement with respect thereto;

hydraulic cylinder means connected between the frame and the lift arms for selective actuation to pivot the lift arms relative to the frame;

first and second lift beams;

means supporting the first lift beam on the distal ends of the lift arms that are pivotally supported on the first longitudinally extending beam of the frame;

means supporting the second lift beam on the distal ends of the lift arms that are pivotally supported on the second longitudinally extending beam of the frame;

the lift arms being pivotable between a first position, wherein the distal ends thereof are disposed adjacent a plane defined by the bottom surfaces of the trailer wheels, and a second position, wherein the distal ends of said lift arms are disposed above the proximal ends thereof, the lift arms including:

a) first portions, including the proximal ends thereof;

b) third portions, including the distal ends thereof; and

c) offset portions rigidly interconnecting the first an third portions thereof;

the first portions of the lift arms supported on the first longitudinally extending beam being spaced from the first

portions of the corresponding lift arms supported on the second longitudinally extending beam a distance greater than the predetermined width of the weapons package, such that clearance is maintained between the first portions of the lift arms and the weapons package as the lift arms pivot between the first and second positions;

*the lift beams having outside surfaces which are spaced apart less than the inner surfaces of said first portions of said lift arms, thereby allowing said lift beams to be lowered between said first portions of said lift arms;*

the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the outwardly facing surfaces of the third portions of the corresponding lift arms supported on the second longitudinally extending beam a distance *substantially* no greater than *the distance between the outermost lateral surfaces of said lift beams, thereby allowing said lift arms to pivot upwardly and insert said lift beams, said third portions of said lift arms and the weapons package upwardly through an opening of minimum clearance with respect to the weapons package,* [predetermined width of the weapons package,] such that the portions of the lift arms do not extend from within the outermost lateral periphery of the weapons package as the lift arms pivot between the first and second positions;

the first and third portions of each lift arm extending from the offset portion thereof to form an obtuse angle, such that when the lift arms are in the first position, the first portions thereof extend downwardly from the frame and the third portions thereof extend substantially parallel to the plane defined by the bottom surfaces of the trailer wheels; and

the lift arms being pivotable under the action of the hydraulic cylinder means to position the lift beams beneath a weapons package that is received between the longitudinally extending beams of the

frame and thereafter to move the lift beams and the weapons package carried thereby upwardly between the longitudinally extending beams of the frame and further upwardly into the weapons bay of an aircraft.

20. (Twice Amended) An aerial weapons handling trailer for receiving, transporting and lifting weapons packages characterized by a predetermined width comprising:

a frame including first and second longitudinally extending beams and a cross beam interconnecting the front ends of the longitudinally extending beams;

the longitudinally extending beams having inwardly facing surfaces spaced apart further than the predetermined width of the weapons package;

at least two front wheels and at least two rear wheels for supporting the front and rear ends of the frame, respectively;

means supporting the front and rear wheels for pivotal movement between first orientations wherein the wheels support the frame for movement in direction extending substantially perpendicular to the longitudinally extending beams of the frame;

a plurality of lift arms;

means pivotally supporting the proximal ends of at least two of the lift arms on the first longitudinally extending beam of the frame with the lift arms extending substantially parallel to each other;

the lift arms being pivotable between a first position, wherein the distal ends thereof are disposed adjacent a plane defined by the bottom surfaces of the trailer wheels, and a second position, wherein the distal ends of said lift arms are disposed above the proximal ends thereof, the lift arms including:

a) first portions, including the proximal ends thereof;

b) third portions, including the distal ends thereof; and

c) offset portions rigidly interconnecting the first and third portions thereof;

the first portions of the lift arms supported on the first longitudinally extending beam being spaced from the first portions of the corresponding lift arms supported on the second longitudinally extending beam a distance greater than the predetermined width of the weapons package, such that clearance is maintained between the first portions of the lift arms and the weapons package as the lift arms pivot between the first and second positions;

*a pair of lift beams including a first lift beam supported on the distal ends of the lift arms which are in turn pivotally supported on the first longitudinally extending beam of the frame and a second lift beam supported on the distal ends of the lift arms which are pivotally supported on the second longitudinally extending beam of the frame;*

*the lift beams having outside surfaces which are spaced apart less than the inner surfaces of said first portions of said lift arms, thereby allowing said lift beams to be lowered between said first portions of said lift arms;*

the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the outwardly facing surfaces of the third portions of the corresponding lift arms supported on the second longitudinally extending beam a distance *substantially* no greater than *the distance between the outermost lateral surfaces of said lift beams, thereby allowing said lift arms to pivot upwardly and insert said lift beams, said third portions of said lift arms and the weapons package upwardly through an opening of minimum clearance with respect to the weapons package,* [predetermined width of the weapons package,] such that the third portions of the lift arms do not extend from within the outermost lateral periphery of the weapons package as the lift arms pivot between the first and second position;

the first and third portions of each lift arm extending from the offset portion

thereof to form an obtuse angle, such than when the lift arms are in the first position, the first portions thereof extend downwardly from the frame and third portions therefor extend substantially parallel to the plane defined by the bottom surfaces of the trailer wheels;

[a pair of lift beams including a first lift beam supported on the distal ends of the lift arms which are in turn pivotally supported on the first longitudinally extending beam of the frame and a second lift beam supported on the distal ends of the lift arms which are pivotally supported on the second longitudinally extending beam of the frame;

the lift beam having outside surfaces which are spaced apart no further than the predetermined width of the weapons package;]

means connecting the distal ends of the lift arms to the lift beams for pivotal movement with respect thereto; and

hydraulic cylinder means connected between the frame and lift arms for selective actuation to pivot the lift arms and thereby raise and lower the lift beams.

Also included as part of Standard's October 3, 1984 filing with the Patent and Trademark Office is a Remarks section in which Standard responded to the final Office Action, dated May 30, 1984, and argued the patentability of its invention over the prior art. The Remarks section states, in pertinent part, the following:

Responsive to the Office Action dated May 30, 1984, independent Claims 1 and 20 are hereby amended to more distinctly define the present invention. Specifically, through such amendments applicants have incorporated language which was suggested by Examiners Millman and Valenza during an interview which took place on September 10, 1984. Independent Claim 39 is hereby cancelled and Claims 40 and 42–44 are hereby amended to depend from Claim 20. Claim 43 is further amended to cure a typographical error cited by the Examiner. Reconsideration of the above-identified application in light of the foregoing amendments is respectfully requested.

Applicants direct the Examiner to the Remarks section of their amendment, filed on April 11, 1984, for its discussion of the desirable features provided by the present invention, but undisclosed by the prior art.

Claims 1–3, 8–13, 20–25, 40 and 42–44 stand rejected under 35 U.S.C. § 103 as being unpatentable over the MHU 33M or MHU 7M trailer, (hereinafter "MHU trailers") manufactured by the assignee of the present invention, in view of the Hillberg reference. Attached hereto as Exhibit A is a photograph which more adequately illustrates the structure and operation of the MHU trailers than do the materials submitted with the Prior Art Statement filed in the above-identified application. Applicants respectfully submit that the present invention is patentably distinguishable from the reference cited by the Examiner, either singly or in combination.

Exhibit A illustrates that the MHU trailers are incapable of lifting a load from the ground and inserting the load through an opening of minimal lateral clearance. This is due to the construction of the lifting arms of these trailers, which do not contain the *dog-leg* and *offset* features claimed in the above-identified application. Therefore, such trailers require that their loads be equipped with lifting pins which extend from the lateral surfaces of the load. Such lifting pins allow the load to be lowered between the lifting arms of the MHU trailers. Clearly the lifting arm arrangement of the MHU trailers requires an opening allowing a substantial amount of clearance adjacent the lateral surfaces of the load to accommodate insertion of both the load and the lifting arms therethrough.

The Examiner contends that it would be obvious to combine the Hillberg reference with the MHU trailers to yield the combination of features claimed in the above-identified application. However, Applicants respectfully submit that Hillberg does not disclose or even suggest the arrangement of lift arms and lift

beams claimed in the above-identified application.

Conspicuously absent from the disclosure of Hillberg is any reference to the ability of the lift arm and lift beam arrangement to lift the load *above* the side beams of the vehicle and to then *insert* the load through an opening of minimum clearance. In fact, careful study of Figure 3 of Hillberg reveals that the entire length of the lift arms 38 and 40 extend outside of the outermost lateral perimeter of the load which they support. Moreover, rather than incorporating a true *offset* portion, such as that claimed in the above-identified application, the lift arms of Hillberg gradually extend outwardly from the lift beams to the trailer. This is perhaps more clearly illustrated by the top view shown in Figure 2. Therefore, incorporation of the lift arms 38 and 40 of Hillberg in the MHU trailers would fall far short of providing the highly desirable capabilities found in the present invention.

It is Applicants' understanding, from the Examiner Interview of September 10, 1984, that the Examiner agrees that the present invention is patentably distinguishable from the cited combination of Hillberg and the MHU trailers. However, Examiners Valenza and Millman suggested that independent Claims 1 and 20 be amended to define the present invention in terms which can be interpreted independently of the particular load with which the claimed invention is utilized. It was also suggested by Examiners Valenza and Millman that Claims 1 and 20 include language describing the function performed by the present invention.

Accordingly, Claims 1 and 20 are hereby amended to define the spacing between the outside lateral surfaces of each pair of lift arms in terms of the spacing between the lift beams which they support. In addition, language is hereby incorporated to emphasize the primary function of the present invention. Please note that many of the amendments hereby effected in Claim 20 were necessary to properly provide an antecedent basis for such additional structural and functional language. Applicants stand ready to work further with the Examiner if necessary, to arrive at acceptable claim language.

\* \* \* \* \* \*

Following the submission of Standard's Amendment, described above, the file wrapper or history of the patent in suit contains a fourth Examiner Interview Summary Record. The fourth interview summary describes a telephonic interview between Standard's patent counsel, Mr. O'Neil, and Examiner Millman held on October 9, 1984. The record reports that: (1) no exhibit was shown or demonstration was conducted; (2) an agreement was reached with respect to the some or all of the claims in question; (3) the parties discussed Claims 4–7, 14–19 and 26; and (4) the Examiner represents that: "Attorney O'Neil agreed to the changes in the claim which will be done by Examiner's Amendment attached herewith." This fourth interview summary record also bears the signature of Examiner Millman.

Following the final interview summary record, the file wrapper contains documents which indicate that the Examiner had concluded to allow certain claims of the pending application. Specifically, the Notice of Allowability, which was mailed October 22, 1984, states that Claims 1–3, 8–13, 20–25, 40, 42, 43 and 44 of the present invention were allowed by the Examiner in view of: (1) the applicants communication filed October 1, 1984;[36] (2) an "interview

---

36. According to the file wrapper, the Amendment filed by Standard on October 1, 1984 was stated by Valenza as having been the influential document in convincing the Examiner to allow the patent in suit. Included in the amended claims contained in this filing were statements suggested by the Patent Examiner, Stuart Millman, during the phone conference held on September 10, 1984. These statements, as included in the amended claims, are as follows:

\* \* \* \* \* \*

*the lift beams having outside surfaces which are spaced apart less that the inner surfaces of said first portions of lift arms, thereby allowing said lift beams to be lowered between said first portions of said lift arms;*

summarized on the attached Examiner Interview Summary Record;" and (3) the "attached Examiner's Amendment." The Notice of Allowability was signed by Primary Examiner Valenza and initialized by Examiner Millman.

The application for the present invention was then reviewed by the appropriate military personnel, including Air Force personnel, Charles Anthony and Colonel Marchiondo, for a determination as to whether the information disclosed therein, in anyway contained classified information. Subsequently, a Notice of Allowance and Issue Fee Due was mailed to Standard's patent counsel on November 26, 1984. The document indicates that the application for the patent in suit was closed and, following examination, has been found "allowable for issuance of Letters Patent."

On March 25, 1985, prior to the issuance of the patent in suit, Standard filed a document transmitting formal drawings for inclusion in the application for Standard's patent entitled Aerial Weapons Loading Trailer and filed a Supplemental Information Disclosure Statement. Pursuant to the duty of disclosure outlined in the Rules of the Patent and Trademark Office, Standard determined that it should supplement the prior art references already in its application with any additional references which might have been pertinent to the investigation of its application. Following a list of supplemental references, Standard's filing, dated March 25, 1984, includes a Remarks section in which Standard attempted to distinguished the prior art references cited in the supplemental disclosure statement. As indicated in the file wrapper, the March 25, 1985 Supplemental Information Disclosure

Statement was "placed in the file but ha[s] not been considered since the provisions of MPEP [Manual of Patent Examiners Procedures] for information filed after the claims have been indicated as allowable have not been satisfied," and, further, Standard did not file a "petition under 37 CFR 312(b) with appropriate fee." [37]

The '548 patent for the Aerial Weapons Handling Trailer was issued to Standard, as assignee of the inventors, on June 11, 1985. As issued, the pertinent claims of the patent in suit, Claims 1 and 9, read as follows:

1. An aerial weapons handling trailer receiving, transporting and lifting weapons packages characterized by a predetermined width comprising:

a frame including first and second longitudinally extending beams spaced apart more than the predetermined width and a cross beam interconnecting the front ends of the longitudinally extending beams;

at least two front wheels and at least two rear wheels for supporting the front and rear ends of the frame, respectively;

means supporting the front and rear wheels for pivotal movement between first orientations wherein the wheels support the frame for movement in a direction extending substantially parallel to the longitudinally extending beams of the frame and second orientations wherein the wheels support the frame for movement in a direction extending substantially perpendicular to the longitudinally extending beams of the frame;

at least four lift arms;

---

the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the outwardly facing surfaces of the third portions of the corresponding lift arms supported on the second longitudinally extending beam a distance *substantially* no greater than *the distance between the outermost lateral surfaces of said lift beams, thereby allowing said lift arms to pivot upwardly and insert said lift beams, said third portions of said lift arms and the weapons package upwardly through an opening of minimum clearance with respect to the weapons package.* * * *

37. Also prior to the issuance of the '548 patent, Standard became aware of the MHU–145/M trailer and brought it to the attention of the Examiner in connection with a co-pending continuation application. In an Information Disclosure Statement, dated May 17, 1985, Standard cited to a document entitled "Life Cycle Cost Estimate for Munitions Transporter/Loading System (MTLS) B–1 Loader (MHU–145/M)." One of the co-inventors of the patent in suit, Ray Dean, received a copy of this reference from Charles Anthony, an Air Force Engineer.

means supporting the proximal ends of at least two of the lift arms on the first longitudinally extending beam of the frame for pivotal movement with respect thereto;

means supporting the proximal ends of at least two of the lift arms on the second longitudinally extending beam of the frame for pivotal movement with respect thereto;

hydraulic cylinder means connected between the frame and the lift arms for selective actuation to pivot the lift arms relative to the frame;

first and second lift beams;

means supporting the first lift beam on the distal ends of the lift arms that are pivotally supported on the first longitudinally extending beam of the frame;

means supporting the second lift beam on the distal ends of the lift arms that are pivotally supported on the second first longitudinally extending beam of the frame;

the lift arms being pivotable between a first position, wherein the distal ends thereof are disposed adjacent a plane defined by the bottom surfaces of the trailer wheels, and a second position, wherein the distal ends of said lift arms are disposed above the proximal ends thereof, the lift arms including:

(a) first portions, including the proximal ends thereof;

(b) third portions, including the distal ends thereof; and

(c) offset portions rigidly interconnecting the first and third portions thereof;

the first portions of the lift arms supported on the first longitudinally extending beam being spaced from the first portions of the corresponding lift arms supported on the second longitudinally extending beam a distance greater than the predetermined width of the weapons package, such that clearance is maintained between the first portions of the lift arms and the weapons package as the lift arms pivot between the first and second positions;

the lift beams having outside surfaces which are spaced apart less than the inner surfaces of said first portions of said lift arms, thereby allowing said lift beams to be lowered between said first portions of said lift arms;

the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the outwardly facing surfaces of the third portions of the corresponding lift arms supported on the second longitudinally extending beam a distance substantially no greater than the distance between the outermost lateral surfaces of said lift beams, thereby allowing said lift arms to pivot upwardly and insert said lift beams, said third portions of said lift arms and the weapons package upwardly through an opening of minimum clearance with respect to the weapons package, such that the third portions of the lift arms do not extend from within the outermost lateral periphery of the weapons package as the lift arms pivot between the first and second positions;

the first and third portions of each lift arm extending from the offset portions thereof to form an obtuse angle, such that when the lift arms are in the first position, the first portions thereof extend downwardly from the frame and the third portions thereof extend substantially parallel to the plane defined by the bottom surfaces of the trailer wheels; and

the lift arms being pivotable under the action of the hydraulic cylinder means to position the lift beams beneath a weapons package that is received between the longitudinally extending beams of the frame and thereafter to move the lift beams and the weapons package carried thereby upwardly between the longitudinally extending beams of the frame and further upwardly into the weapons bay of an aircraft.

\* \* \* \* \* \*

9. The aerial weapons handling trailer according to claim 1 wherein each lift arm is connected to one of the longitudinally extending beams of the frame for pivotal and sliding motion with respect

thereto, wherein the distal end of each lift arm is pivotally connected to one of the lift beams, and further including a bell crank pivotally supported on the frame and connected between the hydraulic cylinder means and the lift arms, said bell crank being responsive to actuation of the hydraulic cylinder means to pivot the lift arm and thereby raise and lower the lift beam.

\* \* \* \* \* \*

## DISCUSSION

The plaintiff, Standard Manufacturing Company, Inc. (Standard), filed this action to recover compensation for the government's alleged use of the subject matter claimed in United States Patent No. 4,522,-548 (the '548 patent), entitled Aerial Weapons Handling Trailer, filed September 28, 1982. The defendant contends, however, that it is not liable for infringement of the patent in suit because: (1) the defendant has proven at trial, by clear and convincing evidence, that the '548 patent is invalid for anticipation and/or obviousness, because the claimed invention would have been obvious to one of ordinary skill in the art at the time the invention was made, and/or (2) the defendant has proven by clear and convincing evidence that the '548 patent is unenforceable in view of Standard's alleged inequitable conduct committed before the Patent & Trademark Office because of inadequate disclosure and misrepresentation of its own MHU–7–33–123/M trailers.

### I. *Obviousness*

█ The defendant challenges the validity of Claim 9 of the '548 patent on the grounds of obviousness. The defendant contends that dependent Claim 9 of the '548 patent is invalid for obviousness because the '548 patent claims a trailer which would have been obvious to one with ordinary skill in the art at the time the inventors made their claimed invention. The defendant's obviousness claim has two prongs. First, the defendant claims that Claim 9 of the '548 patent is obvious in view of the MHU–7/M, the MHU–33/M and the MHU–123/M series trailers and in view of the Scott Russell Straight-line motion mechanism.[38] The prior art status of the trailers and the Scott Russell Straight-line motion mechanism are not in dispute. Alternatively, the defendant contends that Claim 9 is obvious over the MHU–7–33–123/M prior art trailers in view of AAI's design work developed and "optical mock-up" built with respect to the MHU–145/M project. This contention raises a secondary issue over whether AAI's design work on the MHU–145/M trailer, specifically the optical mockup, qualifies as prior art to the patent in suit. In its obviousness claim, the defendant argues that the prior art MHU–7–33–123/M trailers or the optical mock-up include substantially all of the elements of Claim 9 of the '548 patent. Therefore, according to the defendant, the only issues of contention with respect to the claim of invalidity due to the obviousness of the invention are whether a trailer having offsets, which is recited in independent Claim 1 of the '548 patent, and the reversal of the orientation of the sliding and pivoting connection, recited in Claim 9 of the '548 patent, would have been obvious in view of the prior art MHU–7M and MHU–33/M trailers or the optical mock-up.

### A. *Presumption of Validity*

█ According to the applicable statute, the granting of a patent by the United States Patent & Trademark Office carries with it a presumption that the patent is valid.

> The court will, therefore assume that the parties intentionally stated that the prior art would consist of the MHU–7/M and the MHU–33/M and that no negative inference should be drawn from the failure to include the MHU–123/M in joint stipulation 13, nor should the plaintiff's choice not to disclose the MHU–123/M be used against the plaintiff, given the stipulation to consider the three trailers identical for the purposes of the instant case.

---

38. In the stipulations between the parties, the following two slightly inconsistent statements appear:

> 12. The designs of the MHU–7/M, MHU–33M, MHU–123M trailers may be considered identical in all respects material to this case.
> 13. The MHU–7/M and MHU–33/M may be considered as prior art for purposes of this case under 35 U.S.C. § 102 and 103.

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:

(1) Noninfringement, absence of liability for infringement or unenforceability,

(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,

(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title,

(4) Any other fact or act made a defense by this title.

In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number date and page numbers of any publication to be relief upon as anticipation of the patent in suit or, except in the United States Claims Court, as showing the state of the art, and the name and address of any person who may be relied upon as the prior inventor or as having prior knowledge of or as having previously used or offered for sale the invention of the patent in suit. In the absence of such notice proof of the said matters may not be made at the trial except on such terms as the court requires. Invalidity of the extension of a patent term or any portion thereof under section 156 of this title because of the material failure—

(1) by the applicant for the extension, or

(2) by the Commissioner,

to comply with the requirements of such section shall be a defense in any action involving the infringement of a patent during the period of the extension of its term and shall be pleaded. A due diligence determination under section 156(d)(2) is not subject to review in such an action.

35 U.S.C. § 282 (1988). In other words, "[a] Patent is born valid." *Roper Corp. v. Litton Systems Inc.*, 757 F.2d 1266, 1270, 225 U.S.P.Q. 345, 347 (Fed.Cir.1985). This court, therefore, must approach the defendant's challenge to the validity of the patent in suit by presuming that the patented invention is useful, novel and nonobvious under the relevant statutes. 35 U.S.C. § 282; *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1570 (Fed.Cir.1987) (footnote omitted), *cert. den.*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *see also Solder Removal Co. v. United States International Trade Com.*, 582 F.2d 628, 65 C.C.P.A. 120, 199 U.S.P.Q. 129 (CCPA 1978).

In *Panduit v. Dennison Mfg. Co.*, the Federal Circuit stated:

It is neither necessary nor appropriate for a court to declare a patent valid. A trial is required by Congress, 35 U.S.C. § 282, ... to say only whether the patent challenger carried its burden of establishing invalidity in the particular case before the court. When the burden has not been carried, a court need only so state. When the burden has been carried, the court should declare the patent invalid.

*Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d at 1569–70 (footnote & citation omitted); *see also American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). That burden is constant and never shifts. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983). "Though the presumption of validity remains in existence until rebutted and the burden of persuasion continues throughout the litigation on him who asserts invalidity ...," *Solder*

*Removal Co. v. United States International Trade Com.*, 582 F.2d at 633, the party attacking the validity of a patent must prove that the patent is invalid by clear and convincing evidence. *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed.Cir.1984) (citing *Radio Corp. v. Radio Laboratories*, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934)); *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1444 (Fed.Cir.), *cert. dismissed, Hazeltine Corp. v. RCA Corp.*, 468 U.S. 1228, 105 S.Ct. 32, 82 L.Ed.2d 923 (1984) (citing *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1517 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984)).

 In addition to the presumption of validity, in appropriate cases, a presumption of administrative correctness attaches to the decision by the Patent & Trademark Office to issue a patent. Specifically, when a party attacking the validity of a patent relies on prior art, which was specifically considered by the Examiner during the prosecution of the application leading to the issuance of the patent, that party bears the burden of overcoming the deference due a qualified government agency official presumed to have performed his or her job. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d at 1359.

 The presumption mandated by 35 U.S.C. § 282 is applicable to all of the many grounds for challenging a patent's validity. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d at 1570. To arrive at a conclusion concerning the obviousness or nonobviousness of an invention disclosed in a patent, the court is required to consider that "once a patent has been issued, it is presumed valid, and the burden of persuasion on the issue of obviousness is on the party asserting invalidity." *Vandenberg v. Dairy Equip. Co., Div. of DEC International, Inc.*, 740 F.2d 1560, 1564 (Fed.Cir. 1984) (citing 35 U.S.C. § 282). Following the application of the obviousness test, if the court is left uncertain as to the correct conclusion, in view of 35 U.S.C. § 282, the obviousness inquiry should be ended and

the patent held to be valid. *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1097 (Fed.Cir.1985), *vacated*, 475 U.S. 809, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986), *on remand*, 810 F.2d 1561 (Fed.Cir.), *cert. den.*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The burden of persuasion created by the presumption of validity of the patent as issued is more easily met when evidence is introduced of more pertinent prior art than that considered by the Patent Examiner during prosecution of the patent application. *Solder Removal Co. v. United States International Trade Com.*, 582 F.2d at 633. Whether a challenger to the validity of a patent has successfully rebutted the validity of the patent as issued "requires careful consideration of whether the prior art relied upon does in truth render the claimed invention anticipated or obvious." *Id.*, 582 F.2d at 632. These presumptions set the framework or boundaries for the court's discussion of the obviousness/nonobviousness issue, as well as for discussion of the inequitable conduct defense raised by the defendant.

The court finds that, based upon the evidence presented in the instant case, the defendant has failed to overcome the applicable presumptions and has failed to prove by clear and convincing evidence that the differences between the subject matter of the invention disclosed in the patent in suit, which incorporates the claim at issue, as a whole, and the prior art, would have been obvious to a person having ordinary skill in the art to which the subject matter pertains, at the time the invention was made. Additionally, upon a balance of the equities, the defendant has failed not only to overcome the presumptions concerning the validity of the patent in suit, but it has also failed to prove by clear and convincing evidence that Standard, or its attorneys and representatives, acted improperly with respect to the prosecution of the patent application which resulted in the '548 patent.

B. *The Obviousness Test*

According to 35 U.S.C. § 103 (1988):

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

*Id.*

■ Obviousness is a question of law. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966);

*see also Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 155, 71 S.Ct. 127, 131, 95 L.Ed. 162 (1950) (Douglas, J., concurring), *reh den*, 340 U.S. 918, 71 S.Ct. 349, 95 L.Ed. 663 (1951). Like most legal conclusions, it is reached after answers to a series of potential fact questions have been found. *Graham v. John Deere Co.*, 383 U.S. at 17–18, 86 S.Ct. at 693–94. The court's findings of fact are subject to the "clearly erroneous" standard. *Vandenberg v. Dairy Equipment Co.*, 740 F.2d at 1565; *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1535.

■ In deciding the question of obviousness under 35 U.S.C. § 103, it is necessary for the court to carefully review the following factual evidence and determine: (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claim(s) of the patent in suit and the prior art; [39] and also to review (4) the existence of objective criteria of nonobviousness, such as commercial success, long felt, but unsolved need, failure of others, acceptance by experts in the field and copying. [40] It is these

---

**39.** The first three of the evidentiary criteria are specified by the Supreme Court in *Graham v. John Deere*, 383 U.S. at 17, 86 S.Ct. at 694. The often quoted, classical test for determining the obviousness or nonobviousness of an invention in suit was stated as follows:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., *might be utilized* to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. (emphasis added).

*Graham v. John Deere Co.*, 383 U.S. at 17–18, 86 S.Ct. at 694 (citation omitted).

**40.** As originally adopted by the Supreme Court in *John Deere*, the section 103 obviousness test was a three part factual test with an added possible inquiry into the so called "secondary considerations" in item (4). Subsequently, the United States Court of Appeals for the Federal Circuit seems to have elevated the secondary considerations in number (4) to "objective con-

siderations" which now comprise a fourth factual inquiry, under *Graham*, which now must be resolved before coming to a conclusion concerning obviousness. *Vandenberg v. Dairy Equip. Co.*, 740 F.2d at 1566–67 (July 27, 1984). *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573 (Fed.Cir.1984), *cert. den.*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1380 (Fed.Cir.1986), *cert. den.*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). In fact, in *Vandenberg*, the Federal Circuit articulated its basis for requiring a review of the fourth prong as follows:

The so-called 'secondary considerations' can often prevent a court from slipping into an impermissible hindsight analysis. They should be considered as a *fourth* factual inquiry under *Graham* before coming to a conclusion concerning obviousness.

*Vandenberg v. Dairy Equipment Co.*, 740 F.2d at 1567 (citations omitted).

Without reference to the earlier, clear articulation by the Court of Appeals for the Federal Circuit of a four part test for determining obviousness, in December, 1985, the Federal Circuit panel in *Loctite Corp. v. Ultraseal, Ltd.* wrote:

The ultimate test of the adequacy of findings is whether they are sufficiently comprehensive and pertinent to the issue to form a basis for the decision (and whether they are supported by the

factors which the court must utilize as the most reliable indicators of the level of ordinary skill in the art. Moreover, the determination must be made by the trial court on a case by case basis. *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d at 873 (Fed.Cir. 1985); *In re Durden,* 763 F.2d 1406, 1410 (Fed.Cir.1985).

In *Graham v. John Deere Co.,* the Supreme Court explicitly stated that a court must have a well reasoned factual basis for upholding or invalidating a patent.

> This is not to say, however, that there will not be difficulties in applying the nonobviousness test. What is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context. The difficulties, however, are comparable to those encountered daily by the courts in such frames of reference as negligence and scienter, and should be amenable to a case-by-case development.

*Graham v. John Deere Co.,* 383 U.S. at 18, 86 S.Ct. at 694.

To reach a proper conclusion under section 103, the court must step backward in time and into the mind of a person of ordinary skill in the art at a time when the invention was unknown, and just before it was made. In light of all the evidence, the court, then, must make specific factual determinations of whether the patent challenger has convincingly established that the claimed invention as a whole would have been obvious at the time of the invention to a person of ordinary skill in the art.

As stated in *W.L. Gore & Associates, Inc. v. Garlock, Inc.,*

> It is difficult but necessary that the decisionmaker forget what he or she has been taught at trial about the claimed

evidence) (citations omitted). In patent cases, the need for express *Graham* findings takes on an especially significant role because of an occasional tendency of district courts to depart from the *Graham* test, and from the statutory standard of unobviousness that it helps determine, to the tempting but forbidden zone of hindsight. Thus we must be convinced from the opinion that the district court actually applied *Graham* and must be presented with enough express and necessarily implied findings to know the basis of the trial court's opinion.

invention and cast the mind back to the time the invention was made (often as here many years), to occupy the mind of one skilled in the art who is presented only with the references, and who is normally guided by the then-accepted wisdom in the art. Had that been here done the inventions set forth in the claims 3 and 19 of the '566 patent could only have been held non-obvious to those skilled in the art at the time those claims inventions were made.

*W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1553 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

 Although the possibility of near simultaneous inventions by two or more inventors may perhaps be considered as an indication of obviousness, and, therefore, of some evidentiary value, *Stewart–Warner Corp. v. Pontiac,* 767 F.2d 1563, 1570 (Fed. Cir.1985), *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.,* 730 F.2d at 1460, Title 35, Section 103, of the Code demands that obviousness be tested as of "the time the invention was made." *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d at 873. Thus, the obviousness test cannot include a requirement that the invention demonstrate unusual or surprising results or have an effect greater than the prior art, since this would focus on facts determinable only after the invention was made. *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1150 (Fed.Cir.1983). As such, it is incorrect to ask whether the invention is or would be obvious; rather, the proper inquiry should be phrased as whether the invention would have been obvious at the time it was made.

*Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 873 (Fed.Cir.1985) (citation omitted).

Despite the omission by the panel in *Loctite* to mention the fourth prong of the test, as outlined above, which was added to a court's obviousness inquiry by the Federal Circuit panel a little more than a year earlier in *Vandenberg* and in *Simmons,* this court believes that the four (4) prong test (and not the three (3) prong *Graham* test with a *possible* fourth prong) represents the best approach, and the one which this court will follow in the instant case.

██ The trial court, clearly, has a difficult task. The judge must determine whether the invention would have been obvious to those skilled in the art who knew only about the prior art, and who do not have the benefit of hindsight and, often extensive trial testimony on both sides of the issue. The judge must view the prior art without reading into it the patent's teachings. *Vandenberg v. Dairy Equip. Co.,* 740 F.2d at 1564. Additionally, although a person of ordinary skill in the relevant art is presumed to know the prior art, the prior art in question is only that prior art which that individual would have selected in the field of his endeavor and in analogous arts. *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1572 (Fed.Cir.1984). Hindsight, according to the Federal Circuit, is a tempting, but forbidden zone. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d at 873. Moreover, the courts, when making an obviousness determination, have been cautioned by the Federal Circuit to remember that lawsuits arise out of the affairs of people, real people facing real problems. *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1544 (Fed.Cir.1984).

When making the section 103 obviousness determination, the court must view the totality of the evidence to avoid the "hindsight syndrome wherein that which only the inventor taught is used against its teacher." *In re Corkill,* 771 F.2d 1496, 1500 (Fed.Cir.1985) (quoting *W.L. Gore & Assocs. v. Garlock, Inc.,* 721 F.2d 1540, 1553 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984)).

██ The Federal Circuit has stated that the obviousness inquiry rests upon a foundation constructed of all relevant and probative facts found in light of all of the evidence; if that foundation crumbles, the legal conclusion on which it rests will, in turn, fall. *See Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542 (Fed.Cir.1983). Of particular importance is that each patent, including each prior art reference, must be evaluated as a whole. *Schenck v. Nortron Corp.,* 713 F.2d 782, 785 (1983). The combined teachings of prior art as a whole

must be considered. *E.W.P. Corp. v. Reliance Universal Inc.,* 755 F.2d 898, 906 (Fed.Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

██ The fact that the patent is an improvement over other prior art references will not necessarily save it from a finding of invalidity. It matters not that the device works better than the prior art device, if the improvement would have been obvious to those of ordinary skill in the art at the time of the invention. What matters is that the gap between the prior art and what is being claimed must be sufficiently great as to render the latter nonobvious. It is clear that obviousness does not require predictability, but a reasonable expectation of success is necessary. *In re Clinton,* 527 F.2d 1226, 1228 (C.C.P.A.1976).

As indicated above, obviousness, within the meaning of 35 U.S.C. § 103, is a legal conclusion. It is a question of law to be determined from the facts. *In re Geiger,* 815 F.2d 686, 688 (Fed.Cir.1987); *Aktiebolaget Karlstads Mekaniska Werkstad v. United States International Trade Com.,* 705 F.2d 1565, 1575 (1983); *In re De Blauwe,* 736 F.2d 699, 703 (Fed.Cir.1984). A determination that an invention would have been obvious when it was made to one of ordinary skill in the art under § 103 is thus a conclusion of law based upon fact. The "degree to which" it is one of fact is solely that degree required to erect a foundation of facts capable of supporting the conclusion, those facts having been found by applying correct legal standards and expressed in findings free from clear error and based on clear and convincing evidence.

*Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d at 1568.

In *Panduit Corp. v. Dennison Mfg. Co.,* the United States Court of Appeals for the Federal Circuit very carefully laid out the standards for review of a trial court's determination of nonobviousness:

On review of a judgment based on a conclusion of obviousness under 35 U.S.C. § 103, this court must consider not only whether there is legal error, but also whether the underlying findings are

either nonprobative, or clearly erroneous, or both. If ... a district court had not made findings necessary to resolution of the § 103 question, and legal error were present, an appellate court would vacate in view of that legal error and remand for the district court to make the missing findings. *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d at 872–75, 228 U.S.P.Q. 90, 97–99 (Fed.Cir.1985). If unassailable findings were made but could not support the appealed judgment under a proper application of law, an appellate court may vacate or reverse but not make its own findings. *Icicle Seafoods, Inc. v. Worthington* [475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986)].

If findings necessary to support a legal conclusion are clearly erroneous, the conclusion cannot stand. If those facts were such as to permit only one of two possibilities, or if the burden of proving those necessary facts had been on appellee, reversal would not mean the appellate court found facts in defiance of Rule 52(a) [Federal Rules of Civil Procedure]. If, unlike the present case, appellee did not bear the burden below, a remand-requiring fact-finding function might remain.

To obtain reversal without remand, an appellant-patentee must convince this court that the patent challenger failed at trial to carry its statutory burden, 35 U.S.C. § 282, of proving by clear and convincing evidence sufficient facts to support the obviousness conclusion. One way to do that is to show that a proper application of the law to unassailable findings compels reversal. Another is to show that the findings on which the obviousness conclusion rested are clearly erroneous and that nothing of record warrants a further exercise of the fact-finding function or indicates any possibility that the appealed judgment might be sustained by such exercise.

*Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d at 1565–66.

It is also of note that the Federal Circuit has declared that the burden of overcoming the trial court's findings is a heavy one and that the appellate court should not repeat the role of the trial judge in finding their own facts. *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1559, *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986).

### 1. *The Invention in Suit*

The threshold question to be resolved in 35 U.S.C. § 103 analysis is what is the claimed invention. As the United States Court of Appeals for the Federal Circuit recently explained in *Panduit Corp. v. Dennison Mfg. Co.:*

> Analysis begins with a key legal question—*what* is the invention *claimed?* Courts are required to view the claimed invention *as a whole.* 35 U.S.C. § 103. Claim interpretation, in light of the specification, claim language, other claims, and prosecution history, is a matter of law and will normally control the remainder of the decisional process.

*Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d at 1567–68 (emphasis in original and footnote omitted).

It is well settled that an invention is construed not only in light of the claims in the patent, but also with reference to the file wrapper or prosecution history in the Patent & Trademark Office. *Graham v. John Deere Co.*, 383 U.S. at 33, 86 S.Ct. at 701 (citing *Crawford v. Heysinger*, 123 U.S. 589, 8 S.Ct. 399, 31 L.Ed. 269 (1887); *Hogg v. Emerson*, 47 U.S. (6 How.) 437, 12 L.Ed. 505 (1850)). In *Graham v. John Deere Co.*, the court stated:

> Claims as allowed must be read and interpreted with reference to rejected ones and to state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.

*Id.*, 383 U.S. at 33, 86 S.Ct. at 701 (citing *Schriber Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220–21, 61 S.Ct. 235, 239–40, 85 L.Ed. 132 (1940); *Powers–Kennedy Co. v. Concrete Co.*, 282 U.S. 175, 185–86, 51 S.Ct. 95, 99, 75 L.Ed. 278 (1930)). Additionally, as a general rule, when interpreting

the claims of a patent, the "[w]ords in a claim 'will be given their ordinary and accustomed meaning, unless it appears that the inventor used them differently.' " *Casler v. United States*, 15 Cl.Ct. 717, 741 (1988), (citing *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir. 1984) (quoting *Universal Oil Products Co. v. Globe Oil & Refining Co.*, 137 F.2d 3, 6 (7th Cir.1943), *aff'd*, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944))), *aff'd without op*, 883 F.2d 1026 (Fed.Cir.1989). It, however, has been held that the inventor may be his/her own lexicographer—and is not confined to normal dictionary meanings—as long as the inventor uses words consistently in both the claims and in the specifications.[41] *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 632 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569–70 (Fed.Cir.1983); *Autogiro Co. of America v. United States*, 384 F.2d 391, 397, 181 Ct.Cl. 55, 62 (1967).

Claims define the invention in which property rights are created and the patent as a whole, particularly the detailed description of a particular embodiment of the invention in the specifications, teaches how to make and use the invention. It is, therefore, understandable that in interpreting the claims' boundaries, reference to the rest of the specification is necessary. This is particularly so, for example, where part of a claim is vague or when a claim is very broad and uses generic language. "The descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based upon the description. The specification is, thus, the primary basis for constructing the claims." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985). Therefore, it is imperative that, as indicated above, the words be used consistently throughout the specification. *Fonar Corp. v. Johnson & Johnson*, 821 F.2d at 632. Clearly, as the

Supreme Court teaches, it would be inappropriate to deny property in an invention simply because the inventor is not familiar with the vocabulary of those in the trade, or may not have understood, recognized or be able to state the scientific principles underlying his or her invention. *Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 435–36, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911).

The invention in suit is an "Aerial Weapons Handling Trailer." One of the issues in this case concerns the proper construction of the terms "offset" or "offset portion" as used in Claim 9 of the patent as issued. The defendant contends that the MHU–7/M and MHU–33/M series trailers contained the "offset" or "offset portions" in the rear lift arms, while the plaintiff contends that the structure which the defendant calls an "offset" in the prior art trailers is a "clearance bend" which provides clearance for an arc compensator. As discussed, the starting point for determining the construction given by the inventor to the term "offset" or "offset portion" is an analysis of the plain and ordinary meaning of the term, unless it appears that the inventor chose to use the term differently. *Casler v. United States*, 15 Cl.Ct. at 741. If it appears that the inventor chose to use the term differently, then the court should find that the meaning of the term as used in the specifications which accompany the patent, as well as used in the file wrapper, applies.

A standard dictionary definition for the term "offset" includes: "[i]n general, that which sets off, springs, or is derived from, or is set off from, before, or against something." Webster's New International Dictionary, 2d Ed. (1951). The plaintiff, however, contends that the term "offset" or "offset portion" in Claim 9 was more specifically defined and given a different meaning in the patent specifications and claims. Specifically, the plaintiff argues that the patent specifications give a func-

---

**41.** "So long as the meaning of an expression is made reasonably clear and its use is consistent within a patent disclosure, an inventor is permitted to define the terms of his claims." *Lear*

*Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed.Cir.1984) (citing *Ellipse Corp. v. Ford Motor Co.*, 452 F.2d 163, 167 (7th Cir.1971)).

tional definition to the term "offset" or "offset portions." In Column 11, lines 44 through Column 12, line 5 of the specifications of the '548 patent, the inventors state:

\* \* \* \* \* \*

Referring to FIGS. 4, 23, 24, 25 and 26, each of the lift arms 48, 50, 52 and 54 includes an offset or dog leg portion 410. By means of the offset portions 410 the lift beams 62 and 64 are positioned substantially inwardly with respect to the beams 42 and 44. This feature comprises one of the most significant aspects of the invention in that upon downward pivotal movement of the lift arms, the lift beams are positionable at the level of the underlying surface, whereby a weapons package WP supported on a handing adapter HA which is in turn supported on the underlying surface may be lifted directly therefrom without the necessity of using any auxiliary lifting apparatus whatsoever. Of course, the handling adapter HA having the weapons package WP supported thereon may also be lifted from a support, such as the support SP shown in FIG. 4.

Referring specifically to FIG. 26, the provision of the offset portions 410 in the lift arms 48, 50, 52 and 54 is even more significant when the trailer 30 of the present invention is utilized to lift the weapons package WP supported on the handling adapter HA into the weapons bay of an aircraft. Because of the use of the offset portions 410, the lift beams 62 and 64 may be positioned at points that are within the outermost dimensions of the weapons package WP. For this reason the weapons handling trailer 30 of the present invention may be utilized to lift a weapons package into the weapons bay without danger of interference with the weapons bay doors. Again, no auxiliary lifting apparatus is required in order to accomplish this function.

\* \* \* \* \* \*

This specification, indeed, appears to further delineate the definition of the term "offset."

Throughout the prosecution history in this case, the inventors consistently employed the term "offset" or "offset portion" in the claims and in the specifications to describe the interconnecting portion of the lift arms connecting the proximal and distal portions of the lift arm and having a dual function: first, of spacing the proximal (lower) portions of the lift arms sufficiently far apart to permit the weapons package to be lowered between them, and second, of spacing the upper (distal) portions of the lift arms close enough together to bring them within the outermost dimensions of the weapons package, thus, enabling the lift arms of the trailer to lift the weapons package and fit it within an opening of minimal clearance. Both functions were expressed in the original claims filed in the application and in the claims added by the preliminary amendment. This dual function, as described in the patent, was consistent with the inventors' claims in the Prior Art Statement that the invention included lift beams having outside surfaces spaced apart no further than the predetermined width of the weapons package.

In response to the first Office Action, the inventors amended the claims of the patent to define more clearly the lift arms in relation to the proximal, distal and connecting offset portions. The amendment stated, in pertinent part: [42]

\* \* \* \* \* \*

*the first portions of the lift arms supported on the first longitudinally extending beam [of the frame] being spaced from the first portions of the corresponding lift arms supported on the second longitudinally extending beam a distance greater than the predetermined width of the weapons package, such that clearance is maintained between the first portions of the lift arms and the weapons package as the lift arms pivot between the first and second positions;*

*the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the*

---

**42.** The underlining is included in the claim language as presented in the Amendment.

*outwardly facing surfaces of the third portions of the corresponding lift arms supported on the second longitudinally extending beam a distance no greater than the predetermined width of the weapons package, such that the third portions of the lift arms do not extend from within the outermost lateral periphery of the weapons package as the lift arms pivot between the first and second portions*

\*　　\*　　\*　　\*　　\*　　\*

In the final amendment, which resulted in allowance of the claims in the patent in suit, the inventors, at the suggestion of the Patent Examiner, again rewrote the description of the functional characteristics of the "offset portion" independently of the width of the weapons package. The claims were rewritten to contain the following limitations:

\*　　\*　　\*　　\*　　\*　 ·\*

*the lift beams having outside surfaces which are spaced apart less than the inner surfaces of said first portions of said lift arms, thereby allowing said lift beams to be lowered between said first portions of said lift arms;*

the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the outwardly facing surfaces of the third portions of the corresponding lift arms supported on the second longitudinally extending beam a distance *substantially* no greater *than the distance between the outermost lateral surfaces of said lift beams, thereby allowing said lift arms to pivot upwardly and insert said lift beams, said third portions of said lift arms and the weapons package upwardly through an opening of minimum clearance with respect to the weapons package,* such that the third portions of the arms do not extend from within the outermost lateral periphery of the weapons package as the lift arms pivot between the first and second positions.

\*　　\*　　\*　　\*　　\*　　\*

In the accompanying remarks in that amendment, the inventors distinguished the Hillberg patent, which described a trailer having offset lift arms, explaining that "rather than incorporating a true offset portion, such as that claimed in the above-identified application, the lift arms of Hillberg gradually extended outwardly from the lift beams of the trailer." The inventors further distinguished the offset disclosed in the Hillberg reference by pointing to that trailer's inability to insert a load through an opening of minimal clearance.

While the term "offset" or "offset portion," as used in the patent in suit, would fall within the dictionary definition of the term "offset," the dictionary meaning is sufficiently vague for the court to adopt the functional or operational meaning of the term as described in the claims of the patent in suit submitted to the Patent & Trademark Office, and as allowed by the Examiner. The term "offset" or "offset portion," as used in the patent in suit, refers to a structure which positions the distal portions of the lift arms within the outermost dimensions of the weapons package (*i.e.,* within the shadow of the load) and simultaneously positions the proximal ends of the lift arms outside the weapons package in the lowered position. Indeed, the inventor is entitled to be his own lexicographer. *See Fonar Corp. v. Johnson & Johnson,* 821 F.2d at 632; *Autogiro Co. v. United States,* 384 F.2d at 397, 181 Ct.Cl. at 62.

In sum, therefore, the invention in suit is an "Aerial Weapons Handling Trailer," "for receiving, transporting, lifting and positioning aerial weapons, and more particularly an aerial weapons handling trailer for use with large weapons packages." The invention includes lift arms which have an "offset portion," interconnecting the proximal and distal portions of the lift arms, which has the dual function of spacing the proximal (lower) portions of the lift arms sufficiently far apart to permit the weapons package to be lowered between them, and of spacing the upper (distal) portions of the lift arms close enough together to bring them within the outermost dimensions of the weapons package. This "offset" enables the patented Aerial Weapons

trailer to lift the weapons package from the underlying surface, and fit the weapons package within an opening of minimal clearance.

### 2. Scope and Content of Prior Art

■■■ After making the determination concerning "what is the claimed invention," the court must then review the four factual criteria of obviousness and make factual findings as mandated by *Graham* and the subsequent case law in the United States Court of Appeals for the Federal Circuit. Initially, this analysis begins with a determination as to what is the pertinent prior art. To determine the relevant art pertaining to the patent in suit, it is proper to consider the nature of the problem confronting the inventor. *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1009 (Fed.Cir.1983) (citing *Weather Eng'g Corp. v. United States*, 614 F.2d 281, 287, 222 Ct.Cl. 322, 334–5 (1980)). In this portion of the obviousness inquiry, hindsight in the selection of the pertinent prior art must be avoided at all cost. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d at 873. "It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *Orthopedic Equip. Co. v. United States*, 702 F.2d at 1012. Accordingly, the nature of the problem with which the inventor was working defines the relevant prior art. *Weather Eng'g Corp. v. United States*, 614 F.2d at 286–87, 222 Ct.Cl. at 333–34. The court must look to the relevant prior art of record. *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 314 (Fed.Cir.1985). If a given reference is not within the field of the inventor's endeavor, the court then looks at whether the field of the reference is reasonably pertinent to the problem. *Finish Eng'g Co. v. Zerpa Indus., Inc.*, 806 F.2d 1041, 1043 (Fed.Cir.1986); *Bausch & Lomb, Inc. v. Barnes–Hind Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed.Cir.1986), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987), *on remand*, 10 U.S.P.Q.2d 1929 (N.D.Cal.1989); *In re Deminski*, 796 F.2d 436, 441 (Fed.Cir.1986); *Shatterproof Glass Corp. v. Libbey–Ow-*

ens Ford Co., 758 F.2d 613, 620 (Fed.Cir.), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985). The person of ordinary skill in the art also is presumed to have the ability to select and utilize knowledge from references which, although not strictly within the applicable field of art, are easily seen to be within a field analogous, thereto, and the teachings of which can be properly combined with the other prior art references. *See Cable Elec. Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1025 (Fed.Cir.1985). The court in *In re Keller*, 642 F.2d 413, 425, 208 U.S.P.Q. 871, 881 (CCPA 1981) wrote, "[r]ather the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art."

■■■ "A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing or attempting to protect." *E.W.P. Corp. v. Reliance Universal Inc.*, 755 F.2d at 907 (emphasis in original). But the fact that a reference may be directed at a different problem does not mean that it is not pertinent art, if those skilled in the art would recognize its broader application. The use of patents as references goes beyond that which the patentee describes: " 'they are part of the literature of the art, relevant for all they contain.' " *In re Heck*, 699 F.2d 1331, 1332–33 (Fed.Cir.1983) (quoting from *In re Lemelson*, 55 Cust & Pat App, 1294, 397 F.2d 1006, 1009, 158 U.S.P.Q. 275, 277 (1968)).

In 1973, the Court of Customs and Patent Appeals issued its Opinion in *In re Hellsund*, 474 F.2d 1307 (CCPA 1973), in which the court indicated that an applicant's declaration in his specification in the patent application or in other papers submitted during the patent prosecution that certain subject matter is prior art to him is an admission and converts that subject matter to prior art even though it is evidenced by documents or events which fall under no subsection of 35 U.S.C. § 102 (1988). *Tyler Refrigeration v. Kysor Industrial Corp.*, 777 F.2d 687 (Fed.Cir.1985) (In *Tyler Refrigeration v. Kysor Industri-*

*al Corp.*, there was an explicit admission as to the prior art by the attorney representing the applicant to submit a wrap-up amendment to the application in which he cited a reference as the most pertinent prior art known to the applicants); *see also* 2 D. Chisum, *Patents* § 5.03[3][e] (1989). Our attention is also drawn to *In re Nomiya*, 509 F.2d 566 (C.C.P.A.1975), in which foreign applicants clearly labeled two figures of drawings as "prior art" and included their verbal description thereof in the specification under the heading "Description of the Prior Art" and their claims were rejected. In *In re Nomiya*, the court included the following footnote:

> Although the author of this opinion did not join the opinion of the court in *Hellsund*, there was no disagreement among the members of the court with the basic proposition that a statement by an applicant, whether in the application or in other papers submitted during prosecution, that certain matter is 'prior art' to him, is an admission that matter is prior art for all purposes, whether or not a basis in § 102 can be found for its use as a prior art. The point of controversy in *Hellsund* was not whether a binding admission had been made, but what was admitted. The opinion of the court called it an admission of 'prior art,' but the author of this opinion found it to be an admission merely that the Opel patent contained a disclosure of an invention made prior to Hellsund's invention.

*In re Nomiya*, 509 F.2d at 571 n. 5.

Differently articulated:

Statements made by an applicant for a patent, whether in the application or in other papers submitted during prosecution, that certain matter is 'prior art' to him, is an admission that such matter is prior art. The valid prior art created by the admissions can be used for any purpose, including use as evidence of obviousness, whether or not a basis in 35 U.S.C. § 102 can be found for its use as prior art.

*State Indus., Inc. v. Rheem Mfg. Co.*, 223 U.S.P.Q. 305, 316, 1984 WL 1243 (M.D.Tenn.1984), *aff'd in part & rev'd in part*, 769 F.2d 762 (Fed.Cir.1985) (only reversed in regard to attorneys fees). Professor Chisum adds:

> [i]t remains to be seen to what extent disclosed material not actually treated as prior art will be taken as an admission as to the prior art—even apart from the statutory provisions in Section 102. If prior invention is treated as prior art by virtue of Section 102(g) and prior knowledge by the inventor is treated as prior art by virtue of section 102(f), then it is difficult to imagine a case arising where admitted prior material would not have a clear statutory basis under Section 102 anyway. Presumably, the only case possible would be where the applicant includes as prior art in his application prior secret or foreign knowledge that he actually acquired only after the date of invention.

2 D. Chisum, *Patents* § 5.03[3][e] (footnotes omitted) (1989).

The defendant alleges that the asserted claims of the '548 patent are invalid under 35 U.S.C. § 102[43] because each element of

---

**43.** 35 U.S.C. § 102 creates a bar to issuance of a patent if:

§ 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application for patent or inventor's certificate filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2),

the claims, or their equivalent, can be anticipated, either expressly or inherently, in a previously known prior art or previously claimed invention. Following a review of the evidence of the prior art cited to the Patent & Trademark Office and subsequently entered into evidence, the testimony offered at trial and the record on file in this case, the court finds that the pertinent prior art in the instant action includes all devices used to lift a load (of predetermined weight and size) from ground level, transport the load to a given location and raise the load fully within an envelope (of predetermined dimensions).

██ To the question of what is the pertinent prior art in the instant case, for purposes of the court's obviousness inquiry, witnesses for both parties, including the defendant's technical expert, testified that the pertinent prior art was that of weapons handling trailers. The parties disagree, however, with respect to whether the MHU–145/M proposed weapons handling trailer and the optical mock-up of the MHU–145/M, built by AAI in performance of the MT/LS contract are to be considered prior art. First, the defendant contends that, by citing to the "Life Cycle Cost Estimate for Munitions Transporter/Loading System (MTLS) B–1 Loader (MHU–145/M)," in an Information Disclosure Statement, filed in connection with a continuation application, Standard admitted that the MHU–145/M proposed trailer is prior art. Second, the defendant contends that AAI's work on the optical mock-up qualifies as prior art under 35 U.S.C. § 102.

Through the testimony of Mr. Dean, one of the patent inventors, it was established that the Life Cycle Cost Estimate document was included in an Information Disclosure Statement filed by the inventors in the course of prosecuting a later continuation application of the '548 patent, then pending in the Patent & Trademark Office.

One page of the document illustrates a proposed configuration of the yet to be designed MHU–145/M trailer, which the MHU–145/M Program Manager for the Air Force, Charles Anthony, testified was not the design AAI later developed and incorporated into the optical mock-up also at issue. The defendant appears to attempt to persuade the court that the Life Cycle Cost Estimate describes AAI's work on the MHU–145/M trailer and that Standard was knowledgeable concerning AAI's work. The testimony offered at trial by Mr. Anthony, however, demonstrated that the Life Cycle Cost Estimate in question was prepared in February of 1976, prior to the time AAI had done any significant design work on the proposed trailer. Moreover, the testimony is clear that the document offered as part of the Life Cycle Cost Estimate does not, in fact, illustrate a trailer of the MHU–145/M, but is rather a lift mechanism of the MHU–7–33–123/M type, and that the conceptual drawing in the document was not illustrative of AAI's actual design work on the proposed trailer. Indeed, a simple comparison between the drawing in the Life Cycle Cost Estimate, the layout drawings of the MHU–145/M trailer and the optical mock-up introduced by the defendant demonstrates that the trailer illustrated in the document in question and AAI's design of the proposed MHU–145/M trailer are not even similar. In contrast, as stated, similarity is found between the illustration in question and the prior art MHU–7–33–123/M series trailers.

In the Information Disclosure Statement, dated February 6, 1985, there appear a multitude of references which the applicant brought to the Patent & Trademark Office's attention. The references were categorized by Standard into several groups. The reference to the Document in question appears in Group B, as to which, the applicant states:

and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or

concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

The references of this group comprise weapons loading trailers which are relevant to the present invention in certain respects. The apparatus manufactured by Standard Manufacturing Company, Inc. have been in public use and on sale more than one year prior to the filing date of the parent application of the above-identified Application. Although other apparatus similar to that of Standard Manufacturing are manufactured by others, they are no more pertinent than the references of this group.

Each reference utilizes a frame having a pair of longitudinally extending beams interconnected by a cross beam at the front ends thereof. The front and rear ends of the frame are each supported by at least two wheels. Each of the longitudinal beams of the frame has a pair of lift arms pivoted thereto. Each pair of lift arms has a lift beam pivotally mounted to the distal ends thereof. Hydraulic cylinder means are included for pivoting both pairs of lift arms to raise and lower the lift beams.

Notwithstanding these and other similarities, Applicants respectfully submit that the present invention is patentably distinct from the references of this group. For example, the present invention is capable of lifting a weapons package into the weapons bay of an aircraft without the use of auxiliary lifting apparatus. This feature is accomplished by providing lift beams having outside surfaces which are spaced apart no further than the predetermined width of the weapons package. Therefore, the additional expense and operational complications associated with the references of this group, including the need for an auxiliary device to lift and load weapons packages in particular instances, are obviated by the present invention.

The Information Disclosure Statement concludes with a statement by the inventors "expressly reserv[ing] the right to question the relevance and materiality of the references cited herein, in whole, in part or combination."

As to its alleged admission, demonstrated in the above quote from the Information Disclosure Statement, Standard responds that the reference to the "Life Cycle Cost Estimate—MHU–145M," at no time characterizes the MHU–145/M trailer as prior art. According to the plaintiff, the Information Disclosure Statement specifically identifies some of the cited trailers as prior art, including their own manufactured devices, but makes no such statement about the MHU–145/M trailer or the Life Cycle Cost Estimate. Rather, the plaintiff states in the document:

> Pursuant to the duty of disclosure under 37 C.F.R. § 1.56, Applicants desire to bring to the attention of the Office known references believed material to the above-identified application. This submittal is made in accordance with 37 C.F.R. § 1.97 and § 1.98 and § 609 of the *Manual of Patent Procedure.*

Even the legal authorities, such as *In re Nomiya,* 509 F.2d at 566, and Professor Chisum's treatise, on which the defendant relies, do not support its position. As is more fully discussed above, in *In re Nomiya,* the Court of Customs and Patent Appeals held that an applicant for a patent was bound by an admission of prior art where the patent application specifically described the reference in question as prior art. *Id.* at 570–71.

Additionally, the regulation which governs the contents of the Information Disclosure Statements, 37 C.F.R. § 1.98 (1990), provides that "[a]ny disclosure statement filed under § 1.97 or § 1.99 shall include: (1) A listing of patents, publications or other information; and (2) A concise explanation of the relevance of each listed item." *Id.* Previous to the amendment to section 1.97 through 1.99 of the code in 1983, the term "Prior Art Statement" had been used in place of the term "Information Disclosure Statement." The impetus for the name change, according to the Patent & Trademark Office, was to "more accurately characterize the nature and content of the information which may be included in such a disclosure." 48 Fed.Reg. 2700 (1983). The Patent & Trademark's Office's comments continue and state that "[i]nformation which is required to be submitted pur-

suant to § 1.56 [which governs the duty of disclosure] may ultimately be determined not to be 'prior art,' but nevertheless may be 'material' pursuant to § 1.56." *Id.* Thus, the Patent & Trademark Office clearly recognized that an applicant may choose to furnish material information in an Information Disclosure Statement which does not necessarily depict prior art. The court, therefore, finds that Standard's disclosure of the document in question in the required disclosure statement should not be considered an acknowledgment, declaration, concession or any kind of recognition of the fact that the disclosed publication was prior art.

 As an alternative argument concerning the scope and content of the pertinent prior art, the defendant contends that the optical mock-up, developed and built by AAI in furtherance of its contract obligations with respect to the MT/LS contract for the development and manufacture of the MHU–145/M trailer, is prior art within the meaning of 35 U.S.C. § 102(g) or 35 U.S.C. § 102(b).

 As an initial point of reference for the defendant's contentions concerning section 102(g), the date upon which Standard filed its application for the '548 patent was the date Standard constructively reduced its invention to practice; consequently, priority of invention and acts constituting abandonment, suppression or concealment must be determined with reference to that date. 35 U.S.C. § 102(e); *Sun Studs,*

*Inc. v. ATA Equip. Leasing, Inc.,* 872 F.2d 978, 983 (Fed.Cir.1989), *reh'g denied,* 1989 WL 28575 1989 U.S.App.Lexis 6150 (Fed. Cir.), *and vacated, in part, on reh'g;* 11 U.S.P.Q. 1479 (Fed.Cir.1989) (only portion of judgment relating to issue of laches vacated); *see also In re Costello,* 717 F.2d 1346, 1350 (Fed.Cir.1983). Section 102(g) proscribes that a person shall be entitled to a patent unless:

before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who is first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102(g).[44] Thus, to establish prior invention under section 102(g), the defendant is required to establish that the optical mock-up, which is alleged to have been invented by AAI more than five years before Standard applied for the '548 patent, was "complete *i.e.,* [1] conceived and [2] reduced to [3] practice, and [4] not abandoned, suppressed or concealed." *International Glass Co. v. United States,* 408 F.2d at 402, 187 Ct.Cl. at 390 (citing *Corona Cord v. Dovan Corp.,* 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928); *Coffin v. Ogden,* 85 U.S. (18 Wall) 120, 21 L.Ed. 821 (1873); *Armour & Co. v. Wilson & Co.,* 168 F.Supp. 353 (N.D.Ill.1958)).[45]

**44.** "Section 102(g) most commonly applies to priority disputes in U.S. Patent Office interference proceedings. However, it may also be an appropriate defense to patent validity in infringement litigation where a patent application was never filed by the prior inventor." *International Glass Co. v. United States,* 187 Ct.Cl. 376, 390, 408 F.2d 395, 402 (1969) (citing *Engelhardt v. Judd,* 369 F.2d 408, 411 (CCPA 1966)).

**45.** The defendant argues that the proper test for a noninterference type section 102(g) issue is two fold:

First, a determination must be made whether the prior invention [had] been reduced to practice. In the present case, it is indisputable that the optical mock-up was built and tested and that the testing successfully proved that a munitions handling trailer built to the

same size and dimensions would work as intended. Then the second requirement is to determine whether the prior invention has been abandoned, suppressed or concealed. The optical mock-up for the MHU–145/M trailer was not abandoned, suppressed or concealed.

Interestingly, the defendant refers to the optical mock-up as a test device and that the testing performed with the mock-up "successfully proved that a munitions handling trailer built to the same size and dimensions would work as intended." Additionally, the defendant refers to the optical mock-up as being built "for the MHU–145/M trailer." These statements standing alone seem to imply that the optical mock-up was not a munitions handling trailer and could not have satisfied the performance requirements of one.

■ The court's conclusions regarding conception and reduction to practice are legal determinations subject to review free of the clearly erroneous standard. The findings of fact upon which the court makes these conclusions, however, are subject to review under the clearly erroneous standard. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d at 1376.

■ Conception is the "formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is [hereafter] to be applied in practice." *Id.* (citation omitted). "To establish conception, a party must show possession of every feature recited in the count, and that every limitation of the count must have been known to the inventor at the time of the alleged conception." *Coleman v. Dines,* 754 F.2d 353, 359 (Fed. Cir.1985) (Citation omitted). "Conception must be proved by corroborating evidence which shows that the inventor disclosed to others his 'completed thought expressed in such clear terms as to enable those skilled in the art' to make the invention." *Id.* at 359. (Citation omitted). In short, therefore, conception always determines inventorship, although actual reduction to practice determines the date of invention for section 102 purposes.

■ The second requirement for completion, "[a]ctual reduction to practice requires that the claimed invention work for its intended purpose (citation omitted) and as [sic] has long been the law, constructive reduction to practice occurs when a patent application on the claimed invention is filed (citations omitted)." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d at 1376.

An invention is actually reduced to practice when the inventive concept has been embodied in some physical form and demonstrated to be a workable embodiment of the invention. *Eastern Rotorcraft Corp. v. United States,* 384 F.2d 429, 431, 181 Ct.Cl. 299, 301 (1967). Whether the invention has been embodied in a physical form satisfactory to meet the requirements of actual reduction to practice can be determined only by comparing the physical em-

bodiment with the definition of the claimed invention. Indeed, the claims are the metes and bounds of the invention and the physical embodiment must conform to the claims. There cannot be reduction to practice without a physical embodiment which includes all limitations in the claims. *See U.M.C. Electronics Co. v. United States,* 816 F.2d 647, 652 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988).

■ It is true that there is no requirement that the embodiment of the invention at issue be in a commercially ready stage of development, although the invention must have been "sufficiently tested to demonstrate that it will work for its intended purpose." *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 861 (Fed.Cir. 1985) *cert. den.,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). Nonetheless, given the physical embodiment of the invention, the optical mock-up of the proposed MHU–145/M trailer, the task is to determine whether the physical embodiment would actually work. It is clear, that to answer this question, the court must make inquiry as to the testing of the embodiment (the optical mock-up). Accepting that testing is necessary to demonstrate workability and actual reduction to practice, the difficult issue, however, is concerning the amount, nature and extent of the testing required. To this issue, some cases hold that simulated use (laboratory-type) testing of the invention, under conditions simulating those of actual use, can be sufficient to demonstrate its workability for its intended purpose or use. *See Tomecek v. Stimpson,* 513 F.2d 614, 618 (CCPA 1975); *Gaiser v. Linder,* 253 F.2d 433, 117 U.S.P.Q. 209, 211 (CCPA 1958). Indeed, the inquiry should be directed to the kinds of tests performed, based on the needs of the particular art, and whether the tests conducted demonstrated that the invention would work for the intended use. *Eastern Rotorcraft Corp. v. United States,* 384 F.2d at 431, 181 Ct.Cl. at 301. "In an attempt to bring practicability and realism into an area in which the courts had previously been content to deal in generalities

and overly technical considerations," Judge Learned Hand, in *Sinko Tool & Mfg. Co. v. Automatic Devices Corp.*, concluded:

> [A] test under service conditions is necessary in those cases, and in those only, in which the persons qualified in the art would require such a test before they were willing to manufacture and sell the invention as it stands.

*Sinko Tool & Mfg. Co. v. Automatic Devices Corp.*, 157 F.2d 974, 977 (2d Cir. 1946)).

The third requirement of 35 U.S.C. § 102(g) is that the prior invention was not abandoned, suppressed or concealed. Whether an invention has been abandoned, suppressed or concealed depends upon the facts of each case. The question of abandonment is fundamentally a question of intent, either express or implied by action or conduct. *Browning Mfg. Co. v. Brothers, Inc.*, 134 U.S.P.Q. (BNA) 231, 235 (D.Minn.1962), *aff'd*, 317 F.2d 413 (8th Cir.), *cert. denied*, 375 U.S. 825, 84 S.Ct. 67, 11 L.Ed.2d 58 (1963), *reh'g denied*, 383 U.S. 940, 86 S.Ct. 1061, 15 L.Ed.2d 857 (1966). The question of abandonment is to be proven by the party claiming abandonment has occurred. *Amerline Corp. v. Cosmo Plastics Co.*, 407 F.2d 666, 670 (7th Cir.1969). Abandonment is never presumed. *Davis Harvester Co. v. Long Mfg. Co.*, 252 F.Supp. 989, 1011 (E.D.N.C.1966), *aff'd per curiam*, 373 F.2d 513 (4th Cir.1967).

The failure of the first inventor to take steps to give the public the benefit of the invention, within a reasonable period of time, may constitute suppression or concealment. Mere delay will not amount to abandonment. *Davis Harvester Co. v. Long Mfg. Co.*, 252 F.Supp. at 1010; *International Glass Co. v. United States*, 408 F.2d at 403, 187 Ct.Cl. at 391; *Peeler v. Miller*, 535 F.2d 647, 655 (CCPA 1976). The public policy for 35 U.S.C. § 102, therefore, is to encourage the public's right to use of the patent, *Davis Harvester Co.*, 252 F.Supp. at 1010, and to prevent a person from putting an invention in a drawer and doing nothing with the invention so that the public can have the long term benefit

of the technology. *See* 3 D. Chisum, *Patents* § 10.08.

The defendant contends that the full scale optical mock-up, included a lifting mechanism which was capable of lifting a simulated weapons package weighing approximately 1,000 lbs. and placing the weapons package within a simulated B–1 aircraft weapons bay and is, therefore, a prior invention within the meaning of 35 U.S.C. § 102(g). The optical mock-up, according to the defendant, was a reduction to practice because it successfully verified the design concept for the proposed MHU–145/M trailer. Strangely, the defendant maintained that tests conducted by AAI on the optical mock-up proved that a weapons handling trailer built to the same size and shape would perform its intended purpose, a statement which seems implicitly to actually concede that the optical mock-up itself was not an aerial weapons loading trailer.

Based upon the evidence adduced at trial, the court does not agree with the defendant that the optical mock-up is a prior art invention under 35 U.S.C. § 102. In fact, the optical mock-up falls far short of the demanding proof required to establish prior art and overcome the applicable presumption of validity of a patent as issued. Setting aside AAI's developmental work on the AS/32K–6 tow vehicle and the MHU–144/M transport trailer, because neither of those vehicles is designed or capable of use in connection with loading weapons into an aircraft, the court concludes that there was never a complete conception of the MHU–145/M weapons handling trailer reduced to practice, prior to the issuance of the patent in suit.

At the time the MT/LS contract was terminated, there were several competing variations of the design, and, by admission of witnesses for the defendant, who had worked for AAI pursuant to the MT/LS contract, and the contract termination documents, the design effort for the MHU–145/M trailer was only 40 percent complete. Since the design was never subjected to a "critical design review," the concept never rose to the status so that any person of ordinary skill in the art could proceed to

actually reduce the conception of the invention to practice without himself having to contribute inventive effort. This conclusion is supported by the testimony of defendant's witness, who was the design engineer for AAI on the MT/LS contract. Indeed, Mr. Alfriend, the project engineer, agreed that up to the day before the MT/LS contract was informally terminated, AAI lacked critical design dimensional information necessary to complete its design of a munitions handling trailer.

Mr. Alfriend also testified that, generally, under a development contract with the government, munitions handling equipment goes through several design phases. At the end of the preliminary design phase, according to Mr. Alfriend, the government representative reviews the preliminary design for compliance with the contract specifications, and issues raised during that review are resolved. The contractor then goes into a detailed design phase and prepares manufacturing drawings. Once those manufacturing drawings are 80–90 percent complete, a critical design review is scheduled. The critical design review is the last opportunity to influence the design to any significant degree. Once the manufacturing drawings are approved at the critical design review, they are then released to the manufacturing facility to make the device. No critical design review was held prior to the time the MT/LS contract was terminated. It seems evident, therefore, and the testimony indicates, that AAI lacked the critical dimensional information necessary to complete its design of a weapons handling trailer to load the B–1 bomber.

Even if the court were to accept, for the sake of argument, that the invention at issue is a mechanical device which would not require more than an artist's conceptual drawing to satisfy the conception requirement of 35 U.S.C. § 102, the court cannot conclude that the optical mock-up was a reduction to practice of the MHU–145/M concept. The defendant has stipulated that no actual prototype of the MHU–

145/M loader was ever built. This would imply that no device capable of performing the intended purpose of the MHU–145/M concept was ever produced. Indeed, when the MT/LS contract was terminated, a prototype could not have been built because, according to the testimony of Mr. Alfriend, AAI's project manager, there was in existence no final design for the MHU–145/M.[46] In actuality, design work was less than 50 percent complete, and no manufacturing drawings existed from which a prototype could have been constructed.

Even though an actual prototype of the MHU–145/M was never built, the defendant would have the court conclude that because the testing performed by AAI on the optical mock-up for the MHU–145/M validated the concept for the MHU–145/M trailer represented in the optical mock-up, it proved that the alleged prior invention was purportedly reduced to practice and surely would have performed its intended purpose. By stipulation, the parties agreed that the optical mockup "had a lift capacity of approximately 1,000 pounds, and instead of full size wheels, the optical mock-up included casters. The parties also have stipulated that the optical mock-up included the electronics and hydraulic jack pads to demonstrate the optical alignment system that was to be included in the MHU–145/M trailer." The testimony of Theodore Alfriend, among others, clearly indicates that the optical mock-up was not an actual MHU–145/M weapons handling trailer, but rather included elements that AAI had only proposed to be included in the MHU–145/M trailer. Certainly, the plaintiff would have to agree that many of these elements are present in the claims of the '548 patent. Nonetheless, while it is true that the reduction to practice of the claimed invention in the form of the alleged prior art, optical mock-up for the MHU–145/M trailer is measured by the metes and bounds of the patented invention in suit, it is also true that proper testing may be required to satisfy the reduction to practice element of 35 U.S.C. § 102.

---

**46.** At trial, Mr. Alfriend testified that there were several competing designs for the MHU–145/M in circulation when the MT/LS contract was terminated.

As far as what kind or how much testing would be required to satisfy the requirement that the optical mock-up for the MHU–145/M proposed trailer could satisfy the intended purpose of the proposed trailer, the court finds that proper tests under real or simulated service conditions would be necessary because, clearly, persons qualified in the art would require such tests before they were willing to manufacture, sell and use the proposed trailer. As required by the MT/LS contract, the government would not authorize production of this type of device without proof that it would satisfy its intended purpose, which was to load as much as a 35,000 lb. weapons package into the B–1 aircraft.

■ Some testing by AAI was performed on the optical mock-up, but this testing demonstrated only the feasibility of the automatic positioning system and its interface with the B–1 aircraft. The only evidence that the lift system included in the optical mock-up would have achieved its intended purpose was the self serving testimony of defendant's witness, Mr. Alfriend, the AAI project manager for the MT/LS project.[47] The MT/LS development contract itself set forth detail criteria which the design had to meet[48] and it required testing by the contractor of the trailer before acceptance by the government. AAI never developed a test plan for the MHU–145/M trailer (as opposed to the optical mock-up). Finally, in addition to contractor

testing, the trailer was required but failed to undergo testing for nuclear certification because it was designed for loading nuclear weapons into the B–1. Nowhere in the record does AAI demonstrate that it could meet all the government requirements with the MHU–145/M design concept or with the optical mock-up.[49]

The defendant contends that if AAI's design work alone does not constitute a reduction to practice, the construction and testing of the optical mock-up does, and that the optical mock-up for the MHU–145/M trailer is prior art. This argument fails, however, because the defendant's own witness, Mr. Alfriend, agreed that the optical mock-up was not that of "weapons handling trailers," which witnesses for both parties testified was the prior art, but only a demonstration tool. It could lift at most 1,000 pounds and could not, therefore, meet the 35,000 pound requirement called for by the MT/LS contract specification.[50] The function of the optical mock-up was not to fulfill the MT/LS contract and load munitions into aircraft, but "to demonstrate the correct operation of the Automatic Positioning Systems," and "to automatically align the unit [trailer] underneath the aircraft." The automatic positioning system demonstrated by the optical mock-up is irrelevant to the patented invention because none of the claims in the patent rest on whether the alignment is done manually or automatically. The feasibility of

---

**47.** The burden of proof of an inventor's alleged conception and reduction to practice is a heavy one requiring full corroboration by other than the inventor's own self-serving testimony or records. Oral recollections of long past events, unsupported by contemporaneous documentary evidence, are insufficient to meet the strict burden of proof required. Such uncorroborated testimony has also been found insufficient to show anticipation within the meaning of 35 U.S.C. § 102. *Lockheed Aircraft Corp. v. United States,* 553 F.2d 69, 75, 213 Ct.Cl. 395, 407 (1977).

**48.** In a briefing given at the B–1 Support Equipment Group Meeting on May 4, 1976, the Air Force's Charles Anthony outlined the major design requirements which had to be met by the proposed MHU–145/M trailer. These major design requirements included: (1) nuclear certification; (2) automatic loading; (3) 35,000 lb.

capacity; (4) lift height of 116 inches; (5) interface with tow vehicle; (6) ability to load B–52 wing stations; and (7) reliability of 225 hours MTBF (mean time between failure) at 50 percent confidence level.

**49.** It is important to note that the requirements for the MHU–145/M trailer did not include capability to load the bomb bay of the B–52, a capability of the patented invention.

**50.** The court agrees with the defendant that the claims in the '548 patent do not include a requirement concerning the lift capacity of the claimed invention. However, the court notes that tests under service conditions would still be required to prove reduction to practice and the government's lift capacity requirements under the MT/LS contract should be at least some measure of whether reduction to practice had occurred.

the optical alignment system may have been proven by the optical mock-up, but the optical mock-up was not a reduction to practice of the proposed MHU–145/M trailer.[51] An apparatus such as the optical mock-up, which is not capable of loading aerial weapons into aircraft, and, by defendant's admission in the stipulations, was not a trailer but a device which included component parts of the proposed MHU–145/M trailer, cannot properly be considered a device reduced to practice, and within the scope and content of the prior art under 35 U.S.C. 102(g).

▮ Furthermore, even if the court were to conclude that the MHU–145/M trailer concept was complete and actually reduced to practice in the form of the optical mock-up, which it does not, the evidence presented at trial, at the very least, strongly suggests that AAI abandoned its work on the MHU–145/M trailer. AAI did no further design work on any aspect of the MHU–145/M lift mechanism after 1979,[52] and the defendant, for its part, abandoned the MHU–145/M project in 1977 when the contract was terminated. When the B–1 program was reactivated in 1981, neither the government, nor AAI, proposed using the MHU–145/M trailer design. Instead, AAI promoted the concept of an auxiliary powered lift adapter to be used with the MHU–173/E it was already producing for the purpose of loading the bomb bay of the B–52. When AAI finally abandoned the

powered lift adapter concept in August 1983, it did not propose the MHU–145/M trailer at that time either, but instead, according to Mr. DeSalvo, the would-be inventor of the MHU–196/M lifting mechanism, "took a fresh look at modifying the MLT [MHU–173/E] to attain the loading capabilities of airplanes other than the B–52."

According to Mr. Alfriend, the fact that the optical alignment system developed during the course of the MHU–145/M design effort and may have been implemented to a limited extent in a prototype of the MHU–173/E trailer, does not prove intent on the part of AAI to abandon the MHU–145/M proposed weapons loading trailer concept for the purposes of the instant inquiry. Moreover AAI's conceptual design in 1979 of a proposed trailer incorporating the MHU–145/M lift mechanism on the frame of the MHU–173/E for loading wide body aircraft, likewise, does not prove an intention on AAI's part to resurrect the MHU–145/M design.[53] It seems clear that after 1979, AAI did not work on the lift system contemplated for the MHU–145/M trailer, not even when the B–1B program was reinstated in 1981.

The defendant also makes the unsupported statement that in 1982, AAI proposed a lift adapter for the MHU–173/E, incorporating a Scott Russell Straight-line mechanism. A review of the document to which the defendant refers, the 1982 AAI

51. Indeed, at the trial, using the defendant's models (made by AAI), Standard's technical expert, Mr. Bryan, demonstrated that the optical mock-up was not capable of performing the functions of the invention in suit because it could not lower a load close enough to the ground to get under the B–52. Mr. Bryan also demonstrated that a relatively long weapons package would interfere with the forward lift arm of the optical mock-up in its lowermost position. Therefore, even if one were to conclude that the optical mock-up was a reduction to practice of the MHU–145/M "concept," there are distinguishing elements between that prior art (assuming it satisfies the prior art requirements of section 102(g)) and the patented invention in question.

52. Mr. Alfriend testified that after the MHU–145/M contract was terminated in 1977, AAI continued to try to use some of the design work done on the MHU–145/M project. Those ele-

ments of the design which were further considered were: (1) the optical alignment system, (2) the XY pads and (3) the hydraulic wheel motors. These aspects of the design, however, have nothing to do with the invention at issue. Indeed, Mr. Alfriend admitted that the pertinent lift system of the MHU–145/M design was not carried forward into the next weapons loader AAI built, the MHU–173/E.

53. This proposed trailer was purely conceptual. The only sketch which was produced at trial was admittedly "never formally submitted to the Air Force," as Mr. Alfriend testified, but merely discussed informally with some people in the field at Boeing Seattle and perhaps Lockheed. Mr. Alfriend also admitted that the conceptual drawing, which bore an AAI proprietary legend, had never been published, and that very few (less than a dozen) copies had been distributed outside of AAI.

Corporation Study for B–1B Aircraft Weapons Loading System, is sufficient basis to support the conclusion that while the powered lift adapter to which the defendant refers may have incorporated the Scott Russell Straight-line Mechanism, it did not incorporate the concept of the MHU–145/M project. Additionally, the defendant's assertions concerning AAI's disclosure by incorporation of the overall concept of the MHU–145/M lifting mechanism into the MHU–196/M in 1983 means that it was disclosed after the filing of Standard's original patent application on September 28, 1982. Neither AAI's work on the lift adapter for the MHU–173/E or their work on the MHU–196/M trailer prove that AAI did not conceal the MHU–145/M design work on the MHU–145/M between 1979 and 1983, or that AAI did not intend to abandon that design work in 1979 up to 1982, when Standard filed its original patent application.[54]

 The defendant, however, contends that not only was the MHU–145/M concept reduced to practice in the form of the optical mock-up, but that AAI did not abandon, suppress or conceal its work on the MHU–145/M. According to the defendant, there is only one potential customer for the MHU–145/M type trailer, the United States government.[55] The defendant asserts that

AAI made repeated attempts to interest the government in the technology relating to the MHU–145/M trailer, and, therefore, AAI made the technology available to the public. As proof, the defendant points to (1) in the period 1978 through 1980, AAI incorporated the optical alignment system of the MHU–145/M trailer into the production prototype of the MHU–173/E trailer; [56] (2) in December 1979, the lifting system of the proposed MHU–145/M trailer was incorporated into a proposed combination MHU–173/E and MHU–145/M munitions loader for a wide body jet cruise missile carrier; (3) in 1982, AAI proposed a lift adapter for the MHU–173/E incorporating a Scott Russell Straight-line mechanism; and (4) in 1983, AAI incorporated the "overall" concept of the MHU–145/M lifting mechanism into the MHU–196/M. All of these efforts, according to the defendant, were a direct "outgrowth" of AAI's earlier work on the MHU–145/M trailer and, therefore, demonstrate AAI's intention not to abandon, suppress or conceal the technology developed during the MHU–145/M trailer program and AAI's intention to make the technology available to the public.

Based on the evidence in the record, the court finds that AAI's design work on the MHU–145/M trailer does not satisfy 35 U.S.C. § 102(g) as being a concept reduced

---

**54.** The only evidence presented at trial that AAI did not attempt to conceal the MHU–145/M design work was the fact that Mr. Dean of Standard had obtained a copy of the Life Cycle Cost Estimate, mailed to him by Mr. Anthony of the Air Force, regarding the proposed MHU–145/M trailer in 1982. This, of course, resulted in Mr. Dean's disclosure of the report to the Examiner during the prosecution of the application which lead to the '548 patent. The defendant tries to argue that Standard's ability, which ability is not documented, to obtain information from the USAF relating to the MHU–145/M trailer is objective evidence that the USAF did not abandon, suppress or conceal the MHU–145/M technology. This alone, of course, is not sufficient for the court to find that AAI did not abandon the design in 1979 and that AAI was not attempting to conceal its design efforts. There are two important things about the report obtained by Mr. Dean which bolster this conclusion. Charles Anthony testified that the trailer illustrated in that report was, in fact, the MHU–123/M and not the MHU–145/M trailer. The defendant's technical expert, John Bryan,

seemed to confirm this testimony. Second, whether Standard received a copy of the report or not is immaterial for purposes of determining whether the MHU–145/M design work is prior art, since the issue is whether the information is publicly available, not whether it was privately shared.

**55.** The evidence produced at trial by Standard regarding its sale of the prior art trailers to foreign countries suggests that, although the MHU–145/M trailer was being developed for the United States Government to use with the B–1, the technology included in the MHU–145/M trailer, assuming the concept was reduced to practice, was marketable to customers other than the United States.

**56.** The court notes that this statement by the defendant suggests that the defendant would agree with the distinction made by the court between optical mock-up and what would be considered by an individual skilled in the art as a reduction to practice, a prototype.

to practice, prior to the critical date of the invention in suit. Alternatively, given the evidence presented in this case, the court finds that even if the MHU–145/M concept could be considered as having been reduced to practice in the form of the optical mock-up, within the meaning of 35 U.S.C. § 102, AAI abandoned the MHU–145/M lift design in 1979. Additionally, AAI appears to have suppressed or concealed the MHU–145/M design work in as far as the information concerning the MHU–145/M design work was not publicly available from the government, was not retained by the government and was maintained only in AAI's files. Thus, the defendant has failed to prove by clear and convincing evidence that AAI's design work on the MHU–145/M or the optical mock-up is prior art under 35 U.S.C. § 102(g) and it will not be considered as such by this court.

 As an alternative argument, the defendant contends that even assuming AAI's design work on the MHU–145/M was abandoned, suppressed or concealed, the court should still consider the optical mock-up as prior art within the meaning of 35 U.S.C. § 102(b). Section 102(b) provides that if a device described in a patent claim is "on sale" in the United States more than one year prior to the date the application was filed, the device constitutes prior art. 35 U.S.C. § 102(b). The defendant bears the burden of proving that there was a sale or offer to sell more than one year before the application for the patent at issue and that the subject matter of the sale or offer to sell fully anticipated the claimed invention, or would have rendered the claimed invention obvious by its addition to the prior art. *U.M.C. Electronics Co. v. United States*, 816 F.2d at 656.

As explained by a judge of the Court of Claims, the "on sale" bar has the following underlying policies:

First, there is a policy against removing inventions from the public which the public has justifiably come to believe are freely available to all as a consequence of prolonged sales activity [citation omitted]. Next, there is a policy favoring prompt and widespread disclosure of new inventions to the public. The inventor is forced to file promptly or risk possible forfeiture of his invention rights due to prior sales [citation omitted]. A third policy is to prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized 17–year period [citation omitted]. The "on sale" bar forces the inventor to choose between seeking patent protection promptly following sales activity or taking his chances with his competitors without the benefit of patent protection [citation omitted]. The fourth and final identifiable policy is to give the inventor a reasonable amount of time following sales activity (set by statute as 1 year) to determine whether a patent is a worthwhile investment [citation omitted]. This benefits the public because it tends too minimize the filing of inventions of only marginal public interest. The 1–year grace period provided for by Congress in § 102(b) represents a balance between these competing interests.

*General Elec. Co. v. United States*, 654 F.2d 55, 61, 228 Ct.Cl. 192, 202 (1981).

In *UMC Electronics Co. v. United States*, the Federal Circuit specifically found that while the invention at issue had not been reduced completely to practice, the offer to sell could trigger an "on sale" bar under 35 U.S.C. § 102(b). The court appeared to eliminate reduction to practice as an absolute requirement for an "on sale" bar, when it stated: "[i]n view of all of the above considerations, we conclude that reduction to practice of the claimed invention has not been and should not be an absolute requirement of the on-sale bar." *U.M.C. Electronics Co.*, 816 F.2d at 656. Although the *U.M.C.* court declined to formulate a specific standard for determining when something less than a complete embodiment of an invention will trigger an "on sale" bar, the court did give some guidance. It appears that if those engaged in work on a device, alleged to be "on sale" under 35 U.S.C. § 102(b), merely had a conception, or were working on research and development, experimenting with or testing a conception, then no "on

sale" bar would be created. *See U.M.C. Electronics Co. v. United States*, 816 F.2d at 657; *Great Northern Corp. v. Davis Core & Pad Co.*, 782 F.2d 159, 165 (Fed. Cir.1986). As the Federal Circuit stated:

> We do not attempt here to formulate a standard for determining when something less than a complete embodiment of the invention will suffice under the on-sale bar. However, the development of the subject invention was far beyond a mere conception. Much of the invention was embodied in tangible form. The prior art devices embodied each element of the claimed invention, save one, and that portion was available and had been sufficiently tested to demonstrates to the satisfaction of the inventor that the invention would work for its intended purpose.

*U.M.C. Electronics Co. v. United States*, 816 F.2d at 657.

To give effect to the underlying policies of 35 U.S.C. § 102(b), the court must consider the "totality of circumstances relating to the character and extent of commercial activities, the type of invention, and its stage of development as evidenced by engineering models, prototypes, and production models, along with the character and extent of bona fide experimentation." *Western Marine Electronics, Inc. v. Furuno Electric Co.*, 764 F.2d 840, 845 (Fed.Cir. 1985). "All of the circumstances surrounding the sale or offer to sell, including the stage of development of the invention and the nature of the invention, must be considered and weighed against the policies underlying section 102(b)." *U.M.C. Electronics Co. v. United States*, 816 F.2d at 656.

In reaffirming a totality of the circumstances approach to review the public use or sale bar of 35 U.S.C. § 102(b), the Court of Appeals for the Federal Circuit in *In re Brigance*, 792 F.2d 1103 (Fed.Cir.1986), further explained:

> Factors we have considered include: the length of the test period; whether any payment was made for the invention; whether there is any secrecy obligation on the part of the user; whether progress records were kept; whether persons other than the inventor conducted the asserted experiments; how many tests were conducted; and how long the test period was in relation to test periods of similar devices. [footnote omitted] This list of factors is by no means all inclusive, but merely serves as a basis for objective analysis under section 102(b).

The defendant contends that AAI's work performed under a contract with the government clearly falls within the provisions of 35 U.S.C. § 102(b). Specifically, the defendant asserts that the optical mock-up was reduced to a tangible form, was complete, was tested with a simulated weapons package and a simulated bomb bay, which defendant argues demonstrated that a weapons handling trailer built to the same size and dimensions as the optical mock-up could load the B–1 bomber. The optical mock-up, according to the defendant, was built and tested under a contract with the government and the government paid AAI $153,000.00 for the optical mock-up. Additionally, defendant cites to the testimony of Mr. Theodore Alfriend, the Assistant Operations Manager for the Mechanical Systems Group of AAI, the defendant's contractor, during which he stated that he believed the optical mock-up demonstrated that the proposed design for the MHU–145/M trailer would work for its intended purpose.

The evidence in the record, however, shows that the contract under which the optical mock-up was built called for the design and development of the MHU–145/M weapons handling trailer, rather than for commercial procurement. Moreover, there were several competing, but no finalized designs for the trailer when the contract was terminated. In fact, the government had not yet finalized its requirements for the trailer in all essential details. As of the termination date, only 40 percent of the design work on the trailer was complete, and as of that same date, the MHU–145/M trailer had not yet been designed in accordance with contract specifications. AAI had no manufacturing drawings from which a prototype of the MHU–145/M could be constructed, and no critical

design review was ever held between AAI and the government. Finally, none of the testing required by the contract was conducted.

The optical mock-up, therefore, was not, in fact, an aerial weapons handling trailer and was not a reduction to practice of any completed concept. This court remains unpersuaded that the optical mock-up was sufficiently tested to demonstrate that the MHU–145/M trailer would work as intended. The court believes that based on the evidence presented, the optical mock-up was not sufficiently tested to conclusively demonstrate that the invention claimed would work for its intended purpose, especially since the principal support cited to by the defendant is the self-serving testimony of Mr. Alfriend that he believed that the testing performed on the optical mock-up proved that the MHU–145/M design would work as intended. As the Federal Circuit pointed out: "The uncorroborated testimony of prior inventors or users should be evaluated with particular caution [citation omitted], as should the oral testimony of an employee of a party to litigation, recollecting events long past [citation omitted]." *Lockheed Aircraft Corporation v. United States*, 553 F.2d at 75, 213 Ct.Cl. at 407. Mr. Alfriend as an employee of AAI was employed by the alleged inventor and although not directly a named party to the litigation, he was an employee of the defendant's contractor. Moreover, it would appear from the record that others qualified in the art disagreed. Neither the government, nor AAI, were prepared to proceed to manufacture the MHU–145/M for purchase by the government, before completion of the MT/LS development contract, at which time AAI would have completed its design of the MHU–145/M concept and, presumably, would have reduced that concept to practice in the form of a prototype MHU–145/M called for by the contract issued by the government. It is also clear that the public never benefitted from the design and development work of the MHU–145/M because the project was prematurely terminated.

While reduction to practice of the patented invention is not an absolute requirement of an "on sale" bar under 35 U.S.C. § 102(b) in all cases, reduction to practice is, as the Federal Circuit has recognized, "an important analytical tool in the 'on sale' analysis." *U.M.C. Electronics Co. v. United States*, 816 F.2d at 656. Moreover, the court also finds that it cannot agree with the defendant's argument, based upon *U.M.C. Electronics Co.*, that the instant case, too, is one in which an incomplete reduction to practice should satisfy the section 102(b) "on sale" bar.

Although the court finds that the optical mock-up and MHU–145/M trailer were not within the scope and content of the prior art under 35 U.S.C. §§ 102–103, nevertheless, evidence presented at trial concerning the design work performed by AAI under the MT/LS contract for the MHU–145/M and the optical mock-up may be indicative of the general level of skill in the art. *See Lockheed Aircraft Corp. v. United States*, 553 F.2d at 78, 213 Ct.Cl. at 411 (citing *Del Mar Eng'g Lab. v. United States*, 524 F.2d 1178, 207 Ct.Cl. 815 (1975)); *Simmonds Precision Prods., Inc. v. United States*, 153 U.S.P.Q. 465, 468 (Trial Div., Ct.Cl. 1967), 183 Ct.Cl. 969, 1968 WL 2185 (1968); *Servo Corp. v. General Elec. Co.*, 337 F.2d 716, 720 (4th Cir.1964), *cert. denied*, 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966).

Although it seems to have been within the state of the art to load the bomb bay of the B–52 with a single trailer, such as the MHU–173/E, and it arguably may have been within the state of the art to load the B–1 with the MHU–145/M, the challenge, as defined in the patent specifications, was how to load both airplanes in a single stage, with a single loader. There is no evidence that either the proposed MHU–145/M trailer or the optical mock-up were capable of doing these multifaceted tasks. AAI's building of the optical mock-up proves very little. At most, it suggests that the MHU–145/M, if built, could have loaded the B–1 bomber. As demonstrated by plaintiff's expert, John Bryan, however, neither the optical mock-up nor a trailer of the MHU–145/M design could also have

loaded the B–52. Two other witnesses for the defendant, Theodore Alfriend and Charles Anthony, the project manager for the MHU–145 at Elgin Air Force Base, also testified that the MHU–145/M would not have been capable of loading the B–52 bomb bay.

There is also other evidence in the record bearing on the state of the art at the time of the invention. AAI, faced with the problem of loading both the B–52 and the B–1B bombers, in fact, did not arrive at the solution until after they had learned how Standard had solved the problem, despite AAI's previous work on separate trailers for loading both bombers. In its own work, AAI had pursued a solution using a powered lift adapter, which both AAI and the USAF ultimately abandoned in favor of the MHU–196/M, a design which incorporated the invention disclosed in the '548 patent.

In the instant case, the court finds that the pertinent prior art would include all devices which a person of ordinary skill in the art would use to address the problems solved by the patented invention, that is loading the B–52 and B–1B bombers with one trailer and in a one stage loading process.[57] The scope and content of this art would include all prior art weapons handling trailers discussed by the parties at trial; and all trailers, patents and publications discussed by the plaintiff and Patent Examiner during the prosecution of the application for the '548 patent; as well as any other devices used to transport, lift and load a given package into an aircraft or other such vehicle.[58]

Included in the consideration of the prior art are the MHU–7–33–123/M series trailers, which have a U-shaped frame formed by two longitudinal beams interconnected by a cross-beam, and front and rear lift arms, which are pivotally mounted on each side of the frame, lift the weapons load from the ground to an intermediate position for transport, and then upwardly for attachment to the B–52 aircraft. The rear lift arms each contain a slight bend in their configuration, termed by the plaintiff as a clearance bend, to permit clearance of an arc compensator as the lift beams are pivoted up and down. Because the lift arms are positioned directly beneath the lift beams, the maximum width of the weapons package that can be pivoted, without obstructing the lift arms, is one having outer dimensions less then the distance between the inner surfaces of the lift beams. This limits loading of a weapons package to openings having sufficient clearance for both the width of the weapons package and the lift beams on each side.

In addition to the MHU–7–33–123/M series trailers, the Examiner considered, and rejected, the original claims as presented by plaintiff on the basis of several additional prior art references, including the patents to Norris, Ryan and Hillberg, Hillberg evidently found to be the most pertinent art considered by the Examiner insofar as the presence of an offset was concerned. The Hillberg patent discloses an article handling trailer, comprising a U-shaped frame, a pair of lift arms, lifting means and lift beams. The lift arms contain an offset portion between the frame/arm connection, as shown in Figure 3 of the patent. The offsets in the lift arms of the Hillberg patent, however, do not meet the functional limitations of the offset portions claimed in the '548 patent and the trailer is incapable of inserting a weapons load in an opening of minimal clearance.

The Taylor patent, cited by the Examiner in the First Office Action, discloses a trail-

---

57. The defendant argues that the inventors of the '548 patent were merely faced with the problem of loading the B–1B bomber, however, as it is clear from a reading of the specifications included in the '548 patent, the inventors, Messrs. Oswald, Mankey and Dean were confronted with the problem of loading the bomb bays of the B–52 and the B–1B bombers.

58. The court notes that, although during the prosecution of the application for the '548 patent, the Examiner and Standard cited many prior art references, the only prior art references discussed at trial included the prior art MHU–7–33–123/M series trailers, the patent to Hillberg, the patent to Taylor and, to the extent that the parties argued their applicability, the Scott Russell Straight-line Motion mechanism, the MHU–145/M design and the optical mockup for the proposed MHU–145/M trailer.

er containing a lift-up assembly. The trailer comprises two longitudinally extending beams, a fixed cross-member and removable cross-member and wheel assemblies. The trailer's forward and rearward lifting assemblies are pivotably mounted to the base frame and pivotally—and slidably—connected to lift beams. The lifting mechanisms are each powered by a hydraulic cylinder.

To the extent that the court is able, based on the evidence presented, to refer to the Norris and Ryan patents, also cited by the Examiner, the Norris patent discloses a vehicle drive system having four wheels, each powered by a motor to permit the wheels to be pivoted about a vertical axis, allowing the vehicle to move in any direction. The Ryan patent discloses a lifting trailer having longitudinally extending beams actuated by hydraulic cylinders which are attached to lift beams.

In addition to the foregoing, the defendant contends that the Scott Russell mechanism is pertinent prior art. The claims do not recite a Scott Russell mechanism; the patent disclosure does not mention it and none of the prior art references refer to it. Furthermore, the description of the Scott Russell mechanism in the engineering textbook *Ingenious Mechanical Devices*, relied upon the defendant, contains no suggestion or teaching concerning the use of a Scott Russell mechanism in the MHU–7–33–123/M series trailers or any other weapons loading trailer. To the extent, however, that the Scott Russell mechanism is inherent in the MHU–7–33–123/M series trailer,

as the defendant's technical expert, Dr. Kirk, testified, the mechanism, in fact, was before the Examiner.

Consequently, even according to the defendant, the Scott Russell mechanism was before the Patent Examiner when he reviewed plaintiff's patent application and when he decided to allow the claims as patentable. As a result, the decision by the Patent Office is entitled to the presumption of administrative correctness.[59] As stated by the Court of Appeals for the Federal Circuit:

> When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents. In some cases a PTO board of appeals may have approved the issuance of the patent.

*American Hoist and Derrick Co. v. Sowa & Sons*, 725 F.2d at 1359.

### 3. *Level of Ordinary Skill in the Art*

The Federal Circuit has listed six factors to be considered when making the determination of the level of ordinary skill in the art. These factors are: [60] (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) prior

---

**59.** Assuming, for the sake of argument that AAI's design work on the MHU–145/M proposed trailer or its optical mock-up is pertinent prior art, the defendant failed to establish to the satisfaction of the court that such work either anticipated or rendered obvious the subject matter of Claim 9. Dr. Kirk, apparently misconstruing the term offset as used in the patent in suit, testified that the MHU–145/M optical mock-up employed an offset for positioning the distal end of the lift arm under the lift beam. He found no real distinction between the MHU–145/M and the MHU–7–33–123/M trailers, and did not even attempt to show Claim 9 read on the proposed MHU–145/M trailer or the optical mock-up for the MHU–145/M trailer. In contrast, assuming the court were to treat the MHU–145/M design or the optical mock-up as

prior art, plaintiff's technical expert, Mr. Bryan read Claim 9 on the MHU–145/M trailer design and the optical mock-up and demonstrated that Claim 9 was not met by either one.

**60.** The Court of Claims outlined the factors which aid in developing a picture of what is the level of skill of the ordinary person in the art as: (1) the various prior art approaches employed, (2) the types of problems encountered in the art, (3) the rapidity with which innovations are made, (4) the sophistication of the technology involved, and (5) the educational background of those actively in the field. *Jacobson Bros., Inc. v. United States*, 512 F.2d 1065, 1071, 206 Ct.Cl. 518, 528 (1975).

art solutions to those problems; (4) the rapidity with which innovations are made; (5) the sophistication of the technology; and (6) the educational level of active workers in the field. *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–97 (Fed.Cir.1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed.Cir.1983)). "Considerations such as commercial success and the failure of others characterized as 'secondary' in *Graham*, are nonetheless invaluable as real-life indicia not only of the level of skill in the art but also in the ultimate determination of validity." *Jacobson Bros., Inc. v. United States*, 512 F.2d at 1071, 206 Ct.Cl. at 528. In fact, the Federal Circuit stated that:

> [n]ot all such factors may be present in every case, and one or more of these factors or other factors may predominate in a particular case. The important consideration lies in the need to adhere to the statute, *i.e.*, to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of 'ordinary skill in the art'—not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand.

*Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d at 696–97.

As discussed earlier, the hypothetical person of ordinary skill in the art is presumed to be aware of all of the pertinent prior art at the time the invention was made. The actual inventor still is not relevant to the inquiry. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d at 454. The actual inventor's skill is irrelevant to the inquiry because the inventor is thought to possess a special something that sets him/her apart from the workers of ordinary skill. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed.Cir.1985). Moreover, events occurring after the invention is made are not relevant to the determination of the level of ordinary skill in the

art. *Stewart–Warner Corp. v. Pontiac*, 767 F.2d at 1570.

The court finds, and the parties in the instant case at least seem to agree, that a person of ordinary skill in the art would have a bachelor's degree in mechanical engineering and some years of practical engineering experience. Moreover, it is also understood that the person of ordinary skill in the art was familiar with each of the relevant prior art references. The defendant contends that the amount of experience would be approximately two years, the level of experience possessed by Mr. DeSalvo of AAI, a junior engineer involved in the design effort of the accused MHU–196/M trailer. Standard, however, contends that the level of ordinary skill in the art is higher, concluding that the level of experience is at least ten years, a level of experience common to the inventors Oswald, Dean and Mankey and to AAI's other engineers, Alfriend and Hubich, who were involved in the MHU–145/M and MHU–196/M projects. Based on the evidence presented to the court, including the evolution of the art and the prior art solutions, the sophistication of the technology, which is not of an extraordinary complex nature, and the educational levels of those active in the relevant technological field, the court finds that a bachelor's degree in mechanical engineering with approximately five to ten years of experience is the appropriate level of skill for one of ordinary skill in the art.

### 4. *The Differences Between the Patent in Suit and the Pertinent Prior Art*

As is evident from the language of the applicable statute, 35 U.S.C. § 103,[61] the subject matter which must have been obvious, in order for the Patent Office to have denied patentability under 35 U.S.C. § 103, is the entirety of the claimed invention. "The invention must be viewed as a whole." *See Stewart–Warner Corp. v. Pontiac*, 767 F.2d at 1569. It is error to hold that the differences must be unobvi-

---

**61.** 35 U.S.C. § 103 states that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the arts to which said subject matter pertains." 35 U.S.C. § 103.

ous; it is the claimed subject matter as a whole which 35 U.S.C. § 103 says must be nonobvious, not the differences. *Richdel, Inc. v. Sunspool Corp.,* 714 F.2d 1573, 1579 (Fed.Cir.1983). Although the differences may be slight, it makes a difference in the patent at issue and holds the key to success. The question is whether the differences are such that the claimed subject matter as a whole would have been obvious to one of ordinary skill in the art at the time of the invention.[62]

The focus of the obviousness inquiry is on the claims of the invention, not on the embodiments. *Jackson Jordan, Inc. v. Plasser American Corp.,* 747 F.2d 1567, 1578 (Fed.Cir.1984). It is the subject matter of the claims which constitutes what is to be patented, and it is that subject matter which should be the sole object of the court's inquiry in determining obviousness. *In re Sovish,* 769 F.2d 738, 742 (Fed.Cir. 1985).

Since Claim 9 of the patent in suit is a dependent claim, depending on Claim 1,[63] analysis of the differences between the claim and the prior art necessarily requires all of the elements in Claim 1 to be considered in conjunction with those specifically set forth in Claim 9.

The defendant contends that the differences between the invention of Claim 9 as a whole and the prior art trailers are insignificant and, therefore, not patentable. According to the defendant, an element by element comparison of Claim 9 of the '548 patent to Standard's prior art MHU–7–33–123/M trailers demonstrate that the prior art trailers include every element except: (1) offsets in the front lift arms, and (2) the reversal of the orientation of the Scott Russell mechanism. With respect to the presence of offsets in the prior art trailers, the

defendant contends that the prior art trailers include two, rather than four offset arms which are included in the patented invention. The defendant adds that the offset in the prior art is smaller than the offset in the patented invention. The defendant argues that the use of four instead of two lift arms with offset portions would have been obvious to one of ordinary skill in the art at the time of the invention.[64] As far as the second difference which the defendant finds between the prior art and the patented invention, the reversal of the orientation of the Scott Russell mechanism, the defendant states that one of the joint inventors of the '548 patent admitted that the feature claimed in Claim 9 involved the relatively little quick and easy task of flipping the mechanism upside down.

In contrast, the plaintiff does not disagree that the patented invention includes many elements disclosed in prior art trailers. The plaintiff, however, ardently asserts that there are differences between the prior art MHU–7–33–123/M trailers and Claim 9 of the '548 patent. Specifically, the plaintiff argues that the presence of offset portions in the lift arms of the disclosed invention is the most distinguishing element of the new invention over the prior art.

Considering first the elements of Claim 1, the defendant failed to show, by clear and convincing evidence, that the prior art MHU–7–33–123/M trailers contained lift arms having proximal portions offset from the distal portions such that the inside surfaces of the proximal ends are spaced apart a distance greater than the outside surfaces of the lift beams and, such that the outer surfaces of the proximal portions of the lift arms are within the lateral periph-

---

**62.** In order to combine the teachings of more than one prior art reference to conclude that the invention was obvious, the prior art, as a whole, must suggest the desirability of the combination. *Vandenberg v. Dairy Equip. Co.,* 740 F.2d at 1566 (citing *Lear Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d at 889); *In re Imperator,* 486 F.2d 585, 587 (CCPA 1973).

**63.** An applicant may state a claim in "dependent form." A dependent claim is one which refers back to and further limits another claim in the

patent or application. *See* 37 C.F.R. § 1.75(c) (1990); 2 D. Chisum, *Patents* § 8.06[5].

**64.** The defendant argues that "[t]he use of offsets is a simple matter of design choice that would have been readily apparent to one of ordinary skill, a mechanical engineer, in order to avoid the interference between the distal ends of the lift arms and the downwardly hanging doors of the B–1 bomber."

ery of the weapons package and are spaced apart less than the distances between the outer surfaces of the lift beams. These spatial relationships permit the weapons package extending outside the lift beam to clear the lift arms as the lift beams are pivoted up and down and enable the patented trailer to fit the weapons package, the lift beams and the distal portions of the lift arms into a weapons bay with minimal lateral clearance. While it is true that the Claim at issue does not include the limitation specifically referring to the weapons package, in the instant case, in view of the information disclosed in the file wrapper, the Claim language merely restates the spatial relationship. The relevant Claim language is:

\* \* \* \* \* \*

the lift beams having outside surfaces which are spaced apart less than the inner surfaces of said first portions of said lift arms, thereby allowing said lift beams to be lowered between said first portions of said lift arms;

the outwardly facing surfaces of the third portions of the lift arms supported on the first longitudinally extending beam being spaced from the outwardly facing surfaces of the third portions of the corresponding lift arms supported on the second longitudinally extending beam a distance substantially no greater than the distance between the outermost lateral surfaces of said lift beams, thereby allowing said lift arms to pivot upwardly and insert said lift beams, said third portions of said lift arms and the weapons package upwardly through an opening of minimum clearance with respect to the weapons package, such that the third portions of the lift arms do not extend from within the outermost lateral periphery of the weapons package as the lift arms pivot between the first and second positions.

\* \* \* \* \* \*

It is because of the Claim limitation that the weapons package can extend outside the lift beam as the beams are pivoted up and down. This limitation, contrary to the testimony of Dr. Kirk, the defendant's

technical expert, is not present in the prior art trailers.

The court agrees with Dr. Kirk that the "offset" of the patented invention inwardly displaces the distal ends of the lift arms to position them within the shadow of the lift beams, but this overlooks the seeming function of the "offset" as defined in the specifications and file history which makes the invention operable. In considering Claim 9 of the '548 patent, it would appear to be irrelevant that the prior art MHU–7–33–123/M trailers position the distal ends of the lift arms within the shadow of, or beneath, the lift beams. The relevant issue, in accordance with the term "offset" or "offset portion," as defined in the file wrapper, seems to be whether the prior art MHU–7–33–123/M trailers position the distal ends of the lift arms within the shadow of, or beneath, the weapons package. Only when this is the case can the weapons package be lifted by the weapons handles from the underlying surfaces and inserted through an opening of minimal clearance as required by Claim 9. In general, the court found that in an attempt to bolster his interpretation of the patent in suit and the prior art, the defendant's technical expert oversimplified on several occasions, ignoring elements of the patent invention which made it unique.

To the contrary, the plaintiff's legal expert, Judge Colaianni indicated that sections of the '548 patent's Claim language which differentiate the patent from the prior art are the areas of the Claims which deal with the spatial relationships between the lift arms and the lift beams. Judge Colaianni testified at trial about the relationship between the lift arm and the lift beam which:

sets forth the ability of the claimed invention to be able to move from a ground position, lift a load and not only extend it into the bay of a B–1, but also to be able to get under the more constrained distance between the fuselage and the open bay and the ground of the B–52.

In either case, it is undisputed that the clearance bend or slight bend in the rear lift arms of the prior art trailers does not,

and cannot, satisfy the functional requirements defined in the '548 patent for the offset portions in the lift arms. Indeed, after understanding this functional difference, the Examiner allowed the '548 patent to issue over the prior art trailers in view of Hillberg. After listening to and observing the testimony of both experts, the court is persuaded that the Patent Examiner and the plaintiff's expert, Judge Colaianni, were correct as to the interpretation of the significance of the patent language and its relationship to the prior art.

Except for Dr. Kirk, the defendant's technical expert, the witnesses who testified at trial for both the plaintiff and the defendant, Messrs. Alfriend, DeSalvo, Oswald, Dean, Mankey and Bryan, were in agreement that in the prior art trailers, the outer surfaces of the lift beams were outside the inner surfaces of the proximal ends of the lift arms. Dr. Kirk disagreed, taking the position that the limitation described above read on the MHU–7–33–123/M trailers because the outer surfaces at the front of the lift beams were closer together than the inside surfaces at the proximal ends of the rear lift arms. Dr Kirk's reading of the Claim, and comparison of the outer surface at the front of the lift beams with the noncorresponding, distally located inside surfaces on the proximal end of the rear lift arms, ignores the function explicitly set forth in the Claim. This function requires that the full length of the lift beam's outer surface be inside the inner surfaces of the proximal portions of both lift arms to permit the weapons package extending outside the lift beam to clear the lift arms as they are pivoted up and down. Even under Dr. Kirk's interpretation of the Claim, the outer surfaces at the rear portion of the lift beams are outside of the inner surfaces of the proximal ends of the front and rear lift arms. Therefore, Claim 9 (and Claim 1), which enable the trailers to load a weapons package whose outer diameter extends outside of the outer surface of the lift beams into a bomb bay of minimum clearances, does not read on the prior art MHU–7–33–123/M trailers. If the weapons package employed on the prior art MHU–7–33–123/M trailers were wider than the inside surfaces of the lift beams, clearly, the weapons package would strike the upper end of the lift arms and make it impossible to lower the lift beam to the grounds.

Considering the additional elements called for by Claim 9, the parties at least agree that the MHU–7–33–123/M trailers do not employ lift arms "connected to one of the longitudinally extending beams of the frame for pivotal and sliding motion with respect thereto." While agreeing that it is not precisely present in the prior art, the defendant tries to argue that this element is really a version of the Scott Russell mechanism, which can easily be reoriented from the manner in which it was employed in the prior art to the manner in which it is claimed in Claim 9. However, inversion of the orientation of the Scott Russell mechanism in the MHU–7–33–123/M trailers, without simultaneously providing the "offset" of the Claim 1, does not render the MHU prior art capable of loading both the B–1B and the B–52 bombers. In fact, it was insufficient merely to provide a clearance bend to accommodate the arc compensator in the infringing trailers; it was also necessary to provide the offsets of the patented invention to render the infringing trailer capable of loading both aircraft.

In addition, Mr. Bryan, Standard's expert, testified that the MHU prior art trailers did not employ a "bell crank fittingly supported on the frame and connected between the hydraulic lift cylinder and the arms," with the bell crank "responsive to actuation of the hydraulic cylinder means to pivot the lift arm and thereby raising and lowering the lift beam." While Dr. Kirk, the defendant's expert, could not identify a bell crank pivotally mounted on the frame connecting the hydraulic cylinder and the lift arms of the MHU prior art trailers, he claimed this element was nevertheless present in the prior art trailer because you "can apply hydraulic actuation to the end of the lift arm thereby creating rotation about the pivot point."

Finally, to the extent that one might consider the proposed MHU–145/M trailer or the optical mock-up within the scope and

content of the prior art, the same distinguishing factors that exist between Claim 9 and the prior art MHU–7–33–123/M trailers are present between Claim 9 and the MHU–145/M trailer or the optical mock-up. Both the optical mock-up and the proposed MHU–145/M trailer lack the offset portion described in the patented invention.

### 5. *Secondary/Objective Considerations*

The findings concerning the secondary/objective considerations of nonobviousness, such as commercial success, long felt but unsolved need, "focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible to judicial treatment than are the highly technical facts often present in patent litigation." *Graham v. John Deere Co.*, 383 U.S. at 36, 86 S.Ct. at 703 (citing Judge Learned Hand in *Reiner v. I. Leon Co.*, 285 F.2d 501, 504 (2d Cir.1960), *cert. den.*, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961)). As stated by the Supreme Court in *Graham v. John Deere Co:*

> Such inquiries may lend a helping hand to the judiciary which, as Justice Frankfurter observed, is most ill-fitted to discharge the technological duties cast upon it by patent legislation. [citation omitted] They may also serve to guard against slipping into use of hindsight, [citation omitted] and to resist the temptation to read into the prior art the teachings of the invention in issue.

*Graham v. John Deere Co.*, 383 U.S. at 36, 86 S.Ct. at 703.

■ The evidence of real-world events which actually took place, referred to as "secondary considerations," may often be the most probative in the record. Evidence of secondary considerations may often establish that an invention which appears to have been obvious in light of the prior art, in fact, was not. *Simmons Fastener Corp. v. Illinois Tool Works*, 739 F.2d at 1575 (quoting *W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d at 1555); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1538. These considerations allow the court to objectively appraise the inventor's contribu-

tion to the art by viewing the situation before and after the invention appears. In *Ashland Oil, Inc. v. Delta Resins & Refractories*, 776 F.2d 281 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986), the court stated:

> While it is incumbent upon the decision maker to recognize that evidence of secondary considerations need not be necessarily conclusive on the obviousness/nonobviousness issue [citation omitted], the decision maker must also bear in mind that, under certain circumstances, the evidence of secondary considerations may be particularly strong and entitled to such weight that it may be decisive.

*Ashland Oil, Inc. v. Delta Resins & Refractories*, 776 F.2d at 306.

Moreover, secondary considerations "must always when present be considered en route to a determination of obviousness." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1538. Additionally, however, and maybe of great importance, "[a] nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight en route to a conclusion on the obviousness issue." *Id.* at 1539; *see also In re Felton*, 484 F.2d 495, 501 (CCPA 1973). Indeed, the Federal Circuit has stated clearly that the nexus is a required condition to the relevancy of the objective evidence. *Vandenberg v. Dairy Equip. Co.*, 740 F.2d at 1567; *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1539. In the instant case, the defendant does not rebut the facts offered by Standard regarding secondary considerations. Rather, the defendant contends that Standard failed to prove the requisite nexus between any of the claimed relevant, secondary considerations and the elements which plaintiff claims distinguish the '548 patent from the prior art.

### a. *Commercial Success*

■ It is assumed that if a solution to a given problem carried with it the possibility of commercial success in the market, then potential innovators would be induced to attempt a solution to the problem in order

to reap the market reward. Indeed, if commercial success is ultimately attained, then it can be inferred that others attempted but failed to solve the problem. Commercial success in conjunction with other evidence, such as copying by those in the industry, is an indication that the patent is recognized as involving uncommon ingenuity, rather than merely the application of ordinary skill. Commercial success is only probative of nonobviousness if it is the result of the inventive features as opposed to other factors. The Court of Appeals for the Federal Circuit, and its predecessor the Court of Customs and Patent Appeals, have refused to adopt evidence of numbers of units sold, volume of dollar sales, and proof of existing market share, without regard to the reason for the commercial success of the invention in suit. *See Vandenberg v. Dairy Equip. Co.*, 740 F.2d at 1567; *Kansas Jack, Inc. v. Kuhn*, 719 F.2d at 1151. The Court of Appeals for the Federal Circuit has held that "commercial success due only to superior business acumen, or effective advertising, is of no relevance to a determination of whether the invention would have been obvious under 35 U.S.C. § 103." *Solder Removal Co. v. United States International Trade Com.*, 582 F.2d at 637. In order for evidence of commercial success to be used to demonstrate nonobviousness, a party must show that the subject invention displaced prior art devices or surpassed the volume sales of prior devices, that the patentee's market share increased significantly after introduction of the subject invention, replacing earlier units sold or that the patentee was able to demand an extraordinary per unit price. *See Vandenberg v. Dairy Equip. Co.*, 740 F.2d at 1567; *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d at 1382; *Kansas Jack, Inc. v. Kuhn*, 719 F.2d at 1151; *Cable Elec. Products., Inc. v. Genmark, Inc.*, 770 F.2d at 1026–27. In this regard, it is clear to the court that the presentation of expert testimony and other evidence as to the reasons behind any such commercial success can be crucial.

In order to be relevant on the issue of nonobviousness, the commercial success must have been attributable to the patentee's claimed contribution, *Jacobson Bros. v. United States*, 512 F.2d at 1073, 206 Ct.Cl. at 531–32, as opposed to other evidence or commercial reasons not related to the technical aspects of the patented item. *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d at 1027. Clearly, evidence of commercial success which is tied to features or advantages disclosed or inherent in the prior art, or arising out of improvements made subsequent to the claimed invention, may be indicative of the inventiveness of the prior art or improvement rather than the obviousness of the claimed invention. *In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564, 1577 n. 5 (Fed. Cir.1985); *Aktiebolaget Karlstads Mekaniska Werkstad v. United States International Trade Com.*, 705 F.2d at 1577.

There is significant evidence of commercial success probative of the nonobviousness of the invention in this case. The defendant has purchased, on a sole source basis from AAI, at least 136 trailers embodying the patented invention, at a total cost in excess of $58 million. By its own calculations, the defendant's acquisition of the infringing trailers resulted in a net cost savings of almost $14 million for seventy-one trailers over what it would have paid for the prior art MHU–173/E trailers, not counting the additional expense the defendant would have incurred for the powered lift adapters. Moreover, it also is not without significance that the defendant has seen fit to make the accused trailer to enable it to load the Advanced Technology Bomber (B–2).

Commercial success and sufficient nexus has been established for the court to consider commercial success as an element of the evaluation in plaintiff's favor regarding nonobviousness in the instant case. This result is based in part on the government's continued use of the accused trailers, and the government's position that the accused trailers incorporate a lifting mechanism, which they claim is based on prior art, including the Scott Russell mechanism, but which they claim would have rendered the patent at issue obvious.

As discussed in *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed.Cir.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988):

> A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent.
>
> \* \* \* \* \* \*
>
> When the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger, as in any civil litigation.
>
> \* \* \* \* \* \*
>
> It is thus the task of the challenger to adduce evidence to show that the commercial success was due to extraneous invention, such as advertising, superior workmanship, etc.
>
> \* \* \* \* \* \*
>
> A patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is *not* due to factors other than the patented invention. It is sufficient to show that the commercial success was of the patented invention itself. A requirement for proof of the negative of all imaginable contributing factors would be unfairly burdensome, and contrary to the ordinary rules of evidence (emphasis in original).

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd*, 851 F.2d at 1393–94.

Although the defendant asserts that this commercial success is attributable to features also present in the prior art, the court believes that defendant's assertion must fail. The defendant has conceded that the prior art loaders were incapable of loading both the B–52 and B–1B bombers, and it has been demonstrated that the USAF elected to acquire the accused trailers to replace the prior art trailers at the earliest opportunity.

#### b. Long Felt But Unsolved Needs

The plaintiff asserts that the need for a single trailer, capable of loading the B–52, B–1 and future generation bombers, arose in 1976. Although not formally published as a need in 1976, some USAF personnel questioned the wisdom of developing the loader just for the B–1 and inquired if it could be modified or adapted to the B–52.

Although the B–1 bomber project was cancelled in 1977, the need again arose when the project was revitalized in 1981. The evidence showed that the MHU–173/E weapons loaders, which were field tested in late 1981, experienced numerous failures, low availability and operated under restrictions when handling nuclear weapons. These deficiencies of the MHU–173/E, and the need to load the B–1B bomber, led SAC, which had responsibility as the user of both the B–52 and the new B–1B, to issue an urgent Statement of Need in 1983:

\* \* \* \* \* \*

> SAC has an urgent need for a Munitions Lift Trailer (MLT) to support its primary mission of inflicting damage on enemy forces. The MLT must be capable of sustained operations under worldwide environment conditions and have the ability to handle, transport, load/unload (internal/external) existing and planned munitions delivery packages on the B–52, B–1B and follow-on bomber aircraft. \* \* \*

The SAC Statement of Need was a formal recognition of an urgent need for one munitions lift trailer which was not only capable of loading the B–52 and B–1 bombers, but also capable of loading future generation bombers, as well.

#### c. Failure of Others to Solve the Problem

■ Although the need was identified as early as 1976, for a munitions lift trailer capable of loading more than one bomber, AAI failed to provide a solution for the need until after the plaintiff had developed the claimed invention. The MHU–145/M design developed by AAI in the 1976–1977 time period, even if reduced to practice, was incapable of loading the bomb bay of the B–52 aircraft. The MHU–173/E devel-

oped by AAI beginning in 1981 could load the B–52, but was not, without substantial modification, capable of achieving the lift height necessary to load the B–1B. As a loader for the B–52, it was apparently a failure. Despite its earlier work on the MHU–145/M trailer, AAI's approach to loading the B–1B bomber was to propose an auxiliary powered lift adapter.[65] As late as August 2, 1983, AAI was still briefing the USAF on the use of the power lift adapter for the MHU–173/E and its advantages over Standard's proposed 60K loader. After Standard successfully began to promote the invention contained in the '548 patent, AAI abandoned the powered lift adapter and opted to build the MHU–173/E VECP (MHU–196/M), which incorporated the patented invention. Contrary to the evidence presented at trial, the defendant characterizes the changes between the MHU–173/E and the MHU–173/E VECP as modest modification to accommodate the capability of loading the B–52 and B–1B. AAI later touted the MHU–196/M's ability to meet B–52 and B–1B requirements, its reduced complexity, improved maintainability and lower cost as reasons why the USAF should buy it, seemingly admitting that it had previously failed to meet the need regarding the required trailer.

#### d. *Copying*

The evidence presented at trial on the issue of whether AAI copied Standard's invention disclosed in the '548 patent was the most compelling of all the evidence regarding the secondary or objective considerations. In fact, contrary to the defendant's position that Mr. DeSalvo independently derived the lift mechanism disclosed in the MHU–196/M design, the court finds that AAI appeared to have copied the invention disclosed in the '548 patent by way of AAI's acquisition[66] and use of Standard's proprietary drawings, which clearly disclosed the second embodiment of

the '548 patent, prior to AAI's submission of the Value Engineering Change Proposal for the MHU–173/E trailer to the government.

■ As stated by the Court of Appeals for the Federal Circuit, another of the secondary considerations indicating nonobviousness is copying by the alleged infringer of the invention in preference to the prior art. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d at 1569. Alternatively stated, "copying the claimed invention, rather than one in the public domain, is indicative of non-obviousness". *Windsurfing International, Inc. v. AMF Inc.*, 782 F.2d 995, 1000 (Fed.Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986). Copying is particularly relevant to obviousness "where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed." *Vandenberg v. Dairy Equip. Co.*, 740 F.2d at 1567.

The evidence adduced at trial proved that AAI was acutely aware of Standard's efforts to promote its 60K Loader in 1983. The complexity of AAI's MHU–173/E trailer had been criticized, and Dr. Cooper, the Assistant Secretary of the Air Force, had asked AAI what they could do to simplify it.

The evidence also clearly indicates that at least as early as August, 1982, AAI obtained copies of drawings from Standard's 60K Loader Unsolicited Proposal which depicted the essentials of the invention: (1) the inward positioning of the distal end of the lift arm with respect to the outermost dimensions of the weapons package; (2) the positioning of the proximal end of the lift arms outside of the outer dimensions of the weapons package; and (3) the obtuse angular relationship between the proximal and distal ends of the lift arms, which permits the distal end of the lift arm

---

**65.** Indeed, the skepticism of AAI as to the success of a patented device which would ultimately prove to be successful, is an indication of nonobviousness.

**66.** The court specifically makes no finding as to how AAI employees came to acquire the plain-

tiff's drawings and file. For the purposes of the case at issue, it is sufficient to know that AAI did, in fact, have those drawings in their possession and that the accused trailer was designed after the acquisition of those drawings.

to lie substantially parallel to the ground, thus providing the lift arms with sufficient length required to load the weapons package in a bomb bay of minimal clearance. In fact, a briefing given by AAI to the Aeronautical Systems Division at Wright–Patterson Air Force Base on August 2, 1983, AAI displayed a viewgraph illustrating Standard's 60K Loader and made numerous comparisons between Standard's loader and AAI's proposed powered lift adapter.

Shortly after the August, 1983 briefing, AAI dropped the powered lift adapter concept completely, and initiated a program of its own to develop a simplified or completely new loader, which could load both the B–52 and B–1B bombers. A meeting inaugurating this effort was held at AAI on August 8, 1983. Among those present at the meeting were Messrs. DeSalvo, Alfriend and Steve Brickman. The task was assigned to several AAI engineers, who were instructed to work independently of one another on the project. At the time of the meeting, Mr. DeSalvo, the would-be inventor of the new AAI concept,[67] which resulted in the MHU–173/E VECP, was twenty-five years old, had a recent bachelor's degree in mechanical engineering and only had three years of practical experience.

Crucial to the court's finding that AAI copied the invention contained in the '548 patent are Mr. DeSalvo's notes of the August 8, 1983 meeting at AAI. Moreover, having an opportunity to observe Mr. De-Salvo while he gave his testimony at the trial, the court found his testimony that he independently derived the invention not very credible. Mr. DeSalvo's notes of the meeting include notations that he was aware that Standard had hardware (a prototype loader) in August 1983, that he was told the Standard design "beets [sic] AAI's in maintenance costs" and that he should not look at the MLT or Standard's design. Mr. DeSalvo testified that, while the first two references in his notes referred to Standard's present loader design, the third reference that he should not look at Standard's design refers to Standard's old MHU–7–33–123/M design. The court finds it unlikely that the first two references in Mr. DeSalvo's notes were to Standard's present design, while the third was to an old design. Furthermore, not only were drawings illustrating the Standard design in AAI's files at the time and accessible to AAI engineers,[68] but also, on the back of the first page of Mr. DeSalvo's notes, reproduced below, there appears a small drawing which, in the court's view, is a reproduction of the lift mechanism disclosed in Standard's drawings in AAI's possession.[69]

67. Originally referred to as the MHU–173/E VECP, now designated the MHU–196/M.

68. Mr. Alfriend testified that he had looked at the drawings.

69. Neither party recognized this drawing. Mr. DeSalvo testified that these notes were taken during the August 8, 1983 meeting at AAI. Thus, the court can only conclude, without evidence to the contrary, that the drawing, indeed, was made at the time of the meeting.

[Plaintiff's Exhibit 318]

While this drawing does not disclose the critical element of the patented invention, the offset portion, it does represent the lift mechanism disclosed in the Standard drawings in AAI's possession, which the court finds does not look like the prior art MHU trailers. The diagram appears to have an extended lift arm. Neither the prior art MHU trailer, the MHU–173/E or the optical mock-up for the proposed MHU–145/M, contain the lift arm configuration disclosed in this diagram. Even though Mr. DeSalvo testified that he was told not to look at these prior art designs, and that he had not seen them or the '548 patent prior to his work, the court feels compelled by the available evidence to conclude that the design produced by the AAI organization strongly suggests that there was copying in the instant case. Among other probative evidence is the testimony of Mr. Tuttle that prior to putting copies of the Standard designs in his files, he showed the designs to other AAI employees, including Mr. Alfriend, the AAI project engineer and the testimony of Mr. Alfriend that AAI had received a second copy of similar drawings from an acquaintance at Boeing.

Even if one were to conclude that DeSalvo's diagram does not evidence copying in this case, the court finds it interesting that, less than two months after the start of his new design effort in mid-October 1983, Mr. DeSalvo developed a conceptual design which was sufficiently specific to be the subject of a complete USAF briefing to the Aeronautical Systems Division. Plaintiff's technical expert, Mr. Bryan, who reviewed Mr. DeSalvo's work product, testified at trial that the design approach taken by Mr. DeSalvo at the commencement of the project was not workable. Rather than pursuing a logical path to the solution of the problem, Mr. Bryan commented, Mr. DeSalvo's work evidenced a series of unworkable approaches. According to Mr. Bryan, the concept of the invention abruptly appeared for the first time in one of Mr. DeSalvo's drawings and bears no logical or evolutionary relationship to Mr. DeSalvo's earlier attacks on the problem. The inference is, inescapable, that while AAI did not copy the exact embodiment of the invention disclosed in Standard's drawings, it appropriated and copied the concept of the invention and reduced it to practice in an alternative embodiment which included the critical offset portions in the lift arms. Indeed the evidence speaks strongly to the fact that AAI engineers did not arrive at the solution to the task of designing an acceptable trailer independently of Standard's contribution.

Additionally, Dr. Kirk, the defendant's technical expert, testified that the difference between the second embodiment of the invention, which AAI had in its possession, and third embodiment, incorporated in the MHU–196/M trailer, is that the second embodiment employed an inverse Scott Russell mechanism, whereas the third embodiment employed the straight Scott Russell mechanism. One of the co-inventors of the claimed invention, Mr. Mankey, testi-

fied that after conceiving the first and second embodiments of the invention, it was a relatively small task to derive the third embodiment in which the lift arms are pivoted on the frame, as opposed to the lift beams. As Mr. Bryan stated: "Once you understand the nature of the invention, you can incorporate it in a number of ways." Thus, having come into possession of copies of the design of Standard's patented invention, it was no difficult step for AAI to invert the linkage. AAI's own documents, and the rapidity with which its engineer derived the invention, after previously following alternative engineering concepts, strongly support a finding of conceptual copying.

### e. *Recognition by Experts in the Field*

Numerous commands and organizations within the USAF recognized that Standard's concept was a major contribution to the art. Eglin Air Force Base, Armament Division, evaluated Standard's unsolicited proposal and advised Standard that "the proposed effort appears to offer significant improvement over existing development programs and equipment in their field." Various Air Force officials gave Standard encouragement and some Air Force personnel came to Standard's facility to view the prototype. Perhaps the most telling evidence is the briefing given by LTC Kissner to the Vice Commander of the Aeronautical Systems Division at Wright–Patterson Air Force Base, at which the performance of the MHU–173/E prior art trailer and the MHU–196/M, which incorporates the new concepts embodied in the patented invention, were compared. LTC Kissner reported that the expected maintenance for the MHU–173/E would be three times the maintenance of the MHU–196/M, and would require approximately twice the maintenance personnel and cost three times as much to maintain on an annual or twenty year cycle basis. The Aeronautical Systems Division provided further recognition of the invention when they refused to exercise their option of purchasing additional MHU–173/E trailers for loading B–52, cancelled the contract for the powered lift adapter and immediately began purchasing the MHU–196/M trailers covered by the patent in suit. All this, arguably, represents the ready acceptance by experts in the field of the patented invention.

### C. *Conclusion—Obviousness*

Whether the elements recited in Claims 1 and 9 were individually known in the art at the time of the invention is irrelevant. As the Federal Circuit pointed out in *Environmental Designs, Ltd. v. Union Oil Co.*,

All the pieces of the present invention were known in the art, i.e., the equations for hydrogenation and hydrolysis of sulfur compounds, the simultaneity of chemical reactions, and the components of the Claus affluent. That all elements of an invention may have been old (the normal situation), or some old and some new, or all new, is however, simply irrelevant. Virtually all inventions are combinations and virtually all are combinations of old elements. A court must consider what the prior art as a whole would have suggested to one skilled in the art, (citations omitted)....

*Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d at 698.

In making the obviousness determinations, the court views "the prior art without reading into that art the patent's teachings (citations omitted) and must analyze and consider the references on the whole (citations omitted)." *Vandenberg v. Dairy Equip. Co.*, 740 F.2d at 1564. Hindsight is of no value in determining what would have been obvious at the time the invention was made, since any invention, when viewed with the assistance of hindsight, appears obvious in view of the prior art. Obviousness under 35 U.S.C. § 103 must be determined in terms of the prior art available at the time the invention was made. There must be something in the prior art as a whole (other then the disclosure in the patent) to suggest, to one of ordinary skill in the art, the desirability of combining the teachings in the relevant art to make the invention. *See, Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d at 1568.

Dr. Kirk testified that in order to modify the MHU–7–33–123/M prior art trailers to

arrive at the invention, you simply pick up the Scott Russell mechanism in total, invert it and incorporate it into the MHU–7–33–123/M trailers. Inverting the Scott Russell mechanism in the MHU prior art trailers, however, does not supply the patented offset, which is essential to the invention, and the absence of which in the MHU prior art trailers renders those trailers incapable of performing the object of the invention. Because Dr. Kirk could point to no suggestion in the prior art of any structure capable of achieving the desired function, it is difficult to infer that one existed.

The prior art as a whole fails to teach or suggest lift arms having proximal and distal portions interconnected by an offset portion in which the following limitations are simultaneously met: (1) the inner surfaces of the proximal ends of the lift arms are spaced apart more than the outer surfaces of the lift beams—to permit the weapons package to clear the lift arms as they are pivoted up and down—and (2) the outer surfaces of the lift beam are spaced apart more than the outer surfaces of the distal end of the lift arms—to permit the weapons package to clear an opening of minimum clearance. Considering the evidence as to what the prior art as a whole taught to one of ordinary skill in the art at the time of the invention, the differences between the prior art and the patented

invention, the evidence concerning nonobviousness of the invention, including its commercial success, the long felt, but unsolved need, failure by others, the copying of the invention by AAI and recognition of the invention by experts in the field, this court concludes that the subject matter of Claim 9 was not obvious. The defendant has failed to satisfy its burden of proof to overcome the presumption of validity of the '548 patent.

## II. *Inequitable Conduct* [70]

In addition to its obviousness defense, the defendant asserts that all claims of the patent in suit are unenforceable because the plaintiff, Standard Manufacturing Company, Inc., and its counsel, are guilty of inequitable conduct in the prosecution of the patent in suit. Specifically, the defendant contends that Standard, as well as its counsel, acted inequitably because its disclosure of the prior art MHU–7–33–123/M series trailers during prosecution of the '548 patent was not sufficiently detailed to permit the Patent & Trademark Office to examine the patent application correctly. [71]

The defendant contends that during the prosecution of the application for the patent in suit, Standard falsely argued that the crucial distinguishing feature of its in-

---

70. Counsel for the plaintiff began the portion of his closing argument concerning the defendant's inequitable conduct defense with the following anecdote: "it seems that someone observed that when ordinary people meet each other on the street they say, 'Hello,' but when Patent Lawyers meet each other they charge one another with inequitable conduct." In contrast, counsel for the defendant began the portion of his closing argument addressing the defendant's second defense with the following:

> Your Honor, in this case there is no smoking gun document that's going to prove the intent of the inventors or their attorneys with respect to the prosecution of the patent suit. In this case, like in most other inequitable conduct cases, an inference of intent to deceive must be inferred from all the surrounding circumstances relating to the prosecution of the patent in suit.

71. The defendant also seems to suggest that Standard is charged with knowledge concerning the MHU–145/M trailer because in an unrelated lawsuit between Standard and the defendant, in 1984, the defendant produced a document in

discovery which included an illustration of, what the defendant argues, represents the MHU–145/M design. From this, it would seem that the defendant argues that the inventors or their patent counsel failed to disclose this information in 1984, prior to the issuance of the '548 patent. Merely because attorneys representing Standard (other than its patent counsel) may have had access to the document in question, prepared by AAI for a government briefing on August 2, 1983, does not mean that the inventors and patent counsel are charged with knowledge of its contents. Indeed, the duty to disclose prior art to the PTO, pursuant to 37 C.F.R. § 1.56 is limited to "the inventors, the attorneys who prosecute the application and those involved in the preparation or prosecution of the application," not every attorney, employee, agent or representative of the company. Significantly, the defendant did not offer any testimony that the inventors or their patent counsel had knowledge of this document during the prosecution of the patent in suit.

vention from the prior art was the offsets in the lift arms. The defendant further asserts that the claimed offsets existed in the prior art and that the Patent & Trademark Office was never informed of those offsets in the prior art. The defendant argues that Standard's grossly inadequate disclosure of its own prior art trailers was made in careless disregard of the truth. According to the defendant, this careless disregard is shown by the fact that when Standard and its attorneys cited prior art to the Patent & Trademark Office, they failed to point out that the prior art MHU–7–33–123/M trailers included "offsets." The defendant argues that, while Standard disclosed the prior art MHU–7–33–123/M trailers in prosecuting the '548 patent application, they intentionally withheld more pertinent and more detailed manufacturing or engineering drawings, which could have clearly showed the "offset" features present in the prior art. Additionally, the defendant asserts that Standard affirmatively misled the Patent Examiner by making inaccurate statements relating to the technical distinctions between its claimed invention and the prior art MHU–7–33–123/M trailers. In sum, the defendant argues that the alleged inadequate disclosure and willful misrepresentations made by the plaintiff and its representatives, constitute inequitable conduct, and therefore, renders the '548 patent unenforceable. Defendant argues that the Patent Examiner would not have allowed the patent to issue, but for the inadequate disclosure and the misrepresentations relating to the prior art MHU–7–33–123/M trailers.

The Patent & Trademark Office imposes a duty of candor upon every applicant. Examiners rely heavily on the representations made by patent applicants. The duty of patent applicants and requirements for submission are clearly described in 37 C.F.R. § 1.56 (1990):

A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.

37 C.F.R. § 1.56(a).

Under the statute, 35 U.S.C. § 282, there is a presumption of validity for any patent issued by the Patent & Trademark Office. The statute places the burden of establishing invalidity on the challenger. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d at 1570. As such, a party asserting the defense of inequitable conduct bears a heavy burden of proof that a material fact was withheld or falsely represented, which must be met by clear and convincing evidence. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985); *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d at 698.

"Inequitable conduct resides in failure to disclose material information or submission of false material information with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989) (citing *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d at 1559); *F.M.C. Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987).

To be guilty of inequitable conduct, the misrepresentation or failure to disclose must have been intentional. *F.M.C. Corp. v. Manitowoc, Inc.*, 835 F.2d at 1415. Determining whether inequitable

conduct has occurred now requires a three step analysis.

Thus, one who alleges a 'failure to disclose' form of inequitable conduct must offer clear and convincing proof of: (1) prior art or information that is material; (2) knowledge chargeable to applicant of that prior art or information and of its materiality; and (3) failure of the applicant to disclose the art or information resulting from an intent to mislead the PTO. That proof may be rebutted by a showing that: (a) the prior art or information was not material (e.g., because it is less pertinent than or merely cumulative with prior art or information cited to or by the PTO); (b) if the prior art or information was material, a showing that applicant did not know of that art or information; (c) if applicant did know of that art or information, a showing that applicant did not know of its materiality; (d) a showing that applicant's failure to disclose art or information did not result from an intent to mislead the PTO.

*F.M.C. Corp. v. Manitowoc Co., Inc.*, 835 F.2d at 1415.

If a trial court determines factually that the withheld references are material and determines that the conduct was intentional, then the court must balance the two factors to determine whether, as a matter of law, inequitable conduct was committed. According to the Court of Appeals for the Federal Circuit, the more material the omission, the less culpable the intent required. *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1439 (Fed.Cir.1991), *reh'g denied.*

Stated somewhat differently, the Court of Appeals for the Federal Circuit wrote:

'Inequitable conduct' requires proof by clear and convincing evidence of a threshold degree of materiality of the non-disclosed or false information. It has been indicated that the threshold can be established by any of four tests: (1) objective 'but for'; (2) subjective 'but for'; (3) 'but it may have been'; and (4) PTO Rule 1.56(a), *i.e.*, whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent. [citation omitted] The PTO standard is the appropriate starting point because it is the broadest and because it most closely aligns with how one ought to conduct business with the PTO. [citation omitted] It served as the focus of inquiry in *Hycor Corp. v. Schlueter Co.*, 740 F.2d 1529, 1539, 222 USPQ 553, 560 (Fed.Cir. 1984), and in *Driscoll v. Cebalo*, 731 F.2d 878, 884, 221 USPQ 745, 750 (Fed.Cir. 1984). Under the standard, a reference that would have been merely cumulative is not material. [citation omitted]

'Inequitable conduct' also requires proof of a threshold intent. That intent need not be proven with direct evidence. [citation omitted] It may be proven by showing acts the natural consequences of which are presumably intended by the actor. [citation omitted] Proof of deliberate scheming is not needed; gross negligence is sufficient. [citation omitted] Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of a withheld reference. [citations omitted] On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient. [citation omitted]

Once the thresholds of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred. [citation omitted] If the court reaches that conclusion, it must hold that the patent claims at issue are unenforceable.

*J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d at 1559–60.

 In the instant case, on the issue of inequitable conduct, the court was presented with testimony, including expert legal and factual testimony of the inventors, corporate officials, and the testimony of one of the two patent attorneys responsible for the prosecution of the application which

lead to the '548 patent.[72] It is true that this testimony does not include the testimony of all witnesses with personal knowledge of the events or circumstances surrounding the prosecution of the patent application, which ultimately lead to the '548 patent. The court finds, however, that the testimony of those individuals who did appear to be highly credible and sufficient to persuade the court that no inequitable conduct occurred. The court, therefore, declines, as it may, to draw any negative inferences from Standard's decision not to call all the possible witnesses within its control to testify, who may in fact have offered largely redundant testimony, on the issue during the course of the already, lengthy trial. *See A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1400 n. 9 (Fed.Cir.1986) (citing *Chicago College of Osteopathic Medicine v. George E. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir.1983)).

### A. Materiality

The materiality of undisclosed information in a patent application is defined in 35 C.F.R. § 1.56, which states the issue as whether "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." Materiality is a question of fact. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d at 1363. "To be material, a misrepresentation need not be relied on by the examiner in deciding to allow the patent. The matter misrepresented need only be within a reasonable examiner's realm of consideration." *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1421 (Fed. Cir.1989). However, a patent applicant is not obligated to disclose a reference if the reference is cumulative or less material than the references already presented to the Examiner. *Halliburton v. Schlumberger Technology*, 925 F.2d at 1440.

Standard is charged by the defendant with misconduct for failing to submit a drawing to the Patent & Trademark Office, which depicts only the rear lift arm of an MHU–123/M trailer in top and side views.[73]

---

**72.** Lead trial counsel for Standard was Michael O'Neil. Mr. O'Neil was also the attorney who represented Standard during the prosecution of the patent application. The second patent attorney who represented Standard before the PTO was Gregory Carr, a member of the same law firm as Mr. O'Neil. Mr. Carr testified at the trial held in this case. In a footnote in *A.B. Dick Co.*, the Federal Circuit discusses the proposition that "[w]hen a party knows of witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder *may* draw the inference that the testimony would have been unfavorable." (emphasis added) *Id.* at 1400 n. 9 (citing *Chicago College of Osteopathic Medicine v. George E. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir.1983)). The court notes the permissive nature of this rule of guidance and concludes that given Standard's presentation of the testimony of Mr. Carr (the attorney who represented Standard before the PTO during two personal interviews with the Examiner), the testimony of the inventors and the attempt to present the testimony of the former Examiner who allowed the '548 patent (which attempt resulted in a stipulation between the parties that the fact that the Examiner was not going to testify should not result in any adverse inferences regarding the plaintiff's rebuttal to the defendant's case with respect to the inequitable conduct issue), plaintiff's failure to present the testimony of Mr. O'Neil, Standard's trial counsel, with respect to the inequitable conduct issue should not and does not result in any negative inferences, as is more fully explained below.

The parties have also stipulated that: "no adverse inferences are to be drawn from the fact that the Examiner did not testify and that his testimony, if permitted, would not have been adverse to the plaintiff."

**73.** In the words of the defendant:

In early 1982 [Standard] decided to apply for a patent on the 60K Loader. The patent application was prepared from [Standard's] proposal drawings and was eventually filed on September 28, 1982. The patent application received several rejections including a final rejection from the Patent Office, and after two personal interviews with the examiners the patent application issued in June 1985 as U.S. Patent 4,522,-548. The claims in the patent are unusually lengthy and the arguments regarding novelty in the file history are directed exclusively towards the offsets in the lift arms. The closest prior art cited against the '548 patent was [Standard's] own inadequately disclosed prior art MHU trailers.

[Standard's] attorney's provided the examiner with drawings # T1H201J and # 60J46045 of the MHU–33/M and MHU–7/M trailers which were designed by Harry Mankey, one of the applicants and an employee of [Standard]. The drawings were of a relatively small size and showed very few details. The drawings were

While the drawing clearly shows the shape of the rear lift arms and the so called "clearance bends," it does not adequately show the critical spatial relationships between the proximal or distal portions of the lift arms and the outside surfaces of the lift beams with exacting clarity. Standard's approach is given merit since it appears that it was the plaintiff's amendments regarding the critical spatial relationship (with respect to which the Examiner suggested had alternative language) which, in turn, lead to the issuance of the '548 patent.

The file wrapper of the '548 patent demonstrates that the originally drafted claims were not allowed based upon the representations as to the shape of the "clearance bend" in the rear lift arms, but upon the basis of the relationship between the outer surfaces of the lift beams and the corresponding outer and inner surfaces of the distal and proximal ends of the lift arms. In a final embodiment submitted by Standard, which resulted in the allowance of Claims 1 and 9 of the '548 patent, the following functional language was added by the plaintiff to the patent application at the Examiner's suggestion:

the lift beams having outside surfaces which are spaced apart less than the inner surfaces of said first portions of said lift arms, thereby allowing said lift beams to be lowered between said first portions of said lift arms;

... the distance between the outermost lateral surfaces of said lift beams, thereby allowing said lift arms to pivot

upwardly and insert said lift beams, said third portions of said lift arms and the weapons package upwardly through an opening of minimum clearance with respect to the weapons package....

Since it is this language which represents the reason for the ultimate decision by the Examiner to allow the application to issue as a patent, the court finds that this language should be used as the guideline for determining materiality. Therefore, for purposes of the materiality inquiry with regard to the instant case, the proper inquiry should be whether there is a substantial likelihood that a reasonable Examiner would have considered the manufacturing drawing, which the defendant argues is so important, and which represents the rear lift arms of the MHU–123/M trailer, when he was deciding whether or not to allow the application to issue as a patent.

Within the guidelines of this inquiry, the court finds that the manufacturing drawing promoted by the defendant would not have been material to the prosecution of the '548 patent for three reasons. First, the drawing does not disclose any information about the relationship between the proximal and distal ends of the lift arms and the outside surfaces of the corresponding lift beams. Second, the information and drawings furnished by the inventors in the Prior Art Statement filed at the beginning of the prosecution of the application contained the same information disclosed in the manufacturing drawing presented by the defendant.[74]

grossly inadequate to determine whether the prior art MHU trailers included offset portions.

When the prosecution history of the '548 patent is viewed in light of the more detailed engineering drawings which bear Harry Mankey's signature and which were intentionally withheld from the PTO, it is readily apparent that the PTO did not have a clear understanding of the prior art MHU trailers. The photographs of Standard's MHU trailer and the engineering drawing clearly show that the prior art MHU trailer has rear lift arms which include an offset portion. The failure to communicate this information to the PTO and the intentional withholding of the more detailed engineering drawing constitutes gross negligence.

**74.** In distinguishing the prior art MHU–7–33–123/M series trailers from the invention, Stan-

dard, in its Prior Art Statement, argued that, notwithstanding the similarities between the prior art and the invention,

the present invention is patentably distinct from the [prior art MHU–7/M and MHU–33/M trailers]. For example, the present invention is capable of lifting a weapons package into the weapons bay of an aircraft without the use of auxiliary lifting apparatus. This feature is accomplished by providing lift beams having outside surfaces which are spaced apart no further than the predetermined width of the weapons package. Therefore, the additional expense and operational complications associated with the references of this group [including the MHU–7/M and MHU–33/M trailers], including the need for an auxiliary device to lift and load weapons

Third, the court finds that the manufacturing drawing upon which the defendant bases its allegations of inequitable conduct is less pertinent than the Hillberg reference cited by the Patent & Trademark Office when he, at first, rejected Standard's application. The Hillberg reference discloses the relationship between the lift arms and the lift beams, not just a lift arm by itself,[75] and thus appears to be of greater value than the drawing which the defendant urges the court to find was omitted in order to intentionally mislead or deceive the Patent Office during its consideration of the patent application.

This court should not require a patent applicant to include as part of an information disclosure statement all engineering drawings within the applicant's possession or which might conceivably be helpful to consideration of its application. Certainly the complete package of detailed engineering drawings used in the manufacturing of a piece of equipment, such as the prior art MHU-7-33-123/M trailers, would include multiples of drawings, disclosing much more detailed information than would be required by a reasonable Examiner during the prosecution of a patent application.

As to the level of specificity of the information required in a patent application, but the amount of information necessary must be determined on a case-by-case basis. The regulation, 37 C.F.R. § 1.56, requires information on which there is a "substantial likelihood that a reasonable Examiner would consider it important" in the decision-making process. Consequently, the application should include at least enough information regarding the prior art for the reasonable Examiner to understand any material differences between the prior art and the invention disclosed in the application, which the applicant argues makes its invention new and useful.

With respect to the drawings which the inventor is required to submit to the Patent & Trademark Office along with its application for a patent, the Court of

---

packages in particular instances, are obviated by the present invention.
This discussion, combined with the drawings presented by the patent applicant, which represent the prior art trailers, certainly made the Examiner aware of the critical relationship between the lift arms and lift beams at issue, which was present in the invention, although not present in the prior art.

**75.** According to the defendant, during the trial, Standard "took the astonishing position that the Hillberg reference was more pertinent to the examination of the '548 patent than the disclosure of the offsets in the rear lift arms of the prior art MHU trailer."
The defendant argued, however, that Hillberg "does not disclose the combination of offsets with the other claim elements of the prior art MHU trailers." The defendant urged:
... An adequately disclosed prior art MHU trailer would have disclosed the *combination* of offset portions and the other claim elements. A single reference suggesting the claimed combination is more pertinent than a combination of two references suggesting the claimed combination.
The lift arms in the Hillberg patent are gradually offset and do not include three distinct portions like the rear lift arms of the prior art MHU trailer. Moreover, the distal ends of the lift arms of the Hillberg patent are connected to the outside lateral surfaces of the lift beam unlike the distal ends of the lift arms of the prior art MHU trailers which are connected to the inner surfaces of the lift beams. Since the relationship between the lift beams and the distal ends of the rear lift arms of the prior art MHU trailer is similar to the relationship in the claimed invention, [Standard's] contention that the Hillberg patent is more pertinent than the prior art MHU trailers is incorrect.
According to the defendant, Standard's belief that the Hillberg patent was more pertinent than the engineering drawings of the prior art MHU trailer "demonstrates a gross lack of judgment and careless disregard of the truth." The defendant continued: "Since [Standard] knew of the offsets or 'clearance bends' and intentionally withheld the more pertinent engineering drawings, [Standard] was grossly negligent in its citation of prior art to the PTO and an inference of intent to deceive must be drawn from [Standard's] actions." The court disagrees. First, the defendant arguably admits that the slight bend in the configuration of the rear lift arms of the prior art MHU-7-33-123/M series trailers, referred to by Standard as the "clearance bend," could be different from what is defined in the '548 patent as an offset. The court also notes that the defendant appears to want the court to infer the requisite intent to deceive the PTO based upon the same evidence which it also argues constituted gross negligence on the part of the plaintiff. A need to distinguish between gross negligence and an intentional act is more important under recent case law in the Court of Appeals for the Federal Circuit, as is more fully discussed below.

Customs and Patent Appeals held that the relative proportions of the parts and spatial relationships represented in the drawings need not be to scale and may be approximated. *See In re Reynolds,* 443 F.2d 384, 389 (CCPA 1971). If, however, a quantitative, proportional or spatial relationship is a significant part of the inventive concept, such a relationship should be shown as accurately as possible, and certainly so the Patent Examiner could understand any critical differences from the prior art before determining whether or not to grant a patent.

In the present case, the inventors disclosed to the Examiner drawings of the prior art MHU-7-33-123/M trailers. Although these drawings may not have been of the specificity apparent in the manufacturing drawing on which the defendant hinges its inequitable conduct argument, along with the narrative included in the Prior Art Statement filed with the Patent & Trademark Office, they clearly distinguish the prior art MHU-7-33-123/M trailers from the invention. The drawings submitted focus on the fact that the invention includes lift beams having outside surfaces which are spaced apart no further than the predetermined width of the weapons package, a spatial relationship not present in the prior art, and would appear to sufficiently alert and inform a reasonable Patent Examiner of the contents of the prior art trailers. At the very least, the drawings would alert such an Examiner to the important difference between the invention and the prior art, regarding which a reasonable Examiner could make an independent evaluation when deciding the application before him. Moreover, given the information already available to him, if the Examiner determined that he required more information regarding the structure of the rear lift arms of the MHU-7-33-123/M trailers in order to make an independent evaluation of the scope of the prior art trailers, the Examiner could have requested such information from the inventors, who were also the designers of the prior art trailers.

The court, therefore, concludes that the manufacturing drawing submitted by the defendant in support of its argument concerning the inequitable conduct issue is much less critical, *i.e.,* relevant than the defendant asserts. Indeed, the drawing on which defendant bases its argument merely represents an isolated lift arm of the prior art trailers. The key issue with which the Patent Office was concerned before allowing the '548 patent to issue revolved around a critical, spatial relationship of the invention, as a whole, and whether that relationship existed in or was suggested by any prior art. The Examiner had before him the Hillberg reference, which included not only lift arms which were gradually offset from the frame of the trailer, but also relevant spatial relationships. The court, therefore, must conclude that there is little likelihood that a reasonable Examiner would have considered the manufacturing drawing urged as critical by the defendant, materially important when deciding whether to allow the application to issue as a patent.

B. *Intent*

■ Additionally, even if the court were to consider the drawing urged on the court by the defendant to have been wrongfully omitted from the patent application, the court must also determine whether the omission was intentional. The inequitable conduct standard has evolved over time. Earlier, the Federal Circuit and its predecessor courts had held that inequitable conduct, or "fraud on the Patent & Trademark Office," as it was then termed, apparently could be based on a showing that an inventor or its counsel acted with gross negligence in failing to disclose information or in making a material misrepresentation. Deliberate scheming was not necessary and it was sufficient if "gross negligence is present when the actor judged as a reasonable person in his position, should have known of the materiality of a withheld reference." *J.P. Stevens Co. v. Lex Tex, Ltd.,* 747 F.2d at 1560. It is clear from more recent Federal Circuit decisions, however, that gross negligence, standing alone, is not a sufficient basis for a finding of inequitable conduct. *F.M.C. Corp. Manito-*

*woc Co.*, 835 F.2d at 1415 n. 9. In *Kingsdown Medical Consultants v. Hollister, Inc.*, the Federal Circuit more recently tried to reconcile the differences and wrote:

'Gross negligence' has been used as a label for various patterns of conduct. It is definable, however, only in terms of a particular act or acts viewed in light of all the circumstances. We adopt the view that a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.

863 F.2d at 876 (citation omitted).

The Federal Circuit's adoption of a standard based on intent does not allow an inference of an intent to deceive from evidence only of gross negligence on the part of an inventor or its counsel. Earlier this year, the distinction was made very clear by the Federal Circuit when it wrote: "Gross negligence cannot elevate itself by its figurative bootstraps to an intent to mislead based on the identical factors used to establish gross negligence in the first instance unless all the facts and circumstances indicate sufficient culpability." *Halliburton Co. v. Schlumberger Technology*, 925 F.2d at 1443.

Although the defendant seemingly adopts the prevailing standard, it incorrectly, and without factual or legal basis, states that "in the present case only the lowest level of intent, i.e. gross negligence coupled with an inference of intent to deceive, is required because [Standard's] omissions and misrepresentations regarding its own MHU trailers were so highly material to the allowance of the '548 patent." The case law is clear that it is necessary to find an intent to deceive. Defendant's revised standard of gross negligence, coupled with some sort of an inference of intent to deceive, is not recognized anywhere in the Federal Circuit's inequitable conduct jurisprudence. The assertion that "the grossly negligent acts of the attorneys prosecuting the '548 patent and

the patentees were so wanton that there is an inference of an intent to deceive" is contrary to the precedent discussed above, which led to the holding that intent to deceive must be found, if at all, from a review of all evidence in the record, including evidence of good faith.

The defendant contends that by failing to disclose the drawing illustrating the "clearance bend" in the rear lift arms of the MHU–7–33–123/M trailers to the Patent & Trademark Office, and by not specifically discussing the "clearance bends" in the MHU–7–33–123/M trailers, the inventors and their attorneys are guilty of gross negligence "so wanton that there is an inference of an intent to deceive." In the instant case, defendant's arguments on this point fail as a matter of law, and also as a matter of fact. The defendant has not established the requisite intent on the part of the defendant or its attorneys necessary to support a finding of inequitable conduct. Indeed, the evidence presented at trial shows that the so-called "omissions and misrepresentations regarding [Standard's] own MHU trailers" alleged by the defendant did not occur. The court also finds that the defendant's inequitable conduct defense is based on an improper construction of the term offset as it is used in the patent claims, which results in defendant's assertion of which documents the plaintiff should have submitted as part of the patent application.

Indeed, there was no evidence—direct or circumstantial—offered during the proceedings by the defendant to establish any intention on the part of the inventors or their counsel, to deceive the Patent & Trademark Office. The manufacturing or engineering drawing upon which the defendant relies, was one of more than a thousand drawings in the possession of Standard relating to the MHU–7–33–123/M trailers. Although the inventors were aware of the existence of these and other drawings, the manufacturing drawing in question did not come to their attention during the prosecution of the patent. Moreover, the clearance bend illustrated in the manufacturing drawing cited by the defendant was shown in one of the original

drawings from Standard's engineering catalogues, as well as in a photograph on the reverse side of the drawing which the inventors submitted to the Patent & Trademark Office prior to the first Office Action. Thus, the plaintiff and their counsel evidenced their intent to make a full disclosure concerning what they believed material regarding the prior art trailers. Indeed, in the Prior Art Statement, the inventors went so far as to characterize the MHU–7–33–123/M trailers as among the "closest prior art of which they were aware," and went on to explain why the proffered claims were patentable over the MHU prior art trailers. This court cannot, as the defendant would have it, conclude that there is some inference of an intent to deceive evidenced by Standard's failure to bring the manufacturing drawing in question to the attention of the Examiner, even if such a reference met the standard by which to judge inequitable conduct, which it does not.

### C. Balancing Test

■ As to the remaining portion of the inequitable conduct analysis, the Federal Circuit has provided the courts with an equitable balancing, almost a "sliding scale," test by which an equitable conduct finding can be made only in light of all the evidence. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d at 876. For example, if the court finds a high level of materiality, then the court may determine that a low level of intent is sufficient to support a finding that the applicant or his agent committed inequitable conduct before the Patent & Trademark Office. If, in contrast, the court finds a low level of materiality, then the court may determine that a high level of intent would be required to support a finding that the applicant or his agent committed inequitable conduct before the Patent & Trademark Office. *Halliburton Co. v. Schlumberger Technology*, 925 F.2d at 1439.

As stated by the Court of Appeals for the Federal Circuit:

> Questions of 'materiality' and 'culpability' are often interrelated and intertwined, so that a lessor showing of the materiality of the withheld information may suffice when an intentional scheme to defraud is established, whereas a greater showing of the materiality of the withheld information would necessarily create an inference that its non-disclosure was 'wrongful.'

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d at 1363 (quoting *Digital Equip. Corp. v. Diamond*, 653 F.2d 701, 716 (1st Cir.1981)).

Moreover, when the defendant meets its burden of proving threshold levels of materiality and intent, the court then must balance materiality and intent in light of all the other factors surrounding the prosecution of the patent application, such as possible good faith demonstrated during the patent prosecution. In the instant case, the government has presented no evidence that Standard or its patent counsel acted inequitably with intent to deceive during the prosecution of the application that lead to the issuance of the '548 patent. Even if the court were to find, which it does not, that the manufacturing drawing cited to by the defendant was material, and that the court consequently might infer an intent to deceive on the part of Standard from its omission, the requisite actual intent to deceive is absent in this case. As recently reaffirmed by the Court of Appeals for the Federal Circuit: "Gross negligence does not of itself justify an inference of intent to deceive (citation omitted). This court has clarified that negligent conduct can support an inference of intent only when 'viewed in light of all the evidence, including evidence indicative of good faith,' the conduct is culpable enough 'to require a finding of intent to deceive.'" *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d at 876. The continuing good faith displayed by the inventors and their counsel during the prosecution of the application which lead to the '548 patent was clearly documented during the course of the proceedings.

Additional unrebutted evidence in the record of good faith on the part of the plaintiff and its attorneys is documented throughout the patent prosecution. Dur-

ing the prosecution of the application, the inventors submitted a photograph of the prior art MHU–123/M trailer which showed that the lift beams of these trailers were positioned outside of the load and would obstruct the bomb bay doors if it were lifted into an opening of minimum horizontal clearance, such as, the bomb bay of a B–1B aircraft. Following allowance of the amended claims, the inventors' counsel conducted a validity search and filed a supplemental Prior Art Statement, disclosing and commenting on twenty-one more prior art references.

The evidence further showed that although the inventors did not believe that the clearance bends in the rear lift arms of the MHU prior art were particularly relevant, they believed they were adequately disclosed to the Patent & Trademark Office in the drawings and photographs evidenced in the file wrapper. Even the defendant's counsel had some difficulty finding fault with their integrity and conduct.

In addition to suggesting that by its failure to submit the manufacturing drawing at issue to the Patent & Trademark Office Standard failed to disclose material prior art, the defendant also contends that Standard misled the Patent & Trademark Office concerning the prior art MHU–7–33–123/M trailers. This contention is based on the defendant's construction of the term offset and on the fact that Standard never commented on the so-called offset (clearance bend) which is present in the MHU–7–33–123/M prior art, and which the defendant urges is critical to the case. In support, the defendant seized upon the following statement in Standard's response to the first Office Action:

> The MHU–33/M and MHU–7/M trailers cited by the Examiner are structurally and functionally similar to the Taylor reference.

The defendant apparently contends that Standard misled the Examiner by suggesting that the MHU–7–33–123/M trailers were structurally the same as the Taylor reference and, therefore, caused the Examiner to overlook the MHU–7–33–123/M trailers as prior art. The statement, however, is not taken in context of the paragraph in which it appears, or in the context of document as a whole. The entire paragraph, including additional explanatory statements which the defendant seemingly ignored, reads:

\* \* \* \* \* \*

> The MHU–33/M and MHU–7/M trailers cited by the Examiner are structurally and functionally similar to the Taylor reference. As in Taylor, these trailers are *incapable* of lifting or lowering the load through an opening which provides minimal clearance for the load. As is shown by the drawings depicting the MHU–33/M and MHU–7/M trailers, the lifting arms extend along the sides of the load supported thereby when the arms are in their lowered position. Therefore, in the opening through which the load is to be lifted or lowered must provide additional clearance for the lifting arms supporting the load. Without such clearance, the MHU–33/M and the MHU–7/M trailers are incapable of lifting or lowering the load completely through an opening.

\* \* \* \* \* \*

The foregoing passage, read in its entirety, makes clear that when the inventors pointed to the structural and functional similarities between the MHU–33/M and MHU–7/M trailers and the Taylor reference, they were speaking of the ability of those trailers to lift or lower a load through an opening which provides clearance for the load and lift arms. Nothing in this paragraph can be taken as a representation that the MHU–33/M and/or the MHU–7/M trailers lacked a clearance bend or structure offsetting the lift arms within the longitudinal beams of the trailer. Indeed, a reading of the entire remarks section of the amendment demonstrates that the question of the clearance bend or offset never came up and was never addressed. The thrust of the remarks throughout the amendment pertained to the inability of prior art trailers to lift the load through an opening of minimal clearance.

The defendant also contends that the Examiner did not appreciate the existence of a

clearance bend or offset in the rear lift arms of the MHU–7–33–123/M trailers, as evidenced by the second Office Action in which the Hillberg reference was cited, together with the MHU–33/M and MHU–7/M trailers, as disclosing an offset or clearance bend. The defendant, however, failed to offer proof on this point, whereas the plaintiff presented the testimony of Mr. Carr on this point. Mr. Carr testified that he found it significant that the claims were held allowable over the Hillberg reference, which clearly discloses a more pronounced offset than the clearance bend in the rear lift arms of the prior art MHU–7–33–123/M trailers.

Finally, the defendant contends that Standard acted inequitably by advancing claims in the original application (and preliminary amendment) which read on the prior art MHU–7–33–123/M trailers. Although Dr. Kirk gave conclusory testimony that original Claim 1, 3, 8, 27 and 32 advanced in the patent application and preliminary amendment "read on" the prior art prior art trailers, Mr. Bryan demonstrated that the following limitation was not met by the MHU prior art trailers:

the distal ends of the lift arms being inwardly offset to support the lift beams in a spaced apart relationship which is not greater than the width of the weapons package.

Even if Dr. Kirk were correct, however, the prosecution of claims in an application, other than those which are allowed, should not be the focus of an inquiry about inequitable conduct. As stated by the Court of Appeals for the Federal Circuit:

In a case such as this, involving an issued patent attacked for breach of the duty of candor only on the basis of nonfeasance consisting of a failure to disclose known prior art, the key issues of materiality and intent should be decided with reference to the claims of the patent. What we see here, however, is an attempt by defendants to build a case of 'fraud' by reason of nondisclosure of prior art material only to abandoned claims long since cancelled during prosecution after being rejected by the examiner as unpatentable for reasons not involving the uncited prior art. To base a conclusion of 'fraud' on such grounds is to deal with a hypothetical situation, not with reality.

*Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1457 (Fed.Cir. 1984).

As further evidence of good faith, the court points to the testimony of Gregory Carr, one of Standard's patent counsel, who worked for attorney Michael O'Neil, during the prosecution of the patent application. The court found Attorney Carr to be a sincere and honest witness. Mr. Carr testified that he prepared the prior art statements, prepared several written responses, including amendments, which were submitted to the Patent Office and conducted two interviews in the Patent Office regarding the patentability of the invention, all under the supervision of plaintiff's counsel, Michael O'Neill.

Mr. Carr testified that he was aware of the duty of disclosure of all prior art material to the patent application in patent prosecutions under the Patent and Trademark rules. In fact, Mr. Carr testified that when he started working for Michael O'Neil:

[O]ne of the assignments that I had as an associate, a new associate, was to prepare information disclosure statements for patent applications that had been filed. And, as a preparation of that, Mike and I sat down one day and had a fairly lengthy discussion about what the duty of disclosure entailed.

He asked me to go look at the Manual of Patent Examining Procedure and to look at the CFR section, which is Rule 56, and be sure that I understood the rule, asked me to be sure that whatever format requirements or suggestions were made in those rules were followed. And, as I recall, that initial task took me a couple of days of looking around, looking at cases, looking at the MPEP and looking at the CFR and having subsequent discussions with Mike as to how I was going to prepare information disclosure statements, what I would look at and how they would be formulated.

This testimony makes it difficult for the court to believe that Mr. Carr, and, it would appear Mr. O'Neil [76] could have had the requisite intent in the instant case to mislead the Patent Office in the prosecution of the '548 patent. Moreover, with respect to either Mr. Carr or Mr. O'Neil, there is no direct evidence in the record to support a claim of intent to defraud. The following questions and answers at the trial, while Mr. Carr was under oath, are also revealing: "Q. Mr. Carr, did you have any, ever have any intention to mislead the United States Patent & Trademark Office in connection with the '548 patent? A. Absolutely not. Q. Did you intent in any way to withhold any prior art from the Patent & Trademark Office? A. Our intent was to do exactly the opposite of that."

Mr. Carr stated that in the second interview with the Patent & Trademark Office, he discussed and showed the Examiners a large scale version of the drawing submitted with the Prior Art Statement.[77] The defendant, relying on 37 C.F.R. § 1.2 (1990), and the Federal Circuit's decision in *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1572 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984), alleges that any testimony concerning what was discussed in an interview with the Examiner must be disregarded. While it is true that all business with the Patent & Trademark Office must be transacted in writing, *see* 37 C.F.R. § 1.2, the rules of practice before that office specifically state that: "The action of the Patent & Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise stipulation, or understanding in relation to which there is disagreement or doubt." Mr. Carr's statement that he showed a diagram to the Examiners at the interview should not be excluded because of this rule and stands unrebutted by the defendant in the record. Although 37 C.F.R. § 1.2 indeed refers to the need for all actions in the Patent & Trademark Office to be in writing, and while the rule is applicable to business transacted with the Patent & Trademark Office during the course of a patent prosecution, there is no rule of evidence binding on the court which forces exclusion of testimony concerning what occurred during the Examiner's interview. In fact, *Rohm & Haas Co. v. Crystal Chem. Co.*, does not support the defendant's claim that "any alleged oral communications of Mr. Carr must be disregarded." In that case, the court went outside the written prosecution history and relied on the deposition of the Examiner in making its inequitable conduct determination. *Rohm & Haas Co. v. Crystal Chem. Co.* is also distinguishable from the instant case because in *Rohm & Haas Co.* the patent holder admitted that it had made an intentional material misrepresentation during the patent prosecution. The *Rohm* patentee also claimed to have discovered the problem during the course of the prosecution and attempted to cure it in the reexamination proceeding. In finding that the applicant had committed inequitable conduct, the *Rohm* court announced the following standard regarding efforts to "cure" misrepresentations made by an applicant:

---

**76.** Mr. Michael O'Neil represented the plaintiff at the trial. He did not appear as a witness, although he was involved in the patent prosecution. All three inventors, and Mr. Garner and Mr. Carr, who both assisted Mr. O'Neil in the patent prosecution, each testified that they had no intent to deceive and were trying to fully disclose during the patent prosecution. Based on the evidence presented, the court finds the fact that Mr. O'Neil did not testify was not a troublesome omission. This is especially true in light of testimony offered that it was Mr. O'Neil who had instructed several of these other witnesses as to their duty of full disclosure during a patent prosecution.

**77.** The defendant contends that this drawing was never displayed to the Examiners because the Examiner Summary Record of the Interview only noted the viewing of a photograph. The plaintiff, however, argues that the reason for the omission of the demonstration of diagram on the interview record in the file wrapper is because the diagram was already before the Examiner, filed as part of the Prior Art Statement and, therefore, it was unnecessary to refer to it on the interview record.

... we now hold that where intentional material misrepresentations have been made, as here, a complete "cure" must also be demonstrated by clear, unequivocal, and convincing evidence. Because all business with the PTO is to be transacted in writing and its actions must be exclusively on the written record, 37 C.F.R. 1.2, this question of fact should never be difficult to resolve.

*Rohm & Haas Co. v. Crystal Chem. Co.,* 722 F.2d at 1572. Since the patentee admitted the prior misrepresentation, the burden of proof in *Rohm & Haas Co. v. Crystal Chem. Co.* was on the patent owner to prove that the inequitable conduct was "cured."

 The burden of proof is on the defendant to prove that inequitable conduct occurred in the first instance. As part of the court's review and balancing of all the facts surrounding the patent prosecution, evidence of good faith is admissible under the relevant case law to support the plaintiff's position that no inequitable conduct occurred. At the trial, each of the inventors, and Standard's one time legal counsel, Contract Administrator and Vice President Charles Garner, testified as to their understanding of the duty of candor and their intentions in furnishing information during the patent prosecution. While Mr. Garner was testifying, the following colloquy occurred:

Q. Mr. Garner, was it your responsibility during your tenure as Vice President and General Counsel of Standard Manufacturing to work with outside counsel in the fulfillment of the Duty of Candor?

A. Yes, indeed.

Q. Mr. Garner, can you tell the Court whether or not Standard Manufacturing intended to withhold anything from the examiner during the prosecution of the application which resulted in the patent suit?

A. No, they did not. It would have been detrimental to our interest. It was to our interest to disclose everything we knew.

Q. Was there any intention on the part of Standard Manufacturing, sir, to mis-

lead the examiner in any way during the prosecution of the patent application, which resulted in the patent suit?

A. No, there was no intent to mislead.

Likewise, each of the inventors made it absolutely clear that they had no intent to mislead in their patent application. Norman Oswald testified as follows:

Q. Now, Mr. Oswald in presenting your patent application to the Patent Office, are you aware sir of the duty of candor to the Patent Office?

A. Yes, I am.

Q. What do you understand that duty to be?

A. Well, we cannot in any way be seen to withhold information regarding any kind of prior art. And we must disclose to them anything and everything we know to them about the prior art.

Q. Have you, from time to time, sought legal counsel with respect to the duty of candor?

A. Yes, you and I have talked about— yes, Your Honor, Mr. O'Neil my legal counsel has spoken to me about that, on several occasions on other patents that we have been granted.

Q. Mr. Oswald, in filing and prosecuting your patent application when lead to the issuance of the patent suit, was it your intention to withhold any pertinent prior art from the Patent Examiner?

A. In no way.

Q. Was it your intention to provide any false or misleading information to the Patent Examiner?

A. Absolutely not. We knew that this patent would perhaps be a key element. We knew we were up against a formidable adversary in AAI.... We felt that perhaps this patent might be of importance to us and there was no way that I wanted this patent to have anything in it that was at all, would make it at all suspect.

Harry Mankey also made it quite clear that he intended no deception during the patent prosecution.

Q. Mr. Mankey, when you filed the patient [sic] application describing and ex-

plaining the invention that you testified here today, did you sign a oath?

A. Yes.

Q. Were you aware, sir, of the duties to disclose material pertinent ... to the United States Patient [sic] and Trademark Office?

A. Yes.

Q. How did you become aware that you had such a duty?

A. I believe it was in what we signed. Stated in what we signed.

Q. Now during the course of the prosecution of the patient [sic] in suit did you and the other co-inventors provide and [sic] information to your counsel that you believe to be pertinent to the prosecutor of the patient [sic] in suit?

A. I didn't but our company did. Yes.

Q. Who specifically was responsible for providing that information?

A. Ray Dean.

Q. Do you believe, Mr. Mankey, that you complied with your duty of disclosure in connection with the prosecution of the 548 patent?

A. Yes.

Q. Did you intend, sir, to mislead or deceive the United States Patent Trademark Office concerning the clearance bend in the 7M, 33M, or 123M trailer?

A. No.

Robert Dean was even more specific in his testimony than his two colleagues:

Q. Do you recall signing an oath in connection with the filing of the patent application that matured into the patent suit?

A. Yes sir.

Q. All right. And did you understand at the time that the patent application was filed, that you had certain duties with respect to the United States Patent and Trademark Office?

A. Yes sir, that—I was advised of that by Mr. Mike O'Neil and one of his assistance, [sic] Greg Carr.

Q. And what was your understanding of your duties, sir, in connection with the prosecution of the patent and suit?

A. Well, anything that might be considered, using the term prior art, or previous patents, anything that would be relevant to the patent office's evaluation in trying to decide whether an issuance of a patent was a just cause.

Q. And in connection with the prosecution of the patent and suit, did you have occasion to provide any information to your attorneys who were prosecuting it?

A. Yes sir, we provided some drawings.

Q. All right sir. And are you aware of anything that was pertinent in your view, to the subject matter of the patent and [sic] suit that you did not provide to your attorneys?

A. No sir.

Q. All right. Is it your practice Mr. Dean, to review documents filed by your Counsel on your behalf, either in patent applications or in other matters?

A. Yes sir.

Q. And did you review any of the amendments or submissions made by your attorneys in connection with the prosecution of the patent and [sic] suit?

A. Yes sir.

Q. And did you note any inaccuracies in any of the statements that were made in any of those papers?

A. Not in my judgment, sir.

Q. All right sir. What is your practice, if you have a practice Mr. Dean, with respect to statements made by attorneys that you believe to be inaccurate in papers that they are filing on your behalf?

A. Well, I would call it to their attention that they were doing an improper action.

Q. And did such a thing occur in connection with the prosecution of patent and [sic] suit?

A. No sir.

Q. Mr. Dean, was it your intention to conceal any information concerning the lift arms of the MHU–7/M, 77/M or 123/M,—

A. No.

Q. —during the prosecution of the patent and [sic] suit?

A. No sir, that's what we provided drawings of.

Q. All right.

Each of these witnesses for the plaintiff appeared to the court to be credible, sincere and honest, and to possess a clear and correct understanding of their respective duties towards the Patent Office during the patent prosecution. Based upon the testimony presented at trial, the evidence documents good faith on the part of the applicants in order to comply with their duty of disclosure. Finally, it is noteworthy that even Professor Adelman, who testified for the defendant as their legal expert, declined to opine on whether inequitable conduct was committed in this case.

### D. *Conclusion—Inequitable Conduct*

This court agrees with the Court of Appeals for the Federal Circuit that: " 'Inequitable conduct' is not, or should not be, a magic incantation to be asserted against every patentee." *F.M.C. Corp. v. Manitowoc Co.*, 835 F.2d at 1415. Based on the testimony and submissions presented in this case, the defendant has failed to prove, by clear and convincing evidence that the inventors or their counsel committed any acts of inequitable conduct during the prosecution of the '548 patent. The allegations presented by the defendant, in fact, are wholly unsubstantiated in the record.

### CONCLUSION

Following full consideration of the testimony of the witnesses, the exhibits offered by the parties at trial, and the filings submitted, the court holds that:

(1) AAI's MHU–145/M design work and the optical mock-up are not prior art under 35 U.S.C. §§ 102(b) or 102(g) and, therefore, should not be considered for purposes of determining obviousness in the instant case.

(2) The proper construction of the term "offset" as used in Claim 9 of the '548 patent must recognize the dual functions of permitting the weapons package to pass between the inner surfaces of the proximal ends of the lift arms as the lift beams are raised and lowered and displacing the distal ends of the lift arms within the shadow of the weapons package so that the weapons package may be inserted within an opening of minimal clearance.

(3) The prior art, taken as a whole, fails to teach or suggest lift arms having proximal and distal portions interconnected by an offset portion in which the two following features are present:

(a) The inner surfaces of the proximal end of the lift arm are spaced apart more than the outer surfaces of the lift beam (to permit the weapons package to clear the lift arms as they are pivoted up and down); and (b) The outside surfaces of the lift beams are spaced apart more than the outside surfaces of the distal end of the lift arm and less than the outer periphery of the weapons package, to permit the weapons package, the lift beams, and the distal portions of the lift arms to clear an opening of minimal clearance.

The spatial relationships embodied in these features do exist, in part, in the prior art references, however, none of the prior art references contain and combine both features simultaneously.

(4) There is extensive objective evidence indicative of nonobviousness of the patented invention, including a long-felt but unresolved need, failure of others to solve the problem, movement in a different direction by those skilled in the art, recognition by experts, commercial success and copying of the invention by AAI.

(5) The manufacturing drawing depicting the rear lift arms of the MHU–123/M trailer, which was not submitted to the Patent Office by the plaintiff, was not material to the prosecution of the '548 patent because, although it discloses a "clearance bend," the MHU–123/M does not contain an "offset" relationship between the lift arms and the lift beams which resulted in allowance of the claims of the '548 patent.

(6) On balance, there is neither objective nor subjective evidence of intent on the part of the inventors or their counsel to withhold or misrepresent prior art or to otherwise deceive the Patent & Trademark Office in the prosecution of the '548 patent.

For the foregoing reasons, the court concludes that the defendant has failed to prove by clear and convincing evidence that Claim 9 is obvious or that Standard or its attorneys engaged in inequitable conduct in the prosecution of the '548 patent. Accordingly, the court finds that the patent as issued is valid and enforceable. The court also finds that infringement has occurred, in accordance with a stipulation entered into by the parties that if any asserted claim of the patent-in-suit is valid and enforceable, such claim is infringed by both the MHU–196/M and the MHU–204/M trailers.

Pursuant to the court's separate order, the parties and the court will set a schedule for prompt resolution on the issue of appropriate damages.

IT IS SO ORDERED.